Jeffrey E. Keller MD, FACCP, FACEP
365 Spring Meadows Drive
Idaho Falls, Idaho 83404
tfscorcon@gmail.com

November 18, 2021

Gary Franke, Esq.
Gary Franke Law
120 East 4th Street, Suite 1040
Cincinnati, Ohio 45202

    **RE:**    *Grote v Kenton County, Kentucky, et. al.*

Dear Mr. Franke,

You have asked me to review the medical records and other case materials relating to the medical care provided to Bradley Grote while he was incarcerated at Kenton County Detention Center in Covington, Kentucky in July of 2019. My preliminary report includes five sections:

1. My background and qualifications;
2. Records reviewed;
3. Relevant background information;
4. Chronological summary of pertinent events in the case;
5. A summary of my opinions, based on my education, experience, and research.

## 1. Background and Qualifications

I am a Medical Doctor licensed to practice medicine in Idaho and several other states. I am residency trained and Board Certified in Emergency Medicine. I practiced Emergency Medicine from 1986 through 2014. I have been elected to be a Fellow of the American College of Emergency Physicians (FACEP). I began providing medical care to jail inmates in 1996 and began practicing Correctional Medicine full time from 2014 to the present. My company, Badger Medical, provided medical care to inmates incarcerated in several jails and juvenile detention facilities in Idaho. I was also the Chief Medical Officer of Centurion LLC from 2014-2019 and in that role supervised the medical care provided to inmates incarcerated in several state prison systems, including Massachusetts, Florida, Tennessee and several others. Between my own jail medicine company and my work with state prison systems, I have extensive experience in supervising medical programs in both jails and prisons. I have written and lectured extensively about the practice of correctional medicine. I have been elected to be a Fellow of the American College of Correctional Physicians (FACCP) and currently serve as the President-elect of ACCP.

Pertinent to this case, I have extensive experience evaluating and treating patients in both the ER and jails for methamphetamine intoxication.

My current CV is attached as Appendix A, which lists my qualifications and publications in more detail.

2. **Documents Reviewed**

Before developing my final opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of correctional medical practices and provided me with enough relevant data to develop my opinions to a reasonable degree of medical certainty.

3. **Background**

Methamphetamine (meth) is a common drug of abuse in the United States. Meth is also commonly smuggled into and abused in correctional facilities. It is not uncommon for arrestees to swallow packets of methamphetamine (or other drugs) at the time of arrest. This often leads to methamphetamine overdose. Methamphetamine also is commonly mixed with other drugs such as fentanyl and PCP that can lead to mixed, polypharmacy overdoses. All correctional personnel need to be familiar with the signs and symptoms of meth abuse and meth withdrawal. Meth can be snorted, eaten, smoked or injected IV. It causes euphoria, arousal, increased energy and sleeplessness. Methamphetamine overdose can manifest a range of symptoms depending on the dose, how it is ingested and what (if anything) it is mixed with. Mild overdose symptoms include sweating, agitation, restlessness, rapid breathing, rapid heart rate, elevated blood pressure, fever and chest pain. Severe overdose can cause delirium, confusion, severe agitation, organ failure, cardiovascular collapse and death. Methamphetamine overdose in the setting of swallowed baggies of the drug is a medical emergency.

Methamphetamine intoxication and overdose are commonly seen in jails, including the Kenton County Detention Center. Several officers testified at deposition that they had seen methamphetamine overdoses in the jail before and that meth overdose was not unusual. One officer testified that he had seen three meth overdoses on one night.

4. **Chronological Summary**

On 7/19/2019 at 16:04, Mr. Grote was booked into the Kenton County Detention Center. He was noted to be "acting erratic" during booking and admitted that he had "ingested drugs" prior to coming to jail (Officer Brown report). Medical was called to evaluate Mr. Grote.

From this point on, all interactions with Mr. Grote were videotaped and are available for review. (The clock on the video is out of sync with the actual time and is in parentheses. It appears that the actual time was three hours earlier than the video camera clock shows).

At (20:31 on the video), Mr. Grote was seen in booking by LPN Brand. Mr. Grote was clearly in distress. He was visibly diaphoretic (covered in sweat) and extremely restless. His respiratory rate can easily be calculated as being greater than 40 breathes per minute.

At (20:32), LPN Brand placed a pulse oximeter on Mr. Grote's finger to measure his heart rate and oxygen saturation. She wrote something down (probably the vital signs) on her glove. At (20:34), LPN Brand attempted to get a blood pressure. At (20:35) LPN Brand said "Can we take him to a cell somewhere?" At (20:36), Mr. Grote was escorted to cell B4 and lay down on the concrete pad. At (20:37), LPN Brand again placed a pulse oximeter on Mr. Grote's finger. She then said "I'm going to put oxygen on you. Your sats are too low" and placed an oxygen mask on Mr. Grote. Mr. Grote's respiratory rate again can easily be counted and were greater than 50. LPN Brand removed the oxygen.

Five days after this incident, on 7/24/19, LPN Brand wrote a progress note about this encounter in which she said that Mr. Grote had reported using meth and that he had been "acting erratic." LPN Brand stated that "vital signs were attempted at this time, pt was unable to hold still long enough to obtain a proper BP."

However, there are four vital signs: Respiratory rate, heart rate, temperature and blood pressure. Mr. Grote's respiratory rate is easily calculated from the video as being over 50. LPN Brand applied an oximeter to Mr. Grote's finger, which she stated gave her two blood oxygen readings of 89% and later 96%. However, the oximeter will not give blood oxygen readings without also displaying a heart rate, which evidently, LPN Brand did not record. She also made no attempt to get a temperature. Since LPN Brand did not document this encounter until five days later, I suspect she simply forgot the vital signs she did collect.

At (20:39), LPN Brand told the officers to do "15 minute-10 minute" watches on Mr. Grote. At (20:40 on the video) LPN Brand and the officers left the cell.

The deputies recorded checking on Mr. Brand at 17:54 (20:54) and 18:23 (21:23). The officers did not use the "Kenton County Detention Center Observation Form" created for this purpose. Instead, they used a "Security Patrol Log" in which they recorded that "Booking" was "Secure." There is no other specific documentation of Mr. Grote's condition. There is also no record that the Officers communicated any findings with LPN Brand. In other words, it appears that the officers did nothing other than the security checks they would have done anyway.

At (21:33), a trustee inmate alerted the deputies to check on Mr. Grote. Mr. Grote was found to be "foaming at the mouth and having seizure-like activity." The videos of the interactions began again here. At (21:33) the officers arrived at the cell and do a sternal rub on Mr. Grote. He

showed no response. At (21:34) the officers rolled Mr. Grote onto his left side and LPN Brand arrived shortly thereafter. At (21:35), LPN Brand placed an ammonia capsule under Mr. Grote's nose but, again, he showed no response. At (21:36), LPN Brand applied oxygen via nasal canula.

Mr. Grote can be observed on the video to be unconscious, pale, tachypneic, drooling and in severe distress.

At (21:37) LPN Brand wiped sputum away from Mr. Brand's mouth, which she repeated several other times. At (21:40), LPN Brand applied a blood pressure cuff. The ambulance was called at 17:43 (21:43).

LPN Brand subsequently wrote a progress note about this encounter in which she reported that Mr. Grote's vital signs were "Blood pressure 113/70, Pulse: 58 Respiration 12 Pulse oxygen 85%." However, Mr. Grote's respiratory rate can be easily calculated from the video as being over 50 and these vital signs are not congruent with the EMT vital signs obtained shortly thereafter.

At 5:49 PM, (21:50), the EMTs arrived. The EMTs record a heart rate of 110, a blood pressure of 160/75 and a Glasgow Coma Score of 4/15. The EMTs secured an airway, packaged Mr. Grote for transport and wheeled Mr. Grote out of the room at (21:58).

At the hospital, Mr. Grote was admitted to the ICU. He has a stormy course but eventually died. A subsequent autopsy determined that the cause of death was "Acute Methamphetamine Intoxication."

5. **Summary of Opinions**

I hold these opinions to a reasonable degree of medical certainty:

1. Mr. Grote showed the classic signs and symptoms of methamphetamine intoxication and overdose when he was being booked into the Kenton County Detention Center. His distress is clearly obvious on the video of his initial encounter with Detention Officers and LPN Brand. The notes of LPN Brand and the officers show that they understood that Mr. Grote was showing methamphetamine toxicity. Mr. Grote's degree of distress would have been obvious even to a layman. At deposition, multiple officers testified that they had seen methamphetamine overdose before and so were familiar with the syndrome (though they also testified that they had never received any specific training on this subject).
2. LPN Brand wrote five days after the initial encounter with Mr, Grote that she was unable to obtain vital signs. This is at best incorrect and at worst a falsification. The respiratory rate is easily calculated on the video and is grossly abnormal. The heart rate was displayed on the finger oximeter when the oxygen saturation level was obtained. Ms.

Brand appears to have written the vital signs down on her glove. She simply failed to write any record of the encounter at the time. The heart rate was more likely than not also abnormal. Ms. Brand also did not attempt to obtain a temperature, which more likely than not also would have been abnormal. The failure to obtain and record accurate vital signs was a violation of the medical standard of care. The failure to make any record of this encounter with Mr. Grote at the time was a violation of the medical standard of care.
3. Even without consideration of the abnormal vital signs, it should have been clear to everyone in attendance that Mr. Grote was in severe distress and needed urgent medical attention. The appropriate response would have been to call an ambulance immediately. The Kenton County Policies and Procedures clearly state that the Officers have the authorization to call for emergency services without waiting for the advice of medical staff. Both LPN Brand and the officers share the failure to call for emergency services. The failure to call an ambulance at this time was a breach of the medical standard of care that showed deliberate indifference to a serious medical need.
4. If Mr. Grote had been sent to the emergency department by ambulance at the time of his initial encounter with medical, Mr. Grote more than likely would have survived.
5. At the end of the initial encounter, LPN Brand instructed the Correctional Officers to do 10-15 minute checks on Mr. Grote's well-being. This would have involved using the "Kenton County Detention Center Observation Form" and reporting back any findings to medical. The deputies only did the routine booking security checks and this did not involve checking in any special way on Mr. Grote. By this time they were notified by a jail trustee to really check on Mr. Grote, Mr. Grote was dying. The failure to do the 10-15 minute medical observation of Mr. Grote's well-being as instructed by medical was a breach of Jail standards and demonstrated a deliberate indifference to a serious medical need,
6. If the officers had done a check using the "Kenton County Detention Center Observation Form" on Mr. Grote ten to fifteen minutes as they had been instructed to do by LPN Brand, they more likely than not would have discovered Mr. Grote to have deteriorated. Had they called an ambulance earlier, it is probable that Mr. Grote would have survived. The lack of timely assessments of Mr. Grote's deteriorating condition; the lack of documentation of these assessments; the failure to communicate these assessments to medical constituted deliberate indifference to a serious medical need.
7. Even after Mr. Grote was later discovered to be moribund and dying, no one called an ambulance for ten full minutes. The failure to call an ambulance immediately when Mr. Grote was discovered to be unconscious and moribund was a violation of the medical standard of care and a violation of the Kenton County Detention Center Policies.
8. LPN Brand recorded inaccurate vital signs. For example, Mr. Grote's respirations are audible in the video as greater than 50 per minute, not 12 as Ms. Brand recorded. The heart rate and blood pressures she recorded are also inaccurate compared to the heart rate and blood pressure obtained a few minutes later by the EMTs. The failure to record accurate vital signs violated the medical standard of care.

9. Mr. Grote's death was preventable had the jail staff called an ambulance when they first recognized methamphetamine overdose and a patient who was clearly in distress.

I reserve the right to amend or supplement my report as further relevant information becomes available.

Please contact me if you have any further questions.

Sincerely,



Jeffrey E. Keller MD, FACEP, FACCP

November 18, 2021
Date