**Kathryn J. Wild, RN, MPA, CCHP-RN**
**10580 N. McCarran Blvd, #115, Suite 504, Reno, NV 89503**
**Phone: 909-720-0961**

## Expert Report

### I.    INTRODUCTION

My name is Kathryn J. Wild.  My business address is 10580 N. McCarran Blvd, #115, Suite 504, Reno, NV 89503.  I was retained by Lewis Brisbois to consult in the case of *Estate of Bradley Grote v Kenton County, Kentucky, Southern Health Partners, INC, et al.*

I am a licensed Registered Nurse with a master's degree in Public Administration and Certified as a Corrections Healthcare Professional - RN by the National Commission on Correctional Healthcare (NCCHC) concerning the delivery of specialized nursing care in correctional facilities. I have worked in the field of Corrections Healthcare for over 35 years as a Registered Nurse, and Health Services Administrator responsible for the administration of healthcare, training and supervision of healthcare employees, as well as the formation and implementation of policy applicable to staff who provide healthcare to persons housed in corrections facilities.  My Curriculum Vitae and fee schedule are attached. I am retained as an expert witness who is knowledgeable and experienced in the training, supervision and monitoring of healthcare administered to prisoners housed in the setting of a correctional facility, including but not limited to the areas of corrections nursing care, corrections healthcare, corrections healthcare administration, corrections healthcare policy formation and implementation, and the implementation and maintenance of policies and procedures that comply with national corrections standards, including but not limited to those by the NCCHC, the American Corrections Association (ACA), and the Prison Rape Elimination Act (PREA).

### II.    MATERIALS REVIEWED

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

1. Complaint,
2. Uniform Citation – Covington Police Department,
3. SHP Medical Records for Mr. Grote,
4. Kenton County Incident Report,
5. Jailtracker,
6. KCDC Files, July 19, 2019,
7. Videos,
8. KY Certificate of Death,
9. Coroner's Death Report,
10. Grote Autopsy Photos,
11. St. Elizabeth Admission 7/19/19,
12. City of Covington Fire Department Records,
13. Depositions,
    a. Caitlin Marie Brand with exhibits,
    b. Luanna Grote, Mother/Plaintiff,
    c. CO Alexander Brown,

       d. <u>CO Aron Branstutter,</u>
       e. <u>CO Brian Jennings,</u>
       f. <u>Tiara Dockery, CMA,</u>
       g. <u>Jason Russell, Watch Commander,</u>
       h. <u>Samuel Mathews, Covington PD Officer,</u>
       i. <u>Sarah Purnell Bell, Booking Clerk,</u>
       j. <u>Trey Smith, Captain 30(b)(6),</u>
       k. <u>Krystal Mutter, Senior VP of Operations SHP,</u>

14. <u>SHP Documents,</u>
       a. <u>2019 Monthly Service Report – Inmate Health Care,</u>
       b. <u>Medical Team Administrator's Reference Guide,</u>
       c. <u>Nurse Staffing, Scheduling & Overtime PowerPoint,</u>
       d. <u>Nurses Working in Corrections – the Dos and Don'ts,</u>
       e. <u>Incident Report Training,</u>
       f. <u>New SHP Employee Onboarding Training,</u>
       g. <u>EEO Compliance Training,</u>
       h. <u>Ethics in the Workplace Training,</u>
       i. <u>Fraternization with Inmate(s) Training,</u>
       j. <u>Head to Toe Assessment Training,</u>
       k. <u>HIPPA & Correctional Medicine Training,</u>
       l. <u>Chart Smart Documentation Training,</u>
       m. <u>Chronic Care and Protocol Management Training,</u>
       n. <u>Critical Thinking Skills for Correctional Nurses PowerPoint,</u>
       o. <u>Dating in the Workplace & Conflicts of Interest Policy Review,</u>
       p. <u>Patient Safety Training,</u>
       q. <u>Sexual Harassment Training,</u>
       r. <u>Withdrawal Process Training,</u>
       s. <u>Suicide Precautions and Release from Suicide Watch Training,</u>
       t. <u>Paycom Video,</u>
       u. <u>PREA Training Video,</u>
       v. <u>Narcan Protocol,</u>
       w. <u>SHP Policies,</u>
          i. <u>Emergency Services,</u>
         ii. <u>Intoxication and Withdrawal</u>
       x. <u>Caitlin Brand Employee File,</u>
       y. <u>Tiara Dockery Employee File,</u>
       z. <u>SHP Site Operations Org Chart</u>
       aa. <u>SHP Contract and Amendments,</u>
       bb. <u>Health Services Agreement,</u>
       cc. <u>SHP Timesheets,</u>
       dd. <u>SHP Document Production SHP000001-7,</u>

15. <u>Expert Report Jeffrey Keller,</u>
16. <u>Expert Report Victor Lofgreen, Ph.D.,</u>
17. <u>Kentucky Administrative Regulations, Title 501, KAR 3:090. Medical Services,</u>
18. <u>National Commission on Correctional Health Care (NCCHC) – Standards for Health Services in Jails (2018 Edition)</u>

**III. SUMMARY OF DOCUMENT REVIEW**

| Time | Provider/Service | Comments |
|---|---|---|
| | | **Friday, July 19, 2019** |
| @ 1452 - 1601 | Samuel Matthews Arresting Officer Deposition | Covington PD Officer Matthews testified (**pages 9-10**) when he pulled over the car with Mr. Grote, he noted that he was digging in his pants or the car seat and threw several objects toward the fence, which were later found to be 2 capped syringes and a baggie of suspected methamphetamine. He also testified (**page 14 & 33**) that <span style="color:red">Mr. Grote was not exhibiting signs or symptoms of taking a large amount of methamphetamine.</span> Officer Matthews testified (**page 39**) that when they arrived at the jail, Mr. Grote exited the car without any assistance. He was not staggering or acting jittery. He was not sweating a crazy amount and he walked where he was told and followed instructions. Officer Matthews testified (**page 43**) that it was pretty hot out that day and he was sweating more than Mr. Grote. |
| @ 1557 | Kenton County Detention Center Intake Assessment CO Brown | The arresting officer reported to CO Brown that the arrestee was not engaged in any assaultive or violent behavior, was not found to have any dangerous contraband such as drugs or weapons, did not attempt to elude or escape custody, did not need to be separated from other inmates, <span style="color:red">was not aware of the arrestee's consumption or use of potentially dangerous levels of alcohol or drugs</span>, was not aware of any acute medical conditions or injuries, had not demonstrated any behaviors that might suggest mental illness, mental retardation, or acquired brain injury, or suicidal ideation.

CO Brown noted that there were no institutional alerts on file for this arrestee (alerts for mental health, suicide, acquired brain injury or retardation), there was no need for an immediate evaluation by health care staff or a custody supervisor, the patient was not unconscious, unable to answer questions or stand on their own, and did not have a blood alcohol level at or above .290. Mr. Grote denied taking more medication than he had been prescribed in the past 6 hours. |
| @ 1606 | Standard Medical Questions Sarah Bell SHP000125 KCDC0016 | Mr. Grote was screened by the booking clerk on admission to the jail. He denied any serious medical conditions that required attention while incarcerated. He denied taking any prescription medications for either medical or mental health conditions. He denied any mental health conditions. He denied suicidal intent or any previous attempt. <span style="color:red">He was asked, "Have you recently ingested potentially dangerous levels of drugs or alcohol?" and he stated, "No".</span> He denied any past DTs or other serious withdrawal from drugs or alcohol. He was advised and understood that he could request a health care provider while incarcerated, and that he understood all the questions asked and |

| | | |
|---|---|---|
| | | had provided them with all the information he wanted them to be aware of while he was there. Mr. Grote then signed the screening form. |
| @ 1659 | Kenton County Deputy Alexander Brown Incident Report | Deputy Brown was bringing Mr. Grote into the facility to be processed. During the initial questioning the inmate was acting erratic and sweating profusely. Deputy Brown started to pat down the inmate and come to his buttocks section and he would not unclench his buttocks. Deputy Brown called Sgt. Russell with this information and was told to perform an unclothed search. During the unclothed search nothing was found. The inmates sweating and erratic behavior continued and medical was called. <span style="color:red">After further questioning it was determined that the inmate had ingested drugs prior to arrival which he had denied on initial questioning.</span> The inmate was placed in cell B4 in booking to better watch for safety. |
| @ 1659 | Kenton County Officer Jason Russell Incident Report | Deputy Brown was conducting a search on I/M Grote in booking. Deputy Brown advised that Grote was acting erratic during the search and when he was searching his waist and buttocks area Grote began to clinch his body. Brown was directed to conduct an unclothed search. Nothing was located during the search. The search was suspended due to his erratic behavior. Medical was called to check his vitals. |
| | Brian Jennings Deposition | Deputy Jennings testified (**pages 15-16**) that he had previously dealt with Mr. Grote on prior incarcerations and that he was not behaving the way he normally would. He testified that he was jittery, his pupils were dilated, and he was acting nervous. He was also sweating and very fidgety. <span style="color:red">Deputy Jennings asked him if the had taken anything and he denied taking anything. He questioned him again and he again denied taking anything.</span> |
| @~ 1659 | Progress Note Caitlin Brand, LPN Exhibit 3 Late Entry | The LPN was called to booking on a non-emergency call and on arrival patient was sitting in the booking chair and behaving erratic. <span style="color:red">Patient was asked what he had taken, and he stated that he had used a ½ gram of meth a day. When asked if that was all he had used, patient would not answer the question.</span> Vital signs were attempted, and the patient was unable to hold still long enough to obtain a BP. SPO2was 89% and the patient was told to focus on his breathing. Oxygen was applied and his SPO2 rose to 96%. Patient was placed on observation checks. |
| | Body Cam Video | LPN Brand can be seen on video assessing Mr. Grote and attempting to take a BP with the electronic BP machine. Due to his excessive movement, she could not obtain a BP. She was able to obtain his oxygen saturation and is heard to advise him to take deep breaths. Another nurse goes to get a manual cuff and an oxygen tank. LPN Brand again attempts to obtain a BP with the manual cuff but is still unable. Mr. Grote is instructed to walk to an observation cell which he is able to do on his own. |

| | | |
|---|---|---|
| | | LPN Brand follows him into the cell and applies oxygen to the patient until his oxygen level comes back to a normal range. |
| | Caitlan Brand, LPN Deposition | LPN Brand testified (**page 121**) that she thought that Mr. Grote's symptoms of sweating, twitching and irritability were most likely withdrawal symptoms.  <span style="color:red">Mr. Grote never told her that he had ingested or swallowed a large amount of methamphetamine.  LPN Brand testified (**pages 91-92**) that after assessing Mr. Grote she went back to medical to go over his chart for information that they might have for him.</span> |
| | Luanna Grote Deposition | Ms. Grote, Bradley Grote's mother testified (**page 92**) that when she observed her son with similar symptoms of nervousness, hyperactivity, talking fast, and not being able to concentrate, she never called 911 and didn't believe there was much they could do at that point. |
| | Alexander Brown Deposition | Deputy Brown testified (**page 16**) that nurse Brand told them that Mr. Grote should be placed on a 10-minute watch |
| | Brian Jennings Deposition | Deputy Jennings testified (**page 19-21**) that after Mr. Grote was placed into the medical observation cell, he made rounds and checked on him.  <span style="color:red">He went into the cell and asked him again if he had taken anything and Mr. Grote stated, "you know what I took".  He asked him again and he would not answer.</span>  Mr. Grote was sitting in the center of the cell and Deputy Jennings noted that he was still sweating, jittery, acting erratically and his pupils were dilated. |
| | Alexander Brown Deposition | Deputy Brown testified (**page 22**) that he checked on Mr. Grote one time and asked him, "Hey, Bud, you good?" and he replied "yeah".   Deputy Brown testified (**page 27**) that he was performing a release when a Class D Inmate poked his head around the corner and said, "Hey, this guy is foaming at the mouth".  So, he asked the gentleman he was releasing to sit down, turned on his body camera, accessed the cell where Mr. Grote was, and called a signal 6 over the radio. |
| @~ 1735 | Progress Note Caitlin Brand, LPN Exhibit 2 | Called to respond to a signal 6 in booking.  On arrival, patient was being held on his left side by a deputy.  Patient was foaming at the mouth.  A deputy stated that he had been seizing.  Patient was post-ictal and non-responsive to sternum rubs or ammonia inhalants.  SPO2 was 61% and O2 was applied at 5 liters.  Pupils were non-reactive, and patient had shallow labored breathing.  The Sergeant was advised to call a squad.  SPO2 was rechecked at 85%.  BP 113/70, P 58, R 12. |
| @ 1742 | | Dispatched to Jail |
| @ 1750 - 1813 | Covington Fire Care Events | EMS arrived at patient.  On arrival EMS found patient in booking cell unresponsive laying on his left side, pale, cyanotic, foaming from the mouth, fist clenched, and saturated in water.  Officers stated he had been in an unresponsive state for 20 minutes and the only medication given was the oxygen he was on when they arrived.  Officer stated he had been in custody for |

| | | |
|---|---|---|
| | | 2 hours and during search had his glutes clinched as if he was attempting to hide contraband. Due to the short custody time and the unresponsive state of the patient, little to no history was available. Respiratory rate = 18 and shallow, then 14 and shallow Pulse = 99 and regular, then 122 and regular, then 110 and regular, then 77 and regular BP 53/26, then 160/75, then 105/79 SPO2 = 68, Glucose = 58 Airway was cleared via suction and secured airway via nasal airway, and they began ventilation via bag valve mask with 15L of oxygen. On insertion of nasal airway patient responded by flexing. Patient pupils were fixed and slightly dilated. EMS exposed torso and did a head to toe (HTT) assessment; findings were unremarkable. IV access was obtained, and they gave Versed 5mg IM and Narcan 2 mg. |
| @ 1815 | St. Elizabeth Hospital | Bradley J Grote is a 27-year-old male who presents to the ED via EMS in cardiac arrest. Per police, the patient was being checked into jail after being arrested for meth possession and was acting strange at this time (agitated, muscle jerking). They did a body search and put him in holding cell for observation. When they checked on him again, he was foaming at the mouth and actively seizing. EMS arrived at the jail where patient had been seizing for about 20 minutes before their arrival. He received 10mg of versed and 2mg of Narcan and seizing stopped but subsequently was unresponsive and was not breathing. Respirations were assisted with BVM and nasal trumpet prior to arrival. Glucose was low at 54 and was given 1-amp D50. Per EMS his pupils were fixed. His last BP before ED arrival was 107/70. Chart review reveals history of polysubstance abuse. He was admitted to the hospital with the following diagnoses: <ul><li>Cardiac arrest with successful resuscitation</li><li>Cardiogenic shock</li><li>Shock liver</li><li>Acute respiratory failure with hypoxia and hypercapnia</li><li>Accidental amphetamine overdose</li><li>Anoxic encephalopathy</li><li>Status epilepticus</li><li>Seizure</li><li>Respiratory failure requiring intubation</li><li>Hyperkalemia</li><li>Rhabdomyolysis</li><li>Elevated transaminase level</li><li>Polysubstance abuse</li></ul> |

| | | |
|---|---|---|
| | | • AKI (acute kidney injury) |
| **Sunday, July 21, 2019** | | |
| @ 0656 | St. Elizabeth Hospital Time of Death | Bradly Grote was a 27-year-old male who passed away during this admission. He was admitted for cardiac arrest due to methamphetamine overdose. ACLS was initiated on admission and ROSC was achieved after 2 rounds of epinephrine. However, he proceeded to go into multi organ failure, requiring 4 different pressor supports. He expired after approximately 36 hours of full medical treatment. |
| | Autopsy Findings | I. Acute methamphetamine toxicity.<br>1. Investigative history: The decedent was reportedly arrested for methamphetamine possession. While at the jail, he was found "foaming at the mouth and actively seizing, and despite resuscitative attempts, his condition continued to worsen. He was admitted to a local hospital and diagnosed with multisystem organ failure and anoxic brain injury. His condition did not improve, and he was pronounced On July 21, 2019.<br>2. Toxicology of blood drawn at the hospital on July 20,2019 and submitted by the Coroner to Axis Forensic Toxicology: methamphetamine: 7,570 ng/ml and amphetamine = 121 ng/ml.<br>3. Baggie in stomach contents.<br>4. Track marks.<br>5. Cerebral edema<br>6. Scleral icterus.<br>7. Centrilobular necrosis and ascites.<br>8. Bilateral pleural effusions and heavy, congested lungs (combined weights = 1,450 grams) with consolidation of the lower lobe of the right lung.<br>II. No lethal trauma identified.<br>III. Cardiomegaly (450 gams) with focal severe coronary artery atherosclerosis. |

## IV.    DISCUSSION AND OPINIONS

Based on my review of the documents provided to date, my education, training, 36 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that the care provided to Mr. Bradley Grote by Southern Health Partners nurse, LPN Caitlin Brand while incarcerated in the Kenton County Detention Center was reasonable based on all the circumstances presented to her at the time of the care provided, and she was not indifferent to his medical needs.

### *Access to Care*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01 – "Access to Care"** states that inmates have access to care to meet their serious medical, dental, and mental health needs.  The NCCHC states that "Access to Care" means that, in a timely manner, a patient is seen by a qualified health professional, is rendered a clinical judgment, and receives care that is ordered.

**Kentucky Administrative Regulations, Title 501, KAR 3:090. Medical Services, Section 1** states that the Jail's medical services shall be provided by contracting with a health care provider licensed in Kentucky.

There were no barriers to accessing care at the Kenton County Detention Center.  LPN Brand was contacted by officers to see Mr. Grote for a non-emergency assessment in the booking area and immediately responded to the area.  She found Mr. Grote seated in the booking area, rocking back and forth and sweating.  He was able to answer questions regarding his drug use and reported only taking ½ gram of meth daily.  LPN Brand ensured that his oxygen level was corrected and advised the officers to keep a close 10-mintue watch on the patient while she returned to the medical office to review prior medical information.  It was during this short time that Mr. Grote apparently began to seize, and LPN Brand was immediately called to return to his side.  She did so swiftly without delay.

### *Receiving Screening*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-02 – "Receiving Screening"** states that receiving screening be performed on all inmates on arrival at the intake facility to ensure that emergent and urgent health needs are met.  This standard is intended to fulfill four purposes; 1) to identify and meet any urgent health needs of those admitted, 2) to identify and meet any known or easily identifiable health needs that require medical intervention before the health assessment, 3) to identify and isolate any inmates who appear potentially contagious, and (4) to appropriately obtain a medical clearance when necessary.  The standard allows for correctional staff to perform the screening when no healthcare staff are on site.

**Kentucky Administrative Regulations, Title 501, KAR 3:090. Medical Services, Section 1 (9)** states that medical screening shall be performed by the receiving jail personnel on all prisoners upon their admission to the jail and before their placement in prisoner living areas.  The findings of this medical screening shall be recorded on a printed screening form approved by the medical authority.  The medical screening inquiry shall include:

1. Current illnesses and health problems.
2. Medications taken and special health requirements,
3. Screening of other health problems designated by the medical authority,
4. Behavioral observation, state of consciousness and mental status,
5. Notation of body deformities and trauma markings such as bruises, lesions, jaundice, and ease of body movement.
6. Condition of skin and visible body orifices, including infestations.
7. Disposition or referral of the inmate to qualified medical personnel on an emergency basis.

Mr. Grote arrived at the jail on a very warm day as described by arresting officer Matthews, who testified that he was sweating more than Mr. Grote. Upon arrival Mr. Grote was medically screened by the booking clerk utilizing the standardized screening questionnaire. Mr. Grote was able to answer questions appropriately and sign his name to the form.

Mr. Grote was asked multiple times during the arrest and booking process if he had ingested medications and was specifically asked, "Have you recently ingested potentially dangerous levels of drugs or alcohol", and he denied taking anything more than ½ gram of methamphetamine.

The Overall General Signs That Someone Is on A Stimulant Like Meth Include:

- Increased physical activity and, in some cases, hyperactivity
- Increased talkativeness and pressured speech
- Extreme elation
- An inability to relax
- Decreased appetite
- Inability to maintain attention
- Appearing overheated and sweating
- Increased breathing rate and heart rate
- Dilated pupils

The symptoms of a drug overdose may vary depending on the person, the drug, and the amount taken. However, universal symptoms include **nausea and vomiting, drowsiness, loss of consciousness, and trouble breathing.** Early signs of overdose often mimic intoxication, and without evidence or knowledge of a possible overdose, this can easily be missed. There was no evidence or indication available to LPN Brand that Mr. Grote had taken an overdose of any prescription or non-prescription medication, even though he was repeatedly asked that question. Even Mr. Grote's mother testified that she observed her son with similar symptoms of nervousness, hyperactivity, talking fast, and not being able to concentrate and she never called 911.

Inmates are booked into correctional facilities multiple times daily who are under the influence of drugs and/or alcohol and staff rely on the patient's truthful responses to questioning to determine if an excessive amount has been ingested. Although Mr. Grote appeared to be under the influence of methamphetamine at the time of his initial evaluation by LPN Brand, he denied repeatedly that he had taken more than ½ gram.

_

In an abundance of caution, LPN Brand had Mr. Grote placed on close 10-minute watches while she returned to the medical office to review Mr. Grote's past medical history. Unfortunately, prior to her return, he began to have seizures related to his swallowed methamphetamine baggie rupturing and delivering a huge amount of drug into his system.

Plaintiff expert Dr. Jeffrey Keller opined that "Mr. Grote's degree of distress would have been obvious to even a layperson". I would disagree with this opinion as there were at least 4 non-medical laypersons in attendance at this time in booking and his situation was not obvious to anyone. It is easy to review a video, after the fact, when you know the outcome of a case, and to point out that something was obvious. It is not so easy when the situation is unfolding in real time.

### Emergency Services

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-D-07 – "Emergency Services and Response Plan"** states that planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies. The facility provides 24-hour emergency medical, dental, and mental health services.

**Kentucky Administrative Regulations, Title 501, KAR 3:090. Medical Services, Section 1 (13)** states that emergency medical, vision, and dental care shall be available to all prisoners commensurate with the level of care available in the community.

As soon as LPN Brand was notified of a Signal 6 in the booking area she responded swiftly and appropriately with the emergency bag. After she had assessed Mr. Grote's vital signs and mental status, she told the officers to call for EMS. While awaiting arrival of emergency services, she provided oxygen and kept his airway clear. During this period, LPN remained calm and talked with Mr. Grote attempting to solicit a verbal response. Often when patients experience a seizure, they will experience a postictal phase that can last for seconds, minutes, hours and sometimes even days. Seizures are not an uncommon event in a correctional setting and do not always result in immediate transfer to a higher level of care. When it was clear that Mr. Grote was not responding to LPN Brand's attempts to get a response, she alerted staff to call for a squad.

Plaintiff expert Dr. Jeffrey Keller opines in his report that LPN Brand recorded inaccurate vital signs for Mr. Grote that were not accurate compared to the heart rate and blood pressure obtained by EMS. It is clear from the EMS report that Mr. Grote's vital signs were bouncing up and down throughout the emergency transport and this could account for the differences noted in the record. His blood pressure, pulse and respiratory rate were clearly noted to vary dramatically during the trip to the hospital.

Dr. Keller further finds fault with LPN Brand's documentation and opines that it was a violation of the standard of care. He's correct that she did not record her first assessment until 5 days after the event. LPN Brand had returned to her medical office after her first assessment of Mr. Grote to obtain more information. She had no time to record her assessment before she was called back for a Signal 6 emergency. LPN Brand recorded her emergency response to the Signal 6 after Mr. Grote had left the facility for the emergency room. As she testified in deposition, she

initially charted the incident of him being sent out that evening, and when she came back to work, she made the late entry of her first encounter. Forgetting to make a chart entry is not a violation of the standard of care, but simply an error that was corrected as soon as possible. Her failure to make the initial chart entry was a mistake that made no difference in the outcome of this case.

The nursing standard of care is a standard of reasonableness and is not a standard of perfection. A nurse's conduct must be evaluated prospectively, within the rules of the setting, and a bad outcome does not mean that a violation of the nursing standard of care has occurred. Reasonable nurses may disagree about the proper evaluation or care of a given patient, but different approaches may all be within the standard of care.

**SUMMARY OF OPINIONS:**

1.  There were no barriers to accessing healthcare in the Kenton County Detention Center created by any Southern Health Partners healthcare personnel, policy, or procedure.

2.  Mr. Grote was immediately screened on admission to the jail by a booking clerk as required by the standards and seen shortly after by LPN Brand. This was well within the standard of care for receiving screening.

3.  LPN Brand assessed Mr. Grote and attempted to obtain vital signs and drug use history. She appropriately went to look up his past medical history from his old records when the Signal 6 was called.

4.  The emergency response when Mr. Grote was reported to have had seizure was swift and appropriate and was not indifferent to his healthcare needs.

5.  Based on my education and experience in the correctional health care setting, and review of the records provided, it is my opinion that the care provided to Mr. Bradley Grote while in the Kenton County Detention Center by Southern Health Partners LPN Caitlan Brand met reasonable practices based on all the circumstances presented to her at the time of the care provided, and she was not indifferent to his serious medical needs.

My opinions in this case are based on many years of education and experience in the correctional health field, and upon the documentation provided to me for review. I reserve the right to supplement this opinion in the event additional documentation is provided in this matter. My opinions herein are expressed within a reasonable degree of nursing certainty.

Executed on December 15, 2021, in Reno, Nevada.

_____
 Kathryn J. Wild, RN, MPA, CCHP-RN