# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| **LUANNA GROTE, ADMINISTRATOR OF ESTATE OF BRADLEY GROTE,** <br><br> **Plaintiff,** <br> v. <br><br> **KENTON COUNTY, et al.,** <br><br> **Defendants.** | Case No.: 2:20-CV-101 WOB-CJS <br><br> ELECTRONICALLY FILED |

## KENTON COUNTY DEFENDANTS' REPLY MEMORANDUM SUPPORTING SUMMARY JUDGMENT

Come now Kenton County, Kentucky, *former* Jailer Terry Carl, Deputies Brian Jennings, Alexander Brown, Jason Russell and Aaron Branstutter, and Clerk Sarah Bell, each in their respective *individual* capacities, and file their reply memorandum in support of summary judgment.

### I.     INTRODUCTION

To overcome her burden on summary judgment, Plaintiff must show not only that the *individual* deputies violated the Fourteenth Amendment but that they also violated clearly established Fourteenth Amendment law. That requires her to show that the illegality of deputies' actions in July 2019 was, at that time, "beyond debate." *D.C. v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018). That is not remotely so on these facts.

Start with what ought to be an end to the matter. No case *holdings* cited by Plaintiff support the objective component of the deliberate indifference standard. None. And she did not even attempt to distinguish *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009). In each of the cases Plaintiff cited, the

objective component was either conceded or assumed to be met, without any factual analysis into when the objective component would not be met in drug overdose cases resulting in death. Plaintiff's response makes the same assumption, but erroneously.

Like the officer in *Spears*, who knew that decedent had smoked crack and had observed unusual behavior, none of the KCDC staff knew more than LPN Brand – that Grote disclosed taking a half gram of methamphetamine four (4) hours prior and was exhibiting symptoms of withdrawal. KCDC Defendants maintain, based on these unrefuted facts, that Grote's medical needs were not sufficiently serious and obvious until 5:35 p.m., when Grote was observed unresponsive and seizing in cell B4. Upon seeing these worsening changes, Deputies immediately called a signal six medical emergency and LPN Brand was summoned to return to the cell. She assessed Grote and determined that a transport was necessary. Deputies arranged it without delay. These straightforward facts corroborated by mechanical video and audio evidence should end this dispute. But there is more.

Consider the reality that contraband in correctional settings is not new. *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003). Yet Plaintiff has not identified a single decision *holding* that deputies' failure to detect body stuffing in the face of repeated denials by the inmate of having recently ingested potentially lethal amounts of methamphetamine and denying possessing contraband exposes them to liability for a lethal overdose. The deputies' screening intake process in this case was by-the-book, and medical determined that Grote was withdrawing. In hindsight, we know there was more to the story Grote told. But even so, Plaintiff cannot point to a single incident, other than this case, to suggest that any other inmate has died from body stuffing, or that KCDC has not diligently collaborated with its medical authority to recognize medical emergencies and to prevent these type incidents.

The record establishes, convincingly, that neither the deputies nor Clerk Bell were aware that Grote was suffering from a serious medical condition resulting from body stuffing methamphetamine drugs. Contrary to Plaintiff's assertion in her response, -pg.1-, that Grote had advised staff that he had swallowed methamphetamines, there is no evidence whatsoever that he advised either medical or KCDC staff what he had done. Instead, as heard on BWC audio during the first medical assessment, he responded to LPN Brand's question … how much did you "take?" He answered … "1/2 gram" … at "twelve." It is simply not factually accurate that any deputy or clerk ignored Grote's serious medical needs from body stuffing a lethal dose of methamphetamine. Expectedly, this assertion on -pg. 1- is not supported by a cite to the record. The material facts for which there is unrebutted record support is that Dep. Brown acted appropriately by notifying medical staff about what he observed during intake, and again when he was made aware of Grote's worsening condition in cell B4. During the interim period of watches, the deputies were entitled to rely on the medical assessments and opinions of LPN Brand until noticing Grote having seizures.

Before turning to the subjective component of deliberate indifference and qualified immunity, a few words are in order about Plaintiff's response to orient this reply. Some of Plaintiff's factual assertions are unsupported by the record. Each of them is included in an endnote.[i] For efficiency, if the unsupported assertion is material or could potentially create a genuine dispute if assumed to be true, it will be addressed in the body of this reply in addition to being called out in the endnote. Otherwise, the endnote preserves the objectionable liberties taken by Plaintiff in her response.

II. **SUMMARY JUDGMENT IS APPROPRIATE**

    A. Federal Claims

The subjective component of deliberate indifference requires analysis of whether the individuals acted "recklessly in the face of an unjustifiably high risk" that is either "known or so

obvious that it should be known." *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021); *see also Greene v. Crawford County*, 22 F.4th 593, 606 (6th Cir. 2022). In this case, there is no record evidence supporting the claim that any deputy or Clerk Bell ignored Grote's serious medical needs. Nor was the risk so obvious that it should have been known until Grote became unresponsive.

First, Jailer Carl had no interaction with Grote. Second, Deputy Brown and Clerk Bell screened Grote accurately under 501 KAR 3:090 § 1, subsections (7) and (9). Each accurately recorded what Grote reported about recent drug use and contraband. Thereafter, Deputy Brown notified medical staff about his observations during intake, and again when Grote's condition noticeably worsened in cell B4. In the interim, each deputy that interacted with Grote relied on LPN Brand's assessment, diagnosis and decision to implement a detox watch, as the law entitles them to do. That is not deliberate indifference.

○ *Terry Carl*

It is well established that "[p]ersons sued in their *individual* capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). They cannot be held liable under a theory of respondeat superior; rather, they must have "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.*

Carl had no personal contact with Grote while he was at KCDC. He was at home when he learned that Grote had been transported, *Carl* p. 23, and went to the hospital to meet Grote's family. *Id.*, at 25. As the popularly elected jailer, he relied on SHP, the contracted medical authority, to make all medical decisions regarding KCDC inmates, *id*. at 48-9, and his staff was trained to defer to their judgment. *Id.* at 50-1.

Plaintiff argues that Carl was deliberately indifferent by delegating the jail's medical care to SHP. Plaintiff's argument fails for several reasons. First, Kentucky law requires jails such as

4

KCDC to contract with a healthcare provider licensed in Kentucky to provide medical care for inmates. 501 KAR 3:090 § 1(1). Moreover, that regulation specifically prohibits jailers and his deputies from restricting the health care staff "in the performance of their duties except to adhere to the jail's security requirements." 501 KAR 3:090 § 1(3). To the extent that Plaintiff argues that the policy decision to contract with SHP is somehow itself facially unconstitutional, such a theory would not apply to Carl in his *individual* capacity; it would apply to Kenton County. Moreover, it has been rejected by the Sixth Circuit. *Winkler v. Madison Cnty.,* 893 F3d 877 (6th Cir. 2009); *see also Hamilton v. Pike Cty.*, 2013 WL 529936 (E.D. Ky. Feb. 11, 2013).

The plaintiff in *Hamilton* made arguments nearly identical to those Plaintiff makes here. The plaintiff there suffered from a variety of medical problems when he was booked into the county jail. That jail also contracted with SHP to provide medical care to inmates. SHP medical staff failed to recognize that the plaintiff was extremely ill, and he was hospitalized with acute renal failure, deep venous thrombosis, and sepsis, among other conditions, requiring multiple surgeries which left him confined to a wheelchair. *Id.* at *3-4. The plaintiff sued the jailer, alleging that he was deliberately indifferent by relying on SHP to treat the plaintiff, by failing to supervise SHP staff, and by failing to override SHP's medical decisions. *Id.* at *6-7. The district court rejected all these arguments, holding that the jailer "reasonably relied on the assumption that the medical staff would attend the [the plaintiff's] medical needs." *Id.* at *7. The court also noted that the jailer's reliance was reasonable because there was no history of complaints about the medical staff and that Kentucky law prohibits jail staff from interfering with the medical staff's performance of their duties. *Id.*

Capt. Smith testified in this case as Kenton County's 30(b)(6) designee. *See* R. 91-1, 91-2 (Kenton County 30(b)(6) designations and answers to interrogatories). He made clear that each variety of inmates' medical needs (whether to assess an inmate who has overdosed or who may be

5

detoxing or suffering a seizure or a cardiac event) are referred to medical staff. *Capt. Trey Smith*, p. 39, 48, 49, 54, 62, 64, 73, 74. SHP decides what care is medically necessary, and whether to transport an inmate to the hospital. *Id.* at 40. If, however, medical staff is not immediately present, the Shift Commander, in this case Sgt. Russell, has authority to call 911. *Sgt. Russell*, p. 76. Deferring to medical staff when they are present and contacting the Shift Commander when medical staff is not immediately present, is how deputies are trained. *See* PNP 4.5.3, Section I (4); *Capt. Smith*, at 40. Moreover, Russell did **not** testify that he would never call 911 unless medical told him to. *Russell* at 76.

> Q. Is it your testimony that you would never have called 911 unless a medical staff person told you to do it?
>
> A. Never in that situation or any situation?
>
> Q. That situation.
>
> A. That situation, no, medical was doing their job.
>
> Q. Did you have authority in June, July 2019 to call 911 regardless of whether or not medical told you to do it?
>
> A. Yeah. *Russell,* p. 76.

This line of questioning continues, through -p.79-, finally ending with Russell saying that he would have called 911 after seeing Grote having a seizure in cell B4, even if medical had not requested him to do so. Plaintiff's insistence to the contrary is unfounded.

As was the case in *Hamilton*, there is no evidence of a history of complaints about the jail medical staff. In fact, Grote is the only KCDC inmate to die from an overdose where it has been alleged to be from lack of medical care. *Captain Smith*, at 82-3, 86-7. This single incident is insufficient to show that Carl ignored a substantial risk of harm to any KCDC inmate. Even coupled with the fact that multiple overdoses not resulting in death have occurred at KCDC during

some deputies' tenure, that is insufficient that fact lacks context that would allow an inference that a problem with KCDC medical services was so severe that Carl "must have known" that inmates were at a substantial risk of serious harm from KCDC medical services policy. *See Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994). In fact, the opposite inference is more reasonable since there is record evidence of only one death (Grote) amid multiple overdose incidents, and no evidence of any injuries from any less medically serious overdoses. *See* R. 91-1, 91-2 *supra.* So, the evidence and all reasonable inferences therefrom is that Jailer Carl knew the importance of deputies' properly screening prisoners about recent drug use and contraband at intake, that he trained them how best to perform those duties, that it was important to contact medical staff if concerns arose, and that his medical services policy was preventing deaths and injury to inmates who experience overdose or withdrawal while in custody.

Therefore, Carl is entitled to qualified immunity on Plaintiff's claim of deliberate indifference against him personally.

○ *Deputies and Clerk*

The law cited above applies equally to the deputies and clerk — they too were entitled to rely on SHP staff to make medical decisions regarding Grote. And, as noted, Kentucky regulations prohibit jail staff from interfering with medical staff unless safety is implicated. This same authority also defeats Plaintiff's argument that deputies had any duty to monitor Grote beyond visual observations while he was in cell B4. They did what LPN had asked them to do, which was to keep an eye on Grote.

And what about those liberties in Plaintiff's factual account to support her suggestion that inconsistencies in the record are genuine and material. Each his objectionable but easily addressed. To name a few, LPN Brand requested a watch every 10-15 minutes, not strictly every ten, as

Plaintiff asserts. *Brand,* p. 46-7, 91.  Dep. Brown did **not** testify that Grote *could not be* photographed or fingerprinted.  Instead, he described *why* he will sometimes wait until later in the shift when inmates are suspected to be experiencing withdrawal. *Brown*, p. 15-16. Brown did **not** testify that Grote's agitation and shaking were worsening during booking, only that his sweating progressed during booking. *Id.* at 10. Plaintiff's assertion that the only documentation of contact with Grote after he was escorted to cell B4 is the security patrol log is also inaccurate. Overhead video surveillance of the Mile is available throughout and BWC video exists for the signal six medical emergency.

  The overhead video is the best evidence of when the visual assessments occurred. Dep. Brown testified that he observed Grote sitting up when he first visually assessed him and moved the curtain covering the cell window aside. This can be seen at 4:50-51 in the video. It is not in dispute that BWC shows Grote lying down during the initial medical assessment inside the cell at 4:39-4:43.  It is also uncontroverted that Russell was not in booking when Brown made the decision to suspend Grote's booking, so he relied on Brown's discretion that it be done.  As such, Russell did **not** testify that he *personally* did not think that Grote's condition prevented him from being photographed. To be sure, he did not see him until *after* the signal six was called.

  The liberties taken with the evidentiary record cannot be ignored, but getting more to the essential point, it is not clearly established that deputies violate a prisoner's rights if they do not call 911 before medical staff, who is immediately present, deems it necessary.  More generally, Plaintiff does not cite any circuit court case allowing a prisoner to sue for harm suffered because of his own illegal conduct that he repeatedly conceals from everyone able and interested to save his life. If ever a claim was designed for qualified immunity, this is it, as Plaintiff has not identified any court in the country, anytime anywhere, that has recognized such a claim.  The point

8

of qualified immunity is to protect "all but the plainly incompetent" so "long as their actions could reasonably have been thought consistent with" the U.S. Constitution. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) (quotation omitted). The evidence in this case, unrefuted by genuine factual disputes, establishes that none of the individual deputies or clerk were aware that Grote was suffering from a serious medical condition before he started seizing, and they acted appropriately once they were made so aware. *See Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003) (finding that it can hardly be said that the Officers acted with deliberate indifference).

In sum, after addressing some of the liberties taken by Plaintiff in her responsive pleading, there is no genuine dispute of any material fact as to whether any deputy or Clerk Bell was deliberately indifferent to Grote's serious medical needs. *See Vittetoe v. Blount Cnty., Tennessee*, 861 F. App'x 843, 849 (6th Cir. 2021) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

- <u>Observation form and documenting watches</u>

Unsurprisingly, this subsection of the reply must begin where we just ended – addressing Plaintiff's avoidance of the factual record. In July 2019, observation forms were used **only** for suicide watches, **not** detox watches, or any other watches requested by medical. *See 30 (b)(6) Designee Capt. Smith* at 50-1, 84-5. In addition to Captain Smith's testimony, the entirety of Kenton County's <u>Suicide Watch Program</u>, PNP 3.4.8, is attached as Exhibit 1 hereto. It provides needed context to the excerpted form that Plaintiff selectively entered into the record by itself. The <u>Suicide Watch Program</u> policy includes the excerpted form. But that form was not in use for detox watches in 2019. Plaintiff's insistence on revisiting that topic with retired jailer Carl was objectionable under

9

the parties' agreed upon conditions of deposing him out-of-time. R. 93 (agreed upon conditions), *Carl*, p. 32-8, 65-7 (the record preserves the objection and grounds for it).

Expectedly, Carl testified that he was confused and unsure about specific forms in use, and policies in effect, in 2019, since he retired in January 2021, and so much time had passed between July 2019, and when he was eventually deposed. *Id.* Plaintiff has taken further liberties with the record regarding another 30(b)(6) designated topic in the context of Carl's testimony. Carl did **not** testify that more records or video than what exists in this case was required by KCDC policy or Department of Corrections standards. What was required to be recorded, and how it was recorded, was covered in the 30(b)(6) topics and Captain Smith's testimony. Specifically, Carl testified that BWC are required during watches **only** if an incident occurs (*e.g.*, like a signal 6), but that most generally only overhead cameras document when detox watches occur. *Carl,* p. 32-3. He did **not** testify that deputies *should have been* recording their watches on the Mile using BWC. *Id.* 59-67. Similarly, Sgt. Russell did **not** testify that an observation form should have been used on Grote's cell door. The predicate of the deposition question was "*if* [the form] was in use in 2019 ...", then that is what *would* happen. *Russell* at 64, 92.

Kenton County's designee Captain Smith testified — and PNP 3.4.8 and overhead video of the Mile establishes — that there was no observation form in use in 2019, except for suicide watches. It is plainly visible in the video that no form was on cell B4. It was not until May 2020, when Col. Fields implemented different procedures for suspended bookings and observations that included an observation form for all type watches. *Capt. Smith* at 50-1.

Lastly, in addition to distorting the record far beyond just applying it in the light most favorable to her, there is a causation problem with Plaintiff's argument. She offers no explanation why it would have made a difference if deputies, instead of relying on overhead surveillance to document watches,

had used a form to record those watches for that same period. *See Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994). No reasonable juror could find that the manner of recording the watches caused any harm relative to the alternative of completing a form.

- o    Frequency of watches

Missing the twenty-minute observation interval required by 501 KAR 3:060 by a mere minute was not a mistake of constitutional proportions. Similarly, missing LPN Brand's watch interval only once by six (6) minutes did not violate Mr. Grote's constitutional rights. The video and timeline show that deputies were moving other inmates housed in cells adjacent to B4 between 5:18 and 5:33 p.m. There is no evidence or reasonable inference that a deputy or clerk *recklessly* disregarded Grote's worsening condition.

Here, as in *Winkler supra*, the deputies followed the instructions of the medical staff to observe a suspected detoxing inmate and report any observable change in his condition. It is not *clearly established* that missing a single twenty-minute observation period by one minute could violate Grote's constitutional rights under the Fourteenth Amendment. And failing to strictly follow an internal policy like LPN Brand's shorter watch period of 10-15 minutes is not a per se constitutional violation. *Id.* (nurses failure to strictly adhere to internal policy was not deliberate indifference)*; see also Meier v. County of Presque Isle,* 376 Fed. Appx. 524 (6th Cir. 2010) (Court *held* that it was unclear if officer was aware of an internal policy, but even if he was aware of the policy and failed to comply, his failure is not a constitutional violation (*citing Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir. 1995)). The law governing the asserted constitutional violation in this case was therefore not clearly established in July 2019.

- o    Urine test to detect drugs

Carl testified that a urine sample, had it been collected from Grote and tested by medical, would have shown the *presence* of methamphetamine. However, the test would not have shown the *quantity*. *Carl,* at 55-7. So, the test that Plaintiff urges as a constitutional standard would have told only part of the story, just as Grote himself had done throughout. In other words, the test would have verified only what Grote had already disclosed — that he had taken methamphetamine. Critically, it would not have revealed what Grote was concealing, that he had body stuffed a lethal quantity of drugs in a plastic baggie that the medical examiner documented had spilled its toxic contents into Grote's blood stream.

*Meier v. County of Presque Isle* (6th Cir. 2010) *supra* is again instructive. In *Meier*, after being arrested for driving under the influence, Paul Meier was transferred to the Presque Isle County Jail. While there, a deputy administered a breath-analysis test. Meier's breath alcohol concentration level was .31. During booking, a clerk administered the medical screening and an alcohol questionnaire. She contacted medical staff because of the high alcohol level. Medical confirmed that Meier could walk, speak, and continue a conversation. *Id*. at 526. Medical staff instructed corrections staff to "keep an eye on" Meier. After watching Meier for a few hours, another corrections officer observed him lying in a pool of blood, unresponsive. *Id*. at 527.

Meier's spouse filed a complaint under 42 U.S.C. § 1983. The complaint alleged that the arresting officer demonstrated deliberate indifference to serious medical needs when he failed to transport him to a medical facility after registering an alcohol concentration greater than .30. *Id*. The County Sheriff's internal policy required the arresting officer to transport a suspect with an alcohol concentration of .30 or higher to a medical facility. *Id*. The court *held* that it was unclear if the arresting officer was aware of the policy, but even if he was aware of the policy and failed to comply, "his failure is not a per se constitutional violation." *Id*. at 529. The court focused on Meier's

federal constitutional rights and found that the arresting officer did not recklessly disregard Meier's medical needs. *Id*. The court further found that the corrections officer who initially screened Meier called medical staff, and did what they asked, which was to "keep an eye on" Meier. The court concluded that no jury could reasonably believe that a defendant was deliberately indifferent toward Meier's serious medical needs, even if the policy was not followed.

Meier's final claim, like here, was against Presque Isle County for failure to train jail staff. However, that claim failed too since a county cannot be liable when none of the individual defendants have committed a constitutional violation.

○ *Kenton County*

As noted above, plaintiff's first argument as to Kenton County's alleged deliberate indifference—that it abandoned its responsibilities by contracting with SHP to provide medical care at the KCDC—has been rejected by the Sixth Circuit. *Winkler*, 893 F.3d 877, 901 (6th Cir. 2018).

Plaintiff next argues that Kenton County may be liable on a failure to train theory. The standard for this theory was outlined in Defendants' initial memorandum in support of summary judgment. It is unnecessary to restate it here. Nor is it necessary to reargue the reasons to strike the report and opinions of Victor Lofgreen, Ph.D., R. 118, other than to reiterate that "[m]ere allegations that a [defendant] was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005).[2]

---

[2] Plaintiff's response to the *Daubert* challenge defeats itself to the extent that she acknowledges that (1) assumed facts must find some support in the record, (2) the opinion must amount to more than mere speculation and (3) it must not embrace an ultimate legal conclusion. Mr. Lofgreen's opinions, as discussed and argued in R. 118, should be excluded for each of the above reasons, and others. Plaintiff's response (R. 128) provides only a superficial restatement of the law without applying it the shortcomings in Mr. Lofgreen's "expert" opinions. *See* R. 128.

Rather, a plaintiff must demonstrate "such a consistent and pervasive pattern of unconstitutional" conduct, "evidencing a failure to train," that it amounted to the municipality being deliberately indifferent to the rights of its citizens. *Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994). And the plaintiff must prove that that the inadequate training "is closely related to" or "actually caused" the plaintiff's injury. *Id.*

Plaintiff has offered no evidence that supports this claim. She has not provided any evidence that the content or frequency of training provided is less or different than what the law requires. Instead, the argument about a lack of medical training is, in effect, repetitive of her theory that Kenton County may be held deliberately indifferent for contracting with SHP to provide medical care at the jail or for not questioning SHP's decisions. Further, Plaintiff has not shown "that there was a history of similar incidents" at KCDC, nothing to show that the County was on notice, and nothing to show that the County's failure to take meliorative action was deliberate. *Miller*, 408 F.3d at 816. *See D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (recognizing that a county's knowledge of only three prior instances of constitutional violations by its prosecutors could not establish notice of habitually unconstitutional conduct in support of a failure-to-train claim).

Without any such evidence, Plaintiff can only claim failure to train based on the single, tragic incident involving Grote. As the Court noted in *Miller*, however, "a single act may establish municipal liability only where the actor is a municipal policymaker." *Id.* Plaintiff offers no authority for the proposition that LPN Brand, an employee of the independently contracted medical authority, could be deemed a "policymaker" for the contracting entity Kenton County. *See Hall v. Kenton County Kentucky, et al.,* 2022 WL 2442199 at *11 (E.D. Ky., July 2022-WOB).

Kenton County is thus entitled to summary judgment on plaintiff's deliberate indifference claim.

### B. State Law Claims

Plaintiff's response very narrowly claims that the individuals did not act in good faith, and for that reason, and that reason alone, immunity to the *individuals* should be denied. However, Plaintiff has not shown any facts which would support a finding of bad faith. To be sure, reliance on SHP to correctly diagnose Grote was not done in bad faith; the law requires it. Nor was the deputies' substantial compliance with the 20-minute observation requirement of KAR 3:060, section 2 (2)(c), undertaken in bad faith. *See Rowan Cty. v. Sloas*, 201 S.W.3d 469, 481 (Ky. 2006) (noting that bad faith would be shown if the public official "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive") (citation omitted).

In this case, the record establishes that deputies in booking have many duties and competing demands for their time during their shifts. *Russell,* p. 35-7. Video evidence shows that the 20-minute watch was delayed by a mere minute as other inmates were being moved from the Mile. Similarly, the 10–15-minute watch period requested by LPN Brand was adhered to in good faith. While not perfect, it was not done in bad faith, and internal procedure "is not a regulation from which negligence for violation should arise *per se*." *Flechsig v. United States,* 991 F.2d 300, 304 (6th Cir.1993). LPN Brand's watch period originated internally and there is no evidence that it was carried out in bad faith.

### III. CONCLUSION

For the foregoing reasons, summary judgment in favor of all the County Defendants is proper and should be granted.

Respectfully submitted:

**OFFICE OF THE KENTON COUNTY ATTORNEY**
/s/ *Christopher S. Nordloh*
Christopher S. Nordloh (85716)
1840 Simon Kenton Way, Fl 4
Covington, KY 41011
*p* 491-0600
cnordloh@kentoncoatty.com

## CERTIFICATION

I hereby certify that a true and exact copy of the foregoing answer has been served electronically upon counsel of record using ECF.

/s/ *Christopher S. Nordloh*
Christopher S. Nordloh (85716)

Endnotes:

1. Grote did not advise *anyone* that he had "swallowed" drugs. Plaintiff Resp. -pg. 1-. Dr. Akpunonu's report describes the various ways to "take" methamphetamine (as Grote said he had done) and none include swallowing it unless body-stuffing.

2. LPN Brand requested a watch every 10-15 min., rather than strictly every 10 min. *Brand,* p. 46-7, 91.

3. Grote is the only KCDC inmate to die from methamphetamine overdose where it has been alleged to be from lack of medical care. *See 30(b)(6) designee Captain Smith*, p. 82-3, 86-7.

4. Dep. Brown did not testify that Grote *could not be* photographed or fingerprinted. Instead, he described *why* he will sometimes wait until later in the shift to do so. *Brown*, p. 15-16

5. Brown did not testify that Grote's agitation and shaking were progressing, only that he noticed that his sweating progressed during booking. *Brown*, p. 10

6. In July 2019, observation forms were used only for suicide watches, not detox watches. *Smith* at 50-1, 84-5.

7. Carl testified that he does not recall specific forms in use in 2019. The medical form for detox watches was not in use in 2019, and Plaintiff's insistence on revisiting that topic with Carl was objectionable under the parties' agreement. *Carl*, p. 32-8; parties' agreement at R. 93.

8. Plaintiff's assertion that the only record documenting contact with Grote after he was placed in cell B4 is the security patrol log is plainly incorrect. Overhead surveillance of the Mile is available throughout.

9. Carl did not testify that more records or video than what exists was required by KCDC policy or DOC standards. Carl testified that he read Captain Smith's deposition and agreed with it. *Carl,* p. 30. BWC are required only if incidents occur, but generally only overhead cameras document when detox watches occur. *Id.* at 32-3. He did **not** testify that deputies *should have been* recording their watches on the Mile using BWC. *Id.* at 59-67.

10. Brown testified that he observed Grote sitting up when he moved the curtain to the side and first visually assessed him. This was at 4:50-51 on the video. *Brown,* p. 20-22. It is not in dispute that BWC shows Grote lying down during the initial medical assessment in B4.

11. Russell was not in booking when Brown made the decision to suspend booking, so he relied on Brown's discretion that the suspended booking was appropriate. Russell did **not** testify that he personally observed anything about Grote's condition, or whether he *could be* fingerprinted and photographed that afternoon. He did not see him until the signal 6. *Russell,* p. 57, 83-4.

12. Russell did not testify that an observation form should have been used on Grote's cell door. The predicate of the question was "*if* [the form] was in use in 2019 "…", *then* that is what would happen. *Russell,* p. 92.

13. Russell did not testify that he would never call 911 unless medical told him to. *Russell,* p. 76-9.

14. Grote's urine, had it been tested by medical, would have shown only the *presence* of the drug that he had already admitted to using. But it would not have shown the *quantity*. *Carl,* p. 55-7.