|                              |   |                                          |
|------------------------------|---|------------------------------------------|
|                              | : |                                          |
| **ESTATE OF BRADLEY GROTE**  | : | **Civil Action No.: 2:20-CV-101**        |
|                              | : |                                          |
|                              | : | **Judge William O. Bertelsman**          |
| **Plaintiff,**               | : | **Magistrate Judge Candace J. Smith**    |
|                              | : |                                          |
| **v.**                       | : |                                          |
|                              | : |                                          |
| **KENTON COUNTY, KENTUCKY et al.,** | : |                                   |
|                              | : |                                          |
| **Defendants.**              |   |                                          |

## DEFENDANTS SOUTHERN HEALTH PARTNERS, INC. AND CAITLIN BRAND'S MOTION FOR SUMMARY JUDGMENT

Defendants, Southern Health Partners, Inc. ("SHP") and Caitlin Brand, LPN (hereinafter "Defendants"), by and through counsel, hereby move this Court to enter summary judgment in their favor pursuant to Fed. R. Civ. P. 56. These Defendants are entitled to summary judgment for multiple reasons. First, Plaintiff has produced no evidence of the deliberate indifference to the care of Bradley Grote as is required for a 42 U.S.C. §1983 claim. Second, Plaintiff lacks the expert testimony needed to establish causation as to the death of Bradley Grote both for the deliberate indifference claim and state law negligence claims. Lastly, Plaintiff has not provided any evidence to support her claims for infliction of emotional distress or punitive damages. These reasons are explained in greater detail in the Memorandum in Support below.

Respectfully,

*/s/ Aimee E. Muller*
Judd R. Uhl (89578)
Katherine L. Kennedy (92606)
Aimee E. Muller (96690)
LEWIS, BRISBOIS, BISGAARD & SMITH
2333 Alexandria Drive, Lexington, KY 40202
judd.uhl@lewisbrisbois.com
kate.kennedy@lewisbrisbois.com
aimee.muller@lewisbrisbois.com

Phone:  (859) 663-9830 | Fax:  (859) 663-9829
*Attorneys for Defendants Southern Health Partners,*
*Inc., and Caitlin Brand, LPN*

<u>**MEMORANDUM IN SUPPORT**</u>

## I.    FACTUAL BACKGROUND

On July 19, 2019, Bradley Grote, the son of Plaintiff Luanna Grote, left home in a vehicle

with Bethany Fuston. [*See* Deposition of Luanna Grote, pg. 34, Exh. 1.]  After picking up other

occupants, the vehicle was pulled over by the Covington Police Department ("CPD"). CPD

Detective Samuel Matthews initiated a traffic stop at 2:52 p.m. due to observing passenger Carolyn

Brun without a seatbelt.  [*See* Deposition of Samuel Matthews, pg. 8, Exh. 2; *see also*, Uniform

Citation, Exh. 3.] At the onset of the traffic stop, Officer Matthews witnessed the front seat

passenger throw objects out the window of the vehicle.  [*See* Matthews Dep., pg. 9.] The front seat

passenger was later identified as Bradley Grote.

The thrown objects were recovered and collected as evidence. Those objects included two

used syringes and a baggie of methamphetamine. *Id*.  During the search of the vehicle and of the

person of Mr. Grote no additional drugs were found.  *Id*. pp. 9-10.  Mr. Grote was ultimately taken

into custody related to the incident, as well as for an outstanding arrest warrant. *Id*. pp. 31-33.  It was

later discovered that at some point during this interaction, Mr. Grote secretly swallowed a bag of

methamphetamine.[1]  This would be a fatal decision.

During the traffic stop investigation and transport to the Kenton County Detention Center

Mr. Grote did not show any signs of physical impairment.  *Id*. at 10.  Det. Matthews then transferred

custody of Mr. Grote to Kenton County Detention Center ("KCDC") Deputy Brown. *Id*. Body

camera footage just prior to accepting Grote into custody at KCDC confirms that upon questioning,

---

[1] As addressed in the Kenton County Defendants' Motion for Summary Judgment [DN 116, p. 10, footnote 7], the evidentiary timeline establishes that Mr. Grote swallowed a bag of methamphetamine near the time of his arrest. The evidentiary timeline is consistent with Plaintiff Luanna Grote's opinion. Ms. Grote, who was familiar with her son's drug use and the signs and symptoms of it, believed her son was sober when he left their home just prior to his arrest.  [Grote Dep., Exh. 1, at 59.]

Mr. Grote informed Dep. Brown that he did not have any drugs on his person and that he would not be coming off any drugs or detoxing while incarcerated at KCDC.[2] [*See,* Video "Cov. Body Cam custody transfer" at 19:57 UTC.] Mr. Grote then underwent a routine over-the-clothes pat down search. [*See* Deposition of Alexander Brown, pp. 8-9, Exh. 4.] Deputy Brown believed Mr. Grote showed signs that he was clenching his buttocks, which he believed could be indicative of an inmate attempting to conceal contraband. *Id.* After obtaining the necessary authority, Deputy Brown performed an unclothed search. No drugs or other contraband were found. *Id.*

Mr. Grote next was taken to the booking clerk, Sarah Bell. At the request of Ms. Bell, Mr. Grote completed and signed a Medical Questionnaire in which he indicated that he had not recently ingested poisonous levels of drugs. [*See* Deposition of Sarah Bell, pp. 29-30, Exh. 5; *see also*, Medical Questionnaire, Exh. 6.]

On the date of Mr. Grote's arrest, KCDC contracted with SHP to provide medical services to KCDC in accordance with 501 KAR 3:090. [*See* Medical Services Agreement, Exh. 7.] SHP employed both Nurse Caitlin Brand and Tiara Dockery,[3] the two employees on shift at the time Mr. Grote arrived at KCDC. [*See* SHP Time Records, Exh. 9.]

After Mr. Grote's interaction with booking clerk Sarah Bell, Nurse Brand was summoned, non-urgently, for a medical examination of Mr. Grote. [*See* Deposition of Caitlin Brand, p. 98, Exh. 10.] Upon her arrival, Nurse Brand questioned Mr. Grote about whether he had consumed any drugs and checked his vital signs. *Id.* at 91. Mr. Grote stated he had used 0.5g methamphetamine at

---

[2] All body camera and surveillance camera footage related to this incident was previously delivered to the Court on USB drive. In order to ensure consistency in citations, these Defendants will include an identified file name for each video referenced in the same manner as the Kenton County Defendants in their Motion for Summary Judgment [DN 116].

[3] Ms. Dockery has been employed with Southern Health Partner, Inc. in a clerk position as well as a medical technician position. She is unsure of her title on July 19, 2019, but for the purposes of this litigation, it is irrelevant. [*See* Deposition of Tiara Dockery, pg. 29. Exh. 8.]

noon that day, which was over four hours prior to the time of Nurse Brand's medical examination. [*See* Video "Grote,_Bradley_booking_South".] Mr. Grote also stated he was a daily methamphetamine user. *Id.* Nurse Brand was well aware that 0.5g methamphetamine for a daily user was common, and not a reason to seek emergency medical services.[4]

At the beginning of Nurse Brand's initial medical assessment, Mr. Grote's oxygen saturation was 89%. She provided supplemental Oxygen and advised Mr. Grote to breathe in though his nose and out through his mouth. Mr. Grote's oxygen saturation quickly returned to an appropriate 96%. [*See* Medical Chart Entry of Nurse Brand, Exh. 12.] Nurse Brand also attempted to take Mr. Grote's blood pressure, but was unable to do so due to Mr. Grote being unable to hold still. *Id.* [*See also*, Brand Depo, p. 100.]

At the time of his initial assessment, Mr. Grote's symptoms were consistent with a methamphetamine detox. Accordingly, Nurse Brand treated it as such.[5] [*See*, Brand Depo., pp. 100-101.] She ordered Mr. Grote be placed on observation and checked every 10-15 minutes to monitor any change in his condition. *Id.* at 106. KCDC deputies then escorted Mr. Grote to holding cell B4, an area near booking and the medical office.

Mr. Grote entered cell B4 at 4:39 p.m.[6] KCDC deputies were alerted by a Class D inmate performing cleaning duties in the area near cell B4 that Mr. Grote was seizing at 5:35 p.m. In the less than one hour between the time Mr. Grote entered the cell and the time deputies were alerted to

---

[4] Nurse Brand testified at deposition that 0.5g did not indicate an overdose amount of methamphetamine. [*See* Brand Dep., pg. 100.] Defense toxicology expert, Dr. Akpunonu, confirms the reported 0.5g of methamphetamine for a known daily user is not an excessive amount of methamphetamine. [*See* Dr. Akpunonu Report, Exh. 11.]

[5] Mr. Grote's symptoms were consistent with a variety of intoxicants, withdrawal symptoms, and psychiatric illness. [*See* Dr. Akpunonu Report, Exh. 11.]

[6] The time Mr. Grote entered cell B4 and all observations of him are able to be verified via the overhead surveillance footage.

a seizure, there were more than seven instances of KCDC staff walking the area near the cell, opening the cell door, or peering through the window to check on Mr. Grote. [*See* Overhead Surveillance Video.]

Nurse Brand was paged "Signal 6," a medical emergency, at 5:35 p.m. [*See*, Brand Dep., pp 66.] She arrived to cell B4 one minute later. [*See,* Overhead Surveillance Video.] Nurse Brand placed an ammonia inhalant under Mr. Grote's nose without significant response. [*See* Brand Dep., pp. 69-70.] Nurse Brand also began monitoring Mr. Grote's Oxygen saturation level via a pulse ox monitor. *Id.* Once Nurse Brand determined she would not be able to correct Mr. Grote's vital signs, she immediately requested that Sgt. Russel call 911. [*See* Brand Dep., pp. 72-73. *See also,* Deposition of Jason Russell, p. 74, Exh. 13.] The call was placed at 5:42 p.m. Covington Fire Department arrived on scene at 5:53 p.m. and prepared Mr. Grote for transport to St. Elizabeth Hospital. [*See* Overhead Surveillance Video, generally.]

As nurse Brand arrived at the cell at 5:36 p.m. and the 911 call was placed at 5:42 p.m., the evidentiary timeline establishes that she was only in cell B4 for 6 minutes. These 6 minutes includes her entering the cell, taking Mr. Grote's vitals, providing supplemental Oxygen, utilizing ammonia inhalants and requesting Sgt. Russell to call for emergency medical services. Her actions do not even arguably constitute a delay in treatment.

It was later discovered that Mr. Grote had a methamphetamine concentration in his blood of 7.57mg/L. [*See* Dr. Akpunonu Report, Exh. 11.] Death is known to occur with a methamphetamine concentration of only 0.54mg/L. *Id.* This means that not only did Mr. Grote ingest more than a lethal dose of methamphetamine, he actually ingested over 14 times a lethal dose, and then lied about it to medical staff attempting to help him. As there is no antidote for methamphetamine toxicity and any decontamination procedures would have limited effectiveness, Mr. Grote unfortunately could not have been saved anyway. [*See* Dr. Akpunonu Report, Exh. 11, Opinion 3.]

After life saving treatment was attempted at St. Elizabeth Hospital, Mr. Grote became in a comatose state and ultimately passed away as a result of acute methamphetamine toxicity on July 21, 2019. [*See* Death Certificate, Exh. 14.]

While the circumstances surrounding Mr. Grote's death are undoubtedly tragic, they are not the result of any medical negligence on the part of Nurse Brand or Southern Health Partners, Inc. Mr. Grote's decision to secretly swallow a baggie of methamphetamine placed him on a collision course with certain death. His decision to conceal his actions and intentionally mislead jail and health care staff about his actions further cemented his fate.

## II.     LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party

must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## III.     ANALYSIS

### A.  Deliberate Indifference

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish both (1) that he was deprived of Constitutionally-protected rights, and (2) that the defendant at issue deprived him of those rights under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988). In alleging that Southern Health Partners, Inc., through nurse Brand violated Mr. Grote's constitutional rights, Plaintiff only generally asserts that all the Defendants, including nurse Brand and KCDC employees, were deliberately indifferent to Mr. Grote's serious medical need by failing to summon emergency medical services quicker than they did. To prevail on the claim against nurse Brand, Plaintiff must show that (1) Mr. Grote had an objectively serious medical need; and (2) nurse Brand subjectively perceived a risk of harm and then disregarded it. *Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001).

These defendants do not dispute the first element of the deliberate indifference test that Mr. Grote had an objectively serious medical need. Rather, these Defendants argue that Nurse Brand did not subjectively perceive the risk of harm and chose to disregard it.

### 1. Plaintiff Cannot Demonstrate that Nurse Brand Subjectively Perceived and then Recklessly Disregarded a Serious Medical Need

The subjective second component is not satisfied by mere negligence but instead requires reckless disregard for the prisoner's serious medical need. *Comstock*, 273 F.3d at 702-03; *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Indeed, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

To show the requisite subjective disregard, the prisoner must show (1) that the state official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed to the prisoner, (2) that the official drew the inference of substantial risk, and (3) that he disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As such, the deliberate indifference standard "describes a state of mind more blameworthy than negligence." *Id.* at 835.

This subjective component of the deliberate indifference standard is intended to avoid the constitutionalization of medical malpractice claims. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Thus "[w]here the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). "For example, '[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs,

but merely a degree of incompetence which does not rise to the level of a constitutional violation.'" *Comstock*, 273 F.3d at 703.

At best, Plaintiff's claim is a failure to recognize the severity of a medical condition. Plaintiff maintains, without support, that Nurse Brand should have requested an ambulance for Mr. Grote immediately upon encountering him for the first time in the booking area. However, this position is not supported even by Plaintiff's own expert, Dr. Keller. According to Dr. Keller, methamphetamine intoxication is not necessarily a medical emergency that would warrant sending a patient out of the jail; it depends on the severity. [*See,* Deposition of Dr. Jeffrey Keller, pg. 8. Exh. 15.]

For Plaintiff to succeed on a deliberate indifference claim, Nurse Brand had to be *subjectively* aware of the aware of the serious medical condition. "To meet the subjective component, the plaintiff must show that an official knew of and disregarded an excessive risk to inmate health or safety. An express intention to inflict unnecessary pain is not required. Still, the plaintiff must demonstrate that the official was aware of facts from which an inference of substantial risk of serious harm to inmate health or safety could be drawn and that the official *actually* drew the inference." *Brawner v. Scott Cty.*, 14 F.4th 585, 591 (6th Circ. 2021).

All of Mr. Grote's symptoms in the non-urgent medical assessment in booking were consistent with a methamphetamine detox. Methamphetamine detox was also consistent with the statements of Mr. Grote that he had taken 0.5g of methamphetamine at noon that day, four hours before Nurse Brand's initial encounter with Mr. Grote. Nurse Brand testified she believed he was experiencing non-emergent methamphetamine detox. [*See* Brand Dep., pg. 100-101.] At Mr. Grote's initial assessment in booking his symptoms did not indicate a methamphetamine overdose nor did Nurse Brand actually know of any reason to suspect an overdose. *Id.*

Moreover, as Plaintiff has no expert proof that Nurse Brand was negligent in her care, he

certainly cannot meet the heightened burden of establishing Nurse Brand was deliberately indifferent to Grote's serious medical need. Accordingly, Plaintiff's constitutional claim against Nurse Brand and Southern Health Partners, Inc. necessarily fails for failure to establish these Defendants committed a constitutional violation.

### 2. Plaintiff Cannot Establish that a Delay in Treatment was the Proximate Cause of Mr. Grote's death.

In addition, Plaintiff's constitutional claim fails for another reason. A § 1983 claim for recovery of monetary damages for the violation of one's constitutional rights is not only a constitutional claim, subject to the principles and case law set forth above, but it is also a tort claim subject to the fundamental principles of tort law. *See Wooler v. Hickman Cty.,* 2008 U.S. Dist. LEXIS 104983, *21-24  (W.D. Ky. Dec. 30, 2008), citing *Molnar v. Care House*, 574 F. Supp. 2d 772 (E.D. Mich. 2008) ("general principles of tort law govern liability imposed by § 1983") (citing *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994)). In other words, to successfully bring a claim for deliberate indifference to Mr. Grote's serious medical needs under the Eighth Amendment, Plaintiff must not only show the existence of (1) a serious medical need, and (2) deliberate indifference to that need by the Defendants, but also (3) a causal connection between the Defendants' deliberate indifference and his injuries. *Id.*, citing *Calhoun v. Volusia Count*y, 499 F. Supp. 2d 1299, 1302-03 (M.D. Fla. 2007).

This element is as critical as the former two elements since compensatory damages cannot be awarded for a violation of constitutional rights absent proof of actual injury, i.e. injury caused by the violation. *See Wooler,* at *21-24, citing *Stachura*, 477 U.S. at 308; *Carey v. Piphus*, 435 U.S. 247, 264, (1978) (Plaintiff could only recover compensatory damages if he proved actual injury caused by the denial of his constitutional rights.). Accordingly, "proximate causation is an essential element of a § 1983 claim for damages." *Horn*, 22 F.3d at 659 (6th Cir. 1994) (citing *Doe v. Sullivan County*, Tenn., 956 F.2d 545, 550 (6th Cir. 1992); *Ellis v. Washington County & Johnson County*, Tenn., 198

F.3d 225, 226 (6th Cir. 1999) (summary judgment appropriately entered in § 1983 action where plaintiff failed to show proximate causation)).

Here, without adequate and reliable expert proof, Plaintiff alleges that the delay in treatment and failure to recognize the overdose resulted in Mr. Grote's death. However, as discussed above, Mr. Grote secretly swallowed 14 times the amount of methamphetamine known to be lethal. Even if Mr. Grote arrived at the emergency room sooner, there would have been no treatment which could have saved his life. There is no such thing as an antidote for methamphetamine toxicity. As explained by Dr. Akpunonu, any decontamination efforts would have had limited effectiveness. He cannot say with any level of certainty that earlier transport to the emergency room would have saved Mr. Grote's life. [*See*, Dr. Akpunonu Report, Exh. 11.] Without reliable testimony[7] or evidence of causation, Plaintiff's 1983 claim fails as a matter of law.

### B. State Law Negligence Claims

Plaintiff has raised a generic state law negligence claim against all the defendants in this case. Although poorly pled, Plaintiffs essentially argue that the defendants (1.) failed to train employees who interacted with inmates in the detection and use of proper and immediate medical care; (2.) denied medical care to Mr. Grote; and (3) failed to follow policies and procedures of the Kenton County Detention Center and Southern Health Partners, Inc. [*See,* Complaint ¶145-152, DN 1, Page ID 26-27.]

Plaintiff's state law negligence claims have the clear appearance of including everything Plaintiff could think of in an attempt to see what would stick. All of these claims fail for the same

---

[7] Plaintiff disclosed Dr. Jeffrey Keller as an expert in this case. Dr. Keller opined that had Mr. Grote arrived at the emergency room sooner his life may have been saved. These Defendants have addressed in a separate Motion to Exclude the Opinions of Dr. Keller that these opinions are unreliable and must be excluded.

reason. Plaintiff cannot establish a causal link between any of the alleged negligent acts and the harm suffered.

The elements of a Kentucky negligence claim are well established. Plaintiff must prove the existence of (1) a duty; (2) breach of the duty; (3) causation; and (4) damages. *Kendall v. Godbey*, 537 S.W.3d 326, 331 (Ky. Ct. App. 2017). "Causation consists of two distinct components: but-for causation, also referred to as causation in fact, and proximate causation. Literally speaking, there can never be only one cause of any result. Every cause is a collection of many factors, some identifiable and others not, all determined by prior events. The law seeks out only the collective cause or causes for which it lays responsibility on some person or persons. But-for causation requires the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred but for the defendant's negligent or wrongful conduct in breach of a duty. **An act or omission is not regarded as a cause of an event if the particular event would have occurred without it**." *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. S. Ct 2016). Kentucky also utilizes the substantial factor test to establish causation. "This standard requires the plaintiff to prove that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm. Substantial-factor causation analysis takes into account the likelihood of multiple causes." *Mannahan v. Eaton Corp*., 2016 Ky. App. LEXIS 120 *6. The burden to prove causation always resides with the plaintiff. *Id. *10.*

It is abundantly clear that Plaintiff cannot establish that the actions of Nurse Brand were the cause of Mr. Grote's death. Mr. Grote's death was caused by him secretly swallowing a baggie of methamphetamine and then lying to Nurse Brand about his actions as she attempted to help him. As discussed in greater detail above, Dr. Akpunonu, a toxicologist, has opined that any decontamination efforts would have had limited effectiveness. He cannot say with any level of certainty that earlier transport to the emergency room would have saved Mr. Grote's life. [*See*, Dr.

Akpunonu Report, Exh. 11].

Plaintiff cannot demonstrate proof of causation that any action by Nurse Brand would have been able to save Mr. Grote's life after he swallowed a baggie containing 14 times a lethal dose of methamphetamine.

### C. Intentional Infliction of Emotional Distress Claim

Plaintiff's claim for infliction of emotional distress is equally as meritless as the other claims[8]. In Kentucky, the tort of intentional infliction of emotional distress is a "gap-filler" tort, but it can stand alone on appropriate facts. *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. S. Ct. 2012). "A litigant cannot prevail on both a negligence claim and an intentional infliction of emotional distress claim on the same set of facts." *Id.* "Emotional distress, standing alone, does not result in liability from an actor's conduct unless his intentional (or reckless) conduct is aimed toward causing emotional distress, is outrageous, and does cause severe emotional distress. Emotional distress as stand-alone damages can only be compensated through the tort of intentional infliction of emotional distress. In all other instances, emotional distress (mental pain and suffering) follows a personal injury, and is only compensable as a by-product of that injury." *Id*. at 582.

To recover under a theory of intentional infliction of emotional distress, the tortfeasor's conduct must be intentional or reckless. *Id.* The alleged mental distress Mr. Grote suffered is the by-product of the alleged medical negligence. Accordingly, intentional infliction of emotional distress was not the proper claim to be brought in this matter.

---

[8] Plaintiff makes a generical claim for "Infliction of Emotional Distress" in ¶159-163 of Plaintiff's Complaint. [DN 1. Page ID 28-29]. Plaintiff's Complaint does not specify if Plaintiff intends to make a claim for negligent or intentional infliction of emotional distress. However, in ¶ 162, Plaintiff uses language of "extreme, outrageous, and intolerable" and so Defendants can only assume Plaintiff intends to make a claim for intentional infliction of emotional distress.

The first reason that Plaintiff's emotional distress claim fails is because Plaintiff cannot establish that Nurse Brand acted intentionally or recklessly. Rather, the evidence shows that Nurse Brand monitored vital signs, provided all medical care within her ability, and requested emergency services upon recognizing a medical emergency. Her conduct was appropriate for the circumstance and did not even breach the standard of care owed by her as a nurse, much less would her conduct have been intentional or reckless. Second, the infliction of emotional distress cannot be maintained on the same set of facts as a negligence claim. Plaintiff's claim is more akin to one of negligence than of infliction of emotional distress. Accordingly, this Court must dismiss the claim for infliction of emotional distress.

### D. <u>Punitive Damages Claim</u>

Plaintiff has provided no evidence which warrants punitive damages in this case either for the state law negligence claims or the deliberate indifference claim. For similar reasons, Defendants are entitled to summary judgment on all of Plaintiff's claims for punitive damages.

#### 1. *Punitive Damages for State Law Negligence Claims*

Pursuant to KRS 411.184(2), Kentucky's punitive damages statute, "A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."

The Kentucky legislature has clearly defined the meanings of oppression, fraud and malice. "Oppression" means conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship. "Fraud" means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff. "Malice" means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that

such conduct will result in human death or bodily harm. KRS 411.184(1)(a-c).

In order to recover, Plaintiff must establish proof that Nurse Brand acted with oppression, fraud or malice. No such proof exists in this case. The evidence clearly establishes that Nurse Brand was acting in accordance with her training as a nurse and was relying on statements made by Mr. Grote about the timing and amount of methamphetamine he has used. At best, her conduct would be negligent if she failed to recognize signs of an overdose. It does not rise to the level of oppression, fraud or malice.

Furthermore, Kentucky's punitive damage statute expressly prohibits punitive damages from being assessed against an employer, in this case Southern Health Partners, Inc., for Brand's conduct. Pursuant to KRS 411.184(3), "In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." There has been no such evidence in this case. Accordingly, these Defendants are entitled to summary judgment on Plaintiff's punitive damages claim.

### 2. *Punitive Damages for Deliberate Indifference Negligence Claim*

In order to recover punitive damages for a 42 U.S.C. § 1983 deliberate indifference claim the defendant must willfully and intentionally violates another's civil rights or acts with reckless or callous indifference to the federally protected rights of others. *Murphy v. Gilman*, 551 F. Supp. 2d 677, 684 (W.D. MI 2008) quoting Gordon v. Norman, 788 F.2d 1194 (6th Circ. 1984).

The analysis remains the same. There has been no evidence Nurse Brand acted willfully or intentionally to violate Mr. Grote's civil rights. There has been likewise no evidence she acted recklessly or with callous indifference.

### IV.   CONCLUSION

For the foregoing reasons, Southern Health Partners, Inc. and Caitlin Brand respectfully

request summary judgment in their favor on all of Plaintiff's claims.

Respectfully submitted,

*/s/ Aimee E. Muller*
Judd R. Uhl (89578)
Katherine L. Kennedy (92606)
Aimee E. Muller (96690)
LEWIS, BRISBOIS, BISGAARD & SMITH
2333 Alexandria Drive, Lexington, KY 40202
judd.uhl@lewisbrisbois.com
kate.kennedy@lewisbrisbois.com
aimee.muller@lewisbrisbois.com
Phone: (859) 663-9830 | Fax: (859) 663-9829
*Attorneys for Defendants Southern Health Partners,*
*Inc., and Caitlin Brand*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was delivered via electronic mail on the 16th day of September, 2022 as follows:

Donald Nageleisen, Esq.
2216 Dixie Highway, Suite 203
dlnlegalmail@yahoo.com

Gary Franke, Esq.
120 E. 4th Street, Suite 1040
Cincinnati, OH 45202
gff@garyfrankelaw.com

Christopher Scott Nordloh
Kenton County Attorney
1840 Simon Kenton Way, Suite 4200
Covington, KY 41011
cnordloh@kentoncoatty.com

*/s/ Aimee E. Muller*
Aimee Muller (96690)
*Attorneys for Defendants*
*Southern Health Partners, Inc. and Caitlin Brand*

# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

AT COVINGTON

CIVIL ACTION NO.: 2:20-CV-101

JUDGE WILLIAM O. BERTELSMAN

MAGISTRATE JUDGE CANDACE J. SMITH


ESTATE OF BRADLEY GROTE,

PLAINTIFF


V.


KENTON COUNTY, KENTUCKY, ET AL.,

DEFENDANTS


DEPONENT:  LUANNA GROTE

DATE:      AUGUST 2, 2021

REPORTER:  ELIZABETH HARLOW



1    family sandwich," and it talks about the triple-decker.

2    And I'm just -- if you need to take a break?

3         A    No.

4         Q    Okay.  It says, "His ride came before he could

5    bite."  Who was -- who's the ride that was picking him

6    up?

7         A    Bethany just -- she had just brought me back

8    from the grocery store, and he had made the sandwich,

9    and she was getting ready to leave, and he asked her for

10   a ride.

11        Q    So Brad would have been home by himself, and

12   then you and Bethany come back from the store?

13        A    Yes.

14        Q    And Brad asks Bethany for a ride somewhere?

15        A    Brad was alone when I left.  And then when I

16   came back, the -- whoever the guy was was there.

17        Q    Who's the guy?  Do you know?

18        A    I don't know him.

19        Q    Was he with -- go ahead.

20        A    He was there with a -- with his girlfriend,

21   and I think they had gotten into an argument, and she

22   left him there.

23        Q    Who's --

24        A    I don't know these people.

25        Q    All right.  Well, let me see if I can figure



1    it hypothesis or theory, of when Brad actually took the

2    drugs that he overdosed on?

3        A    I believe he took the drugs either as they got

4    pulled over, or soon after.  I mean, I -- I'm not sure.

5        Q    So before he got to the jail?

6        A    Yeah.

7        Q    Did anybody from the hospital ever tell you

8    how much or what amount of drugs Brad had ingested?

9        A    I don't remember.  They just said a lot.

10       Q    They didn't --

11       A    I mean, I don't think they knew, either.

12       Q    They didn't tell you whether -- what the

13   levels were in his bloodstream or his body?

14       A    I don't think so.

15       Q    Did they tell you they found any other drugs

16   in his system, besides methamphetamine?

17       A    She said they found a low amount of marijuana

18   and a trace of fentanyl.

19       Q    When you had heard that Brad had -- they had

20   found methamphetamine in his system, did you think Brad

21   was still using methamphetamine or that he had quit?

22       A    I thought he was -- I thought he was -- I

23   thought he quit.

24       Q    Because that's what he had told you?

25       A    He didn't -- yeah.  Well, yeah -- he didn't



1              CERTIFICATE OF REPORTER

2          COMMONWEALTH OF KENTUCKY AT LARGE

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof by me after first

7    being duly sworn to testify the truth, the whole truth,

8    and nothing but the truth; and that the said matter was

9    recorded by me and then reduced to typewritten form

10   under my direction, and constitutes a true record of the

11   transcript as taken, all to the best of my skills and

12   ability. I certify that I am not a relative or employee

13   of either counsel, and that I am in no way interested

14   financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22   ELIZABETH HARLOW,

23   COURT REPORTER / NOTARY

24   COMMISSION EXPIRES ON: 04/06/2022

25   SUBMITTED ON: 08/13/2021



# EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

AT COVINGTON

CIVIL ACTION NO.: 2:20-CV-101

JUDGE WILLIAM O. BERTELSMAN

MAGISTRATE JUDGE CANDACE J. SMITH


ESTATE OF BRADLEY GROTE,

Plaintiff


V.


KENTON COUNTY, KENTUCKY, ET AL.,

Defendants


DEPONENT:  SAMUEL MATTHEWS

DATE:      SEPTEMBER 23, 2021

REPORTER:  TAYLOR VENEMAN



1 suspected methamphetamine.
2 Q And could you tell how much that is, just from
3 the video?
4 (VIDEO PLAYS)
5 A It's hard telling. It's -- it's hard to
6 guesstimate a weight on it.
7 Q Let me jump ahead here. Okay. I'm sorry,
8 it's on 25. Okay. We are now at 18:59:17.
9 (VIDEO PLAYS)
10 A Okay. Exiting my cruiser.
11 Q And then who -- that's the car -- that's --
12 it's a suspect vehicle?
13 A That is the sus --
14 Q What was it; do you remember?
15 A It was a Chevy Malibu 2000.
16 Q So at this point, all the occupants are still
17 in the vehicle?
18 A I believe so, other than Mr. Grote.
19 Q Mr. Grote was, at this point, in the back of a
20 cruiser?
21 A I believe he was still standing outside of a
22 cruiser.
23 Q Somebody is watching him though?
24 A Yes, sir.
25 Q And what are we doing here?

1 A I'm checking the other side of the fence, the
2 residential backyard where I thought he threw something.
3 That's Sergeant Rose. He's told me they found a needle
4 on the other side of the fence, and he -- I believe he's
5 pointing out another needle to me now.
6 (VIDEO PAUSES)
7 Q Okay. And this is just a home -- a private
8 property?
9 A Correct.
10 Q Did you need consent to search that?
11 A We did not.
12 (VIDEO PLAYS)
13 Q What would -- what did you do there?
14 A I bent down and picked up syringes. It's
15 capped. And I located it on the ground in the subject's
16 back yard, which is where I saw Mr. Grote throw
17 something over the fence.
18 Q And that's in evidence too?
19 A It is.
20 Q And so you're just, what, tagging that?
21 A Yep. I'm putting it in a sharps container,
22 which is how we would deal with syringes. And then I'll
23 peal the top off and seal it also.
24 Q I'm going to go to Grote here -- oh, one sec.
25 So this is 19:03:25, at least the identifying tag on the

1 body cam. Now, is that Mr. Grote (indicating)?
2 A That is Mr. Grote.
3 (VIDEO PAUSES)
4 Q And looks like you got a hat there?
5 A Yeah.
6 Q What's going on?
7 A That was his hat on. I don't know if it fell
8 off, or if I've just taken it off. That's part of my
9 search. I'll check the room of the hats and then
10 sideline him.
11 Q I'm going to roll this video, and then I'm
12 going to ask you some questions, okay?
13 A Okay.
14 (VIDEO PLAYS)
15 A I had him spread his feet, ask him if he had
16 anything else on. And he said, "I didn't have anything
17 else on me in the fir" -- "on me in the first place."
18 He's asked me to smoke a cigarette, asked me why I
19 pulled him over. I told him it's because of the seat
20 belt. So I'm searching his pockets here.
21 (VIDEO PAUSES)
22 Q Let me stop it at 19:04. Based on that point,
23 was he acting erratic under the influence of drugs, like
24 he had ingested a large amount of drugs?
25 A He was not.

1 Q Was he sweating?
2 A No.
3 Q Dilated pupils?
4 A No, sir.
5 Q Any of that evidence?
6 A No, sir.
7 (VIDEO PLAYS)
8 A That's me checking his groin area. That's me
9 checking his groin in the front.
10 (VIDEO PAUSES)
11 Q At 19:04:21, you were just checking his groin,
12 look like with your left hand?
13 A Yes, sir.
14 Q No drugs?
15 A No drugs.
16 (VIDEO PLAYS)
17 A I warned him if I -- I did check my back seat
18 before the shift started. There was nothing illegal in
19 there. I told him if I found anything illegal in the
20 back seat, it'd be charged. But he's coherent, talking
21 normally.
22 Q And he wouldn't -- he was obviously upset.
23 He'd been arrested. Was he combative in any way?
24 A No. At the beginning he was verbally non-
25 compliant at the beginning of the traffic stop, but he

1                    CERTIFICATE OF REPORTER

2                        STATE OF OHIO

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page here of by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded stenographically and mechanically by

10   me and then reduced to type written form under my

11   direction, and constitutes a true record of the

12   transcript as taken, all to the best of my skill and

13   ability. I certify that I am not a relative or employee

14   of either counsel, and that I am in no way interested

15   financially, directly or indirectly, in this action.

16

17

18

19

20

21

22   TAYLOR VENEMAN,

23   COURT REPORTER / NOTARY

24   MY COMMISSION EXPIRES ON: 10/20/2025

25   SUBMITTED ON: 10/06/2021



# EXHIBIT 3

COMMONWEALTH OF KENTUCKY

# UNIFORM CITATION

NOT ORIGINAL DOCUMENT
07/22/2020 03:21:18 PM
PACCA-626

**COURT**

| AGENCY | | CRI | 0590100 |
|---|---|---|---|
| COVINGTON POLICE DEPARTMENT | | | |

**OFFENDER / VIOLATOR**

| NAME: LAST, FIRST, MI, FILIAL | | ATTN | HOME PHONE |
|---|---|---|---|
| GROTE, BRADLEY JAMES | | | UNKNOWN |
| ALIAS NAME: LAST, FIRST, MI, FILIAL | | | EMERGENCY PHONE |
| | | | UNKNOWN |

| ADDRESS (NUMBER, NAME, SUFFIX) | | | KENTUCKY RESIDENT STATUS |
|---|---|---|---|
| 445 CENTER ST | | | ✓ F: FULL-TIME   P: PART-TIME   N: NON RESIDENT |

| CITY | STATE | ZIP CODE/EXTENSION | MARITAL STATUS | VICTIM'S RELATIONSHIP TO OFFENDER |
|---|---|---|---|---|
| ERLANGER (KENTON CO) | KY | 41018 | SINGLE | |

| ID TYPE | ID. ST. | ID. NUMBER | S. S. NUMBER | HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|
| OPERATOR'S LICENSE | KY | G09896477 | 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 | 5' 05" | 180 | BROWN | BROWN |

| | | | | | ETHNIC ORIGIN | | ALCOHOL/DRUG INVOLVEMENT |
|---|---|---|---|---|---|---|---|
| COMMERCIAL VEHICLE | | PLACARDED HAZARDOUS VEHICLE | | | HISPANIC   ✓ NON HISPANIC | | ALCOHOL |

| DATE OF BIRTH | SEX | RACE | B A RESULTS |
|---|---|---|---|
| 10 10 1991 | ✓ MALE   FEMALE | ✓ WHITE   BLACK   AM. INDIAN OR ALASKA   ASIAN | BREATH   NOT REQUESTED   ✓ DRUGS |
| PLACE OF EMPLOYMENT / OCCUPATION | CITY | STATE KY | BLOOD   NOT REQUESTED   UNKNOWN |
| | | | URINE   NOT REQUESTED |

**VEHICLE**

| VEHICLE MAKE | VEHICLE MODEL | VEH. YEAR | VEHICLE COLOR |
|---|---|---|---|
| CHEVROLET | MALIBU | 2000 | GLD |

| VEH. TYPE | REGISTRATION: STATE, YEAR, NUMBER | VEHICLE IDENTIFIERS | MPH | IN MPH ZONE | VIOL. KEY |
|---|---|---|---|---|---|
| 4D | KY | 2019 | 445ZMT | | | | |

**DATE / TIME**

| VIOLATION DATE | VIOLATION TIME | EXACT LOCATION OF VIOLATION | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 07 19 2019 | 2:52 PM | 1847 HOLMAN AVE | | | COVINGTON |
| | | | | COUNTY KENTON | SECTOR 3 |

| ARREST DATE | TIME OF ARREST | EXACT LOCATION OF ARREST | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 07 19 2019 | 3:05 PM | 1847 HOLMAN AVE | | | COVINGTON |
| | | | | COUNTY KENTON | SECTOR 3 |

**CHARGES AND POST-ARREST COMPLAINT**

| NUMBER | | VIOLATION CODE | ASCF | STATUTE/ORD. | CHARGE(S) | STARTING CASE | ENDING CASE | DRUG TYPE |
|---|---|---|---|---|---|---|---|---|
| 1 | of 3 | 42187 | 0 | 218A.1415 | 1 | 19-036335 | | METHAMPHETAMINE |
| 2 | of 3 | 50230 | 0 | 524.100 | 1 | 19-036335 | | |
| 3 | of 3 | 42081 | 0 | 218A.500(2) | 1 | 19-036335 | | METHAMPHETAMINE |
| | of | | | | | | | |

POST-ARREST COMPLAINT
Charge 1: POSS CONT SUB, 1ST DEGREE, 2ND OFFENSE (METHAMPHETAMINE)
Charge 2: TAMPERING WITH PHYSICAL EVIDENCE
Charge 3: DRUG PARAPHERNALIA - BUY/POSSESS

On the above date, time, and at the above location I conducted a traffic stop on a vehicle for a rear passenger not wearing a seatbelt. Upon initiating my emergency equipment the above person got out of the car and began to walk across the parking lot. I told him to get back in the car, before sitting down I observed him throw several items, one which was clearly a syringe over a high fence/behind a dumpster. I checked the area and located a baggie of meth and 2 syringes. The above person did not wish to speak to officers post Miranda.

**COURT**

| COURT DATE | COURT TIME | PAYABLE | COURT LOCATION | | YEAR 19 |
|---|---|---|---|---|---|
| ARRESTED | | ✓ COURT | KENTON | | |
| COURT CASE NUMBER | | | TOTAL PREPAYABLE AMOUNT | NOT PREPAYABLE | |

**CASE**

| WITNESS 1 NAME: LAST, FIRST, MI, FILIAL | | STATE | ZIP CODE | | CONTROL NUMBER |
|---|---|---|---|---|---|
| WARNER, SPECIALIST | | | | | DG68112 |
| WITNESS 1 ADRRESS (NUMBER, STREET, SUFFIX) | | CITY | | | |
| WITNESS 2 NAME: LAST, FIRST, MI, FILIAL | | STATE | ZIP CODE | | |
| WITNESS 2 ADRRESS (NUMBER, STREET, SUFFIX) | | CITY | | | |

| SERVING WARRANT FOR OTHER AGENCY   SPECIFY: - | | | ✓ IN-CAR VIDEO | | TYPE |
|---|---|---|---|---|---|
| | | | FINGERPRINTS | | 1 |
| OFFICER SIGNATURE | BADGE/I.D. NUMBER | ASSIGNMENT | PHOTOS | | |
| Mathews, S. | 0307 | 0307 | ✓ EVIDENCE HELD | | |

# EXHIBIT 4

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF KENTUCKY

3                    AT COVINGTON

4            CIVIL ACTION NUMBER: 2:20-CV-101

5              JUDGE WILLIAM O. BERTELSMAN

6

7    ESTATE OF BRADLEY GROTE           PLAINTIFF

8         vs.

9    KENTON COUNTY, KENTUCKY, ET AL.      DEFENDANTS

10

11                    * * * * * * * *

12   DEPONENT:            ALEXANDER BROWN

13   DATE:               AUGUST 5, 2021

14                    * * * * * * * *

15

16   Lois A. Roell,

17   Registered Merit Reporter

18

19

20

21

22   *Barlow*
     *Raising the Bar*
23   Reporting & Video Services, LLC
     620 Washington Street
24   Covington, Kentucky 41011
     (859) 261-8440

25

1  have?

2      A    I remember bringing him into the

3  facility.  I remember having him assessed medically.

4  I remember strip searching him.  I remember calling

5  a signal 6 and then assisting EMS with placing him

6  on the stretcher.

7      Q    Could you tell me what you recall about

8  bringing Mr. Grote into the facility?

9      A    I don't remember which department brought

10 him in, but it was in the middle of summer and I

11 remember him being kind of sweaty, starting off,

12 chalked it up to it being hot.  I asked him my

13 initial intake questions, and usually as bringing

14 someone in, I visually assess people to kind of see

15 like how I feel like they're going to behave for

16 safety purposes.

17     Q    Sure.

18     A    And then once brought in, his behavior

19 kind of turned a little bit.  Got in there, started

20 performing my pat-down search of him on the wall in

21 the grill.  Very strange pat-down search, a lot of

22 clenching, fidgeting.  So I took that as a sign of

23 trying to hide something.  I contacted Sergeant

24 Russell.  Once I brought him in, sat him in front of

25 the booking officer, I contacted Sergeant Russell,

1   performed an unclothed search on him.  After the

2   unclothed search, he was still continuing his

3   behavior, so I figured it would be best for medical

4   to assess him.  And after medical assessed him, I

5   let him finish the booking process with the booking

6   officers, and then I determined that it would be

7   best for him to relax for a little bit, maybe calm

8   down.  I've seen a lot of people come in from

9   alcohol that are coming off of alcohol withdrawals

10  and stuff, and sometimes it's best for them to relax

11  a little bit and finish their booking process.

12      Q    Let's go back to, you said that his

13  behavior turned.  What do you mean, turned?

14      A    It gradually progressed, like the

15  sweating progressed, the shaking, like the agitation

16  look progressed.

17      Q    The strip search that you performed,

18  where would that have been done, was that in the

19  booking area?

20      A    Yes, sir.  So there are three -- well,

21  technically there's four rooms on the right side as

22  you're exiting booking.  One is the changeout room,

23  which is where we would take inmates to change their

24  clothes or whatever to take them back to general

25  population.  The other three are restrooms.  Usually

```
 1                              )

 2   COMMONWEALTH OF KENTUCKY    )

 3                              )

 4          I, Lois A. Roell, RMR and Notary Public

 5   in and for the Commonwealth of Kentucky, do hereby

 6   certify:

 7          That the witness named in the deposition,

 8   prior to being examined, was by me duly sworn;

 9          That said deposition was taken before me

10   at the time and place therein set forth and was

11   taken down by me in shorthand and thereafter

12   transcribed into typewriting under my direction and

13   supervision;

14          That said deposition is a true record of

15   the testimony given by the witness and of all

16   objections made at the time of the examination.

17          I further certify that I am neither

18   counsel for nor related to any party to said action,

19   nor in any way interested in the outcome thereof.

20          IN WITNESS WHEREOF I have subscribed my

21   name and affixed my seal this 7th day of October,

22   2021.

23                    _____

24                    LOIS A. ROELL, RMR
                       Notary Public  ID 629180
25                     My Commission expires: 09/07/23
```

# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3                AT COVINGTON

4        CIVIL ACTION NUMBER: 2:20-CV-101

5          JUDGE WILLIAM O. BERTELSMAN

6

7    ESTATE OF BRADLEY GROTE          PLAINTIFF

8          vs.

9    KENTON COUNTY, KENTUCKY, ET AL.     DEFENDANTS

10

11                  *  *  *  *  *  *  *  *

12   DEPONENT:        SARAH BELL (NKA SARAH PURNELL)

13   DATE:            AUGUST 3, 2021

14                  *  *  *  *  *  *  *  *

15

16   Lois A. Roell,

17   Registered Merit Reporter

18

19

20

21

22              *Barlow*
               *Raising the Bar*
23        Reporting & Video Services, LLC
24             620 Washington Street
              Covington, Kentucky  41011
25                (859) 261-8440

 1     A     From the deputy that -- from the officer

 2     that gave it to them.

 3     Q     Did you review Mr. Grote's citation?

 4     A     Not what his charges were, just his

 5     information to put in the computer, so like his name

 6     and social.

 7     Q     You had a computer at your desk?

 8     A     Yes.

 9     Q     All the booking information that you

10     would have gathered, at least that you used in

11     booking Mr. Grote, you would have put in the

12     computer?

13     A     Yes.

14     Q     After you get the citation and you put

15     information in the computer, what do you do next?

16     A     I mean, just go through the screens on

17     the JailTracker system until the inmate sits in the

18     chair.

19     Q     What screens do you go through?

20     A     There was maybe like seven different

21     ones, basic information, what their charges were,

22     property, medical questions, and I don't remember

23     the other ones.

24     Q     So would you be discussing information

25     with the inmate while you're going through the

1   screens?

2       A    Asking medical questions when it came to

3   that screen.

4       Q    Is that the only screen that you would

5   discuss information with the inmate to your

6   knowledge?

7       A    Maybe ask him -- well, I guess I could

8   see what he's wearing, but like his color of his

9   shoes because you can't see that.  That's the only

10  other thing I would discuss with him.

11      Q    The color of his shoes?

12      A    Yeah.

13      Q    Where would you be taking this

14  information, would you be sitting at a desk?

15      A    Yes.

16      Q    Would he be standing in front of you?

17      A    Sitting.

18      Q    So you go through the seven screens and

19  then what do you do?

20      A    I mean, in between there, answer phones,

21  scan documents, seal property.

22      Q    When you say you answer phones, who's

23  calling booking, you mean from the outside public?

24      A    Yes.

25      Q    What types of phone calls would you

1                                    )

2   COMMONWEALTH OF KENTUCKY   )

3                                    )

4           I, Lois A. Roell, RMR and Notary Public

5   in and for the Commonwealth of Kentucky, do hereby

6   certify:

7           That the witness named in the deposition,

8   prior to being examined, was by me duly sworn;

9           That said deposition was taken before me

10  at the time and place therein set forth and was

11  taken down by me in shorthand and thereafter

12  transcribed into typewriting under my direction and

13  supervision;

14          That said deposition is a true record of

15  the testimony given by the witness and of all

16  objections made at the time of the examination.

17          I further certify that I am neither

18  counsel for nor related to any party to said action,

19  nor in any way interested in the outcome thereof.

20          IN WITNESS WHEREOF I have subscribed my

21  name and affixed my seal this 7th day of October,

22  2021.

23          _____

24          LOIS A. ROELL, RMR
            Notary Public  ID 629180
25          My Commission expires: 09/07/23

# EXHIBIT 6

# Standard Medical Questions

Name: GROTE, BRADLEY JAMES (881218)
Date of Birth: ████

Interviewer: BELL, SARAH                    Date / Time: 07/19/2019 16:06

| Answer | |
|---|---|
| NO | 1. DO YOU HAVE A SERIOUS MEDICAL CONDITION THAT MAY REQUIRE ATTN WHILE YOU ARE HERE? IF YES, MEDICAL |
| NO | 2. ARE YOU CURRENTLY TAKING A PRESCR MED THAT MAY NEED CONTINUED WHILE YOU ARE HERE?**IF YES,NOTIFY MEDICAL |
| NO | 3. DO YOU WEAR DENTURES? IF SO, UPPER, LOWER OR BOTH? |
| NO | 4. DO YOU HAVE YOUR DENTURES WITH YOU? (IF ANSWERED YES TO QUESTION 3) |
| NO | 5. DO YOU HAVE A SERIOUS MENTAL HEALTH CONDITION THAT MAY NEED ATTENTION WHILE YOU ARE HERE?*** |
| NO | 6. HAVE YOU RECENTLY TAKEN OR BEEN PRESCRIBED MEDICATION FOR EMOTIONAL PROBLEMS?*** |
| NO | 7. HAVE YOU BEEN HOSPITALIZED FOR EMOTIONAL PROBLEMS WITHIN THE LAST YEAR? |
| NO | 8. HAVE YOU EVER ATTEMPTED SUICIDE?*** |
| NO | 9. ARE YOU CURRENTLY THINKING ABOUT SUICIDE? *** |
| NO | 10. HAVE YOU RECENTLY INGESTED POTENTIONALLY DANGEROUS LEVELS OF DRUGS OR ALCOHOL?***IF YES, CONTACT MEDICAL |
| NO | 11. HAVE YOU EXPERIENCED DT'S OR OTHER SERIOUS WITHDRAWAL FROM DRUGS OR ALCOHOL?*** |
| NO | 12. HAVE YOU EVER HAD A CLOSED HEAD INJURY THAT REQUIRED HOSPITALIZATION?***IF YES, CONTACT MEDICAL |
| NO | 13. DO YOU HAVE A LEARNING OR OTHER DISABILITY THAT WILL IMPACT YOUR ABILITY TO UNDERSTAND INSTRUCTIONS? |
| NO | 14. ARE YOU AWARE OF ANY REASON YOU SHOULD BE SEPARATED FROM ANOTHER INMATE WHILE YOU ARE HERE? |
| NO | 15. HAVE YOU EVER REQUIRED SEPARATION FROM ANOTHER INMATE WHILE INCARCERATED IN ANOTHER FACILITY? |
| YES | 16. DO YOU UNDERSTAND THAT YOU MAY REQUEST A HEALTH CARE PROVIDER WHILE YOU ARE HERE? |
| YES | 17. HAVE YOU UNDERSTOOD ALL OF THE QUESTIONS I HAVE ASKED YOU? |
| YES | 18. HAVE YOU PROVIDED US WITH ALL THE INFO THAT YOU WANT US TO BE AWARE OF WHILE YOU ARE HERE? |
| YES | 19. DOES THE SCREENING OFFICER FEEL THAT THE ARRESTEE IS CAPABLE OF UNDERSTANDING ALL QUESTIONS ASKED? |
| NO | 20. DOES THIS ARRESTEE HAVE ANY INSTITUTIONAL HISTORY OF ALERTS? CALL CRISIS LINE FOR MENTAL RELATED |
| NO | 21. DOES THE SCREENING OFFICER FEEL THAT HIS ARRESTEE SHOULD BE REFERRED TO A SUPERVISOR FOR REVIEW? |
| NO | 22. ***IF YES ANSWER TO QUESTIONS 5,6,7,8, 9, AND 11 CALL JAIL CRISIS LINE-877-266-2602 AFTER 5PM CALL 800-928-8000 |
| NO | 23. IF NO TO #19 OR YES TO RELATED TO RELATED TO MENTAL HEALTH, SUICIDAL, ABI, MR, CALL JAIL CRISIS LINE |
| NO | 24. MEDICAL QUESTIONNAIRE REVISION DATE  10/29/2008 |

_____                    _____
Offender's Signature                        Officer's Signature

# EXHIBIT 7

## HEALTH SERVICES AGREEMENT

**THIS AGREEMENT** between Kenton County, Kentucky (hereinafter referred to as "County"), and Southern Health Partners, Inc., a Delaware corporation, (hereinafter referred to as "SHP"), is entered into as of the _____ day of _____, 2015. Services under this Agreement shall commence on July 1, 2015, and shall continue through June 30, 2020, in accordance with Section 6.1.

## WITNESSETH:

WHEREAS, County is charged by law with the responsibility for obtaining and providing reasonably necessary medical care for inmates or detainees of the Kenton County Detention Center (hereinafter called "Jail") and,

WHEREAS, County and Jailer desire to provide for health care to inmates in accordance with applicable law; and,

WHEREAS, the Jailer and County, which provides funding as approved by the Kenton County Fiscal Court for the Jail, desire to enter into this Agreement with SHP to promote this objective; and,

WHEREAS, SHP is in the business of providing correctional health care services under contract and desires to provide such services for County under the express terms and conditions hereof.

NOW THEREFORE, in consideration of the mutual covenants and promises hereinafter made, the parties hereto agree as follows:

## ARTICLE I: HEALTH CARE SERVICES.

1.1     General Engagement.  County hereby contracts with SHP to provide for the delivery of all medical, dental and mental health services to inmates of Jail.  This care is to be delivered to individuals under the custody and control of County at the Jail, and SHP enters into this Agreement according to the terms and provisions hereof.

1.2     Scope of General Services.  The responsibility of SHP for medical care of an inmate commences with the booking and physical placement of said inmate into the Jail.  The health care services provided by SHP shall be for all persons committed to the custody of the Jail, except those identified in Section 1.7.   SHP shall provide and/or arrange for all professional medical, dental, mental health and related health care and administrative services for the inmates, regularly scheduled sick call, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, pharmacy

**SHP000126**

services management, administrative support services, and other services, all as more specifically described herein.

SHP shall be financially responsible for the costs of all physician and nurse staffing, over-the-counter medications, medical supplies, on-site clinical lab procedures, medical hazardous waste disposal, office supplies, forms, folders, files, travel expenses, publications, administrative services and nursing time to train officers in the Jail on various medical matters. SHP's financial responsibility for the costs of all license permits and fees, emergency kits and restocking, prescription pharmaceuticals, x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail) and all medical and mental health services rendered outside the Jail shall be limited by the annual cost pool described in Section 1.5 of this Agreement. All pool costs in excess of the annual cost pool limit shall be the financial responsibility of the County, or shall not otherwise be the financial responsibility of SHP.

1.3     Specialty Services. In addition to providing the general services described above, SHP by and through its licensed health care providers shall arrange and/or provide to inmates at the Jail specialty medical services to the extent such are determined to be medically necessary by SHP. In the event non-emergency specialty care is required and cannot be rendered at the Jail, SHP shall make arrangements with County for the transportation of the inmates in accordance with Section 1.9 of this Agreement.

1.4     Emergency Services. SHP shall arrange and/or provide emergency medical care, as medically necessary, to inmates through arrangements to be made by SHP.

1.5     Limitations On Costs - Cost Pool. SHP shall, at its own cost, arrange for medical services for any inmate who, in the opinion of the Medical Director (hereinafter meaning a licensed SHP physician), requires such care. SHP's maximum liability for costs associated with all emergency kits and restocking of emergency kit supplies, all necessary license and permit fees, all prescription pharmaceuticals, all x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail) and all medical and mental health services for inmates rendered outside of the Jail will be limited by a pool established in the amount of $150,000.00 in the aggregate for all inmates in each year (defined as a twelve-month contract period) of this Agreement. If the costs of all care as described in this Section 1.5 exceed the amount of $150,000.00 in any year, SHP will either pay for the additional services and submit invoices supporting the payments to the County along with an SHP invoice for one hundred percent (100%) of the costs in excess of $150,000.00, or in the alternative, will refer all additional qualifying invoices to County for payment directly to the provider of care. For all invoices payable to SHP as reimbursement for pool excess costs, such amounts shall be payable by County within thirty days of the SHP invoice date. After a grace period of sixty days has passed from the date of invoice, a late fee of two percent (2%) on the balance will apply each month thereafter until SHP has been reimbursed in full. For purposes of this Section

1.5, the pool amount will be prorated for any contract period of less or more than twelve months.

If the costs of all care as described in this Section 1.5 are less than $150,000.00 in any year (defined as a twelve-month contract period), SHP will repay to County one hundred percent (100%) of the balance of unused cost pool funds up to the $150,000.00 annual limit. County acknowledges that at the end of each contract period, the cost pool billing will remain open for approximately sixty days in order to allow reasonable time for processing of additional claims received after the new contract period begins and prior to issuing any such refund to County for unused cost pool funds. Specifically, the cost pool cut-off date will be August 31st based on a contract period schedule of July through June each year. SHP will continue to process cost pool payments applicable to the prior contract period through August 31st and apply those amounts toward the prior year's cost pool limit. Any additional cost pool charges received subsequent to the August 31st cut-off date which are applicable to the prior contract period will either be rolled over into the pool for the current contract period or be referred to County for payment directly to the provider of care.

The intent of this Section 1.5 is to define SHP's maximum financial liability and limitation of costs for all emergency kits and restocking of emergency kit supplies, all necessary license and permit fees, all prescription pharmaceuticals, all x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail), all hospitalizations and all other medical and mental health services rendered outside the Jail.

1.6    Injuries Incurred Prior to Incarceration; Pregnancy.    SHP shall not be financially responsible for the cost of any medical treatment or health care services provided to any inmate prior to the inmate's formal booking and commitment into the Jail.

Furthermore, SHP shall not be financially responsible for the cost of medical treatment or health care services provided outside the Jail to medically stabilize any inmate presented at booking with a life threatening injury or illness or in immediate need of emergency medical care.

Once an inmate has been medically stabilized and committed to the Jail, SHP will, commencing at that point, then become responsible for providing and/or arranging for all medical treatment and health care services regardless of the nature of the illness or injury or whether or not the illness or injury occurred prior or subsequent to the individual's incarceration at the Jail. An inmate shall be considered medically stabilized when the patient's medical condition no longer requires immediate emergency medical care or outside hospitalization so that the inmate can reasonably be housed inside the Jail. SHP's financial responsibility for such medical treatment and health care services shall be in accordance with, and as limited by, Sections 1.2 and 1.5 of this Agreement.

It is expressly understood that SHP shall not be responsible for medical costs associated with the medical care of any infants born to inmates. SHP shall provide and/or arrange for health care services to inmates up to, through, and after the birth process, but SHP shall not be responsible for the cost of health care services provided to an infant following birth, other than those services that may be delivered in the Jail prior to transport to a hospital. In any event, SHP shall not be responsible for the costs associated with performing or furnishing of abortions of any kind.

1.7    Inmates Outside the Facilities.    The health care services contracted in the Agreement are intended only for those inmates in the actual physical custody of the Jail and for inmates held under guard in outside hospitals or other medical facilities who remain in official custody of the Jail. Inmates held under guard in outside hospitals or other medical facilities are to be included in the Jail's daily population count. No other person(s), including those who are in any outside hospital who are not under guard, shall be the financial responsibility of SHP, nor shall such person(s) be included in the daily population count.

Inmates on any sort of temporary release or escape, including, but not limited to inmates temporarily released for the purpose of attending funerals or other family emergencies, inmates on escape status, inmates on pass, parole or supervised custody who do not sleep in the Jail at night, shall not be included in the daily population count, and shall not be the responsibility of SHP with respect to the payment or the furnishing of their health care services.

The costs of medical services rendered to inmates who become ill or who are injured while on such temporary release or work-release shall not then become the financial responsibility of SHP after their return to the Jail. This relates solely to the costs associated with treatment of a particular illness or injury incurred by an inmate while on such temporary release. In all cases, SHP shall be responsible for providing medical care for any inmate who presents to medical staff on-site at the Jail to the extent such care can be reasonably provided on-site, or shall assist with arrangements to obtain outside medical care as necessary. The costs of medical services associated with a particular illness or injury incurred by an inmate while on temporary release or work-release may be the personal responsibility of the inmate, or covered by workers' compensation, medical insurance, accident insurance, or any other policy of insurance or source of payment for medical and hospital expenses. In the absence of adequate insurance coverage, or other source of payment for medical care expenses, such costs may, at the election of the County, be applied toward the annual cost pool described in Section No. 1.5. Such costs shall not otherwise be the financial responsibility of SHP.

Persons in the physical custody of other police or other penal jurisdictions at the request of County, by Court order or otherwise, are likewise excluded from the Jail's population count and are not the responsibility of SHP for the furnishing or payment of health care services.

1.8     Elective Medical Care.  SHP shall not be responsible for providing elective medical care to inmates, unless expressly contracted for by the County.  For purposes of this Agreement, "elective medical care" means medical care which, if not provided, would not, in the opinion of SHP's Medical Director, cause the inmate's health to deteriorate or cause definite harm to the inmate's well-being.  Any referral of inmates for elective medical care must be reviewed by County prior to provision of such services.

1.9     Transportation Services.  To the extent any inmate requires off-site non-emergency health care treatment including, but not limited to, hospitalization care and specialty services, for which care and services SHP is obligated to arrange under this Agreement, County shall, upon prior request by SHP, its agents, employees or contractors, provide transportation as reasonably available provided that such transportation is scheduled in advance.  When medically necessary, SHP shall arrange all emergency ambulance transportation of inmates in accordance with Section 1.4 of this Agreement.

## ARTICLE II: PERSONNEL.

2.1     Staffing.  SHP shall provide medical and support personnel reasonably necessary for the rendering of health care services to inmates at the Jail as described in and required by this Agreement.  County acknowledges that, there will be an allowance for a reasonable number of absences for medical staff vacation and sick days, and further that SHP reserves the right to make adjustments to the regular staffing schedule to provide coverage on SHP-designated holidays.

2.2     Licensure, Certification and Registration of Personnel.  All personnel provided or made available by SHP to render services hereunder shall be licensed, certified or registered, as appropriate, in their respective areas of expertise as required by applicable Kentucky law.

2.3     County's Satisfaction with Health Care Personnel.  If County becomes dissatisfied with any health care personnel provided by SHP hereunder, or by any independent contractor, subcontractors or assignee, SHP, in recognition of the sensitive nature of correctional services, shall, following receipt of written notice from County of the grounds for such dissatisfaction and in consideration of the reasons therefor, exercise its best efforts to resolve the problem.  If the problem is not resolved satisfactorily to County, SHP shall remove or shall cause any independent contractor, subcontractor, or assignee to remove the individual about whom County has expressed dissatisfaction.  Should removal of an individual become necessary, SHP will be allowed reasonable time, prior

to removal, to find an acceptable replacement, without penalty or any prejudice to the interests of SHP.

2.4    Use of Inmates in the Provision of Health Care Services.  Inmates shall not be employed or otherwise engaged by either SHP or County in the direct rendering of any health care services.

2.5    Subcontracting and Delegation.  In order to discharge its obligations hereunder, SHP shall engage certain health care professionals as independent contractors rather than as employees.  County consents to such subcontracting or delegation. As the relationship between SHP and these health care professionals will be that of independent contractor, SHP shall not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals. SHP shall not exercise control over the manner or means by which these independent contractors perform their professional medical duties. However, SHP shall exercise administrative supervision over such professionals necessary to insure the strict fulfillment of the obligations contained in this Agreement.  For each agent and subcontractor, including all medical professionals, physicians, dentists and nurses performing duties as agents or independent contractors of SHP under this Agreement, SHP shall provide County proof, if requested, that there is in effect a professional liability or medical malpractice insurance policy, as the case may be, in an amount of at least one million dollars ($1,000,000.00) coverage per occurrence and five million dollars ($5,000,000.00) aggregate.

2.6    Discrimination.  During the performance of this Agreement, SHP, its employees, agents, subcontractors, and assignees agree as follows:

      a. None will discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin, except where religion, sex or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the contractor.

      b. In all solicitations or advertisements for employees, each will state that it is an equal opportunity employer.

      c. Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for the purpose of meeting the requirements of this section.

SHP000131

## ARTICLE III REPORTS AND RECORDS

    3.1    _Medical Records._  County acknowledges that SHP's responsibility for all inmate medical records shall commence on the effective date of this Agreement, and that the responsibility for all inmate medical records prior to the effective date of this Agreement shall rest solely with the County.  Nothing in this Agreement shall be interpreted to impose responsibility on SHP for inmate medical records prior to the effective date of this Agreement.  County does further acknowledge, however, that SHP will assist County with the fulfillment of requests for production of medical records for those medical services provided prior to the effective date of this Agreement, and by doing so does not assume any responsibility for such records.  It is mutually understood by both parties that, during the term of this Agreement, SHP shall serve as the Records Custodian in all medical record matters, in accordance with all applicable laws.

    Commencing on the effective date of this Agreement, SHP shall cause and require to be maintained a complete and accurate medical record for each inmate who has received health care services.  Each medical record will be maintained in accordance with applicable laws and County's policies and procedures.  The medical records shall be kept separate from the inmate's confinement record.  A complete legible copy of the applicable medical record shall be available, at all times, to County as custodian of the person of the patient.  Medical records shall be kept confidential.  Subject to applicable law regarding confidentiality of such records, SHP shall comply with Kentucky law, including but not limited to KRS 422.317, and County's policy with regard to access by inmates and Jail staff to medical records.  No information contained in the medical records shall be released by SHP except as provided by County's policy, by a court order, or otherwise in accordance with the applicable law.  SHP shall, at its own cost, provide all medical records, forms, jackets, and other materials necessary to maintain the medical records.  At the termination of this Agreement, all medical records shall be delivered to and remain with County.  However, County shall provide SHP with reasonable ongoing access to all medical records even after the termination of this Agreement for the purposes of defending litigation.

    County has elected to implement an electronic medical records system and acknowledges that SHP has incorporated the total purchase price of the system into SHP's base contract fee, to be paid to SHP by County monthly, amortized over a period of twelve months, beginning on the effective date of this Agreement.  County further acknowledges that, with the exception of the initial system license fee, which will be paid by SHP, and the monthly upgrades, usage and hosting fees, the County will be financially responsible for all costs to integrate the system, and all equipment necessary to facilitate use of the system.  After a period of twelve months beginning on the effective date of this Agreement, provided the County has paid in full the electronic medical records system purchase price to SHP, the amount of base contract compensation to SHP shall be reduced accordingly. In the event this Agreement should terminate prior to the expiration

**SHP000132**

of the first full twelve month depreciation term, County may opt to purchase the system for the amount of the un-depreciated balance.

3.2    Regular Reports by SHP to County.  SHP shall provide to County, on a date and in a form mutually acceptable to SHP and County, monthly statistical reports relating to services rendered under this Agreement.

3.3    Inmate Information.  Subject to the applicable Kentucky law, in order to assist SHP in providing the best possible health care services to inmates, County shall provide SHP with information pertaining to inmates that SHP and County mutually identify as reasonable and necessary for SHP to adequately perform its obligations hereunder.

3.4    SHP Records Available to County with Limitations on Disclosure.  SHP shall make available to County, at County's request, records, documents and other papers relating to the direct delivery of health care services to inmates hereunder. County understands that written operating policies and procedures employed by SHP in the performance of its obligations hereunder are proprietary in nature and shall remain the property of SHP and shall not be disclosed without written consent.  Information concerning such may not, at any time, be used, distributed, copied or otherwise utilized by County, except in connection with the delivery of health care services hereunder, or as permitted or required by law, unless such disclosure is approved in advance writing by SHP.  Proprietary information developed by SHP shall remain the property of SHP.

3.5    County Records Available to SHP with Limitations on Disclosure.  During the term of this Agreement and for a reasonable time thereafter, County shall provide SHP, at SHP's request, County's records relating to the provision of health care services to inmates as may be reasonably requested by SHP or as are pertinent to the investigation or defense of any claim related to SHP's conduct. Consistent with applicable law, County shall make available to SHP such inmate medical records as are maintained by County, hospitals and other outside health care providers involved in the care or treatment of inmates (to the extent County has any control over those records) as SHP may reasonably request.  Any such information provided by County to SHP that County considers confidential shall be kept confidential by SHP and shall not, except as may be required by law, be distributed to any third party without the prior written approval of County.

## ARTICLE IV:  SECURITY
4.1    General.  SHP and County understand that adequate security services are essential and necessary for the safety of the agents, employees and subcontractors of SHP as well as for the security of inmates and County's staff, consistent with the correctional setting.  County shall take all reasonable steps to provide sufficient security to enable SHP to safely and adequately provide the health care services described in this Agreement.  It is expressly understood by County and SHP that the provision of security

SHP000133

and safety for the SHP personnel is a continuing precondition of SHP's obligation to provide its services in a routine, timely, and proper fashion.

4.2   Loss of Equipment and Supplies.  County shall not be liable for loss of or damage to equipment and supplies of SHP, its agents, employees or subcontractors unless such loss or damage was caused by the negligence of County or its employees.

4.3   Security During Transportation Off-Site.  County shall provide prompt and timely security as medically necessary and appropriate in connection with the transportation of any inmate between the Jail and any other location for off-site services as contemplated herein.

## ARTICLE V:  OFFICE SPACE, EQUIPMENT, INVENTORY AND SUPPLIES
5.1   General.  County agrees to provide SHP with reasonable and adequate office and medical space, facilities, equipment, local telephone and telephone line and utilities and County will provide necessary maintenance and housekeeping of the office space and facilities.

5.2   Delivery of Possession.  County will provide to SHP, beginning on the date of commencement of this Agreement, possession and control of all County medical and office equipment and supplies in place at the Jail's health care unit.  At the termination of this or any subsequent Agreement, SHP will return to County's possession and control all supplies, medical and office equipment, in working order, reasonable wear and tear excepted, which were in place at the Jail's health care unit prior to the commencement of services under this Agreement.

5.3   Maintenance and Replenishment of Equipment.  Except for the equipment and instruments owned by County at the inception of this Agreement, any equipment or instruments required by SHP during the term of this Agreement shall be purchased by SHP at its own cost.  At the end of this Agreement, or upon termination, County shall be entitled to purchase SHP's equipment and instruments at an amount determined by a mutually agreed depreciation schedule.

5.4   General Maintenance Services.  County agrees that it is proper for SHP to provide each and every inmate receiving health care services the same services and facilities available to, and/or provided to, other inmates at the Jail.

## ARTICLE VI:  TERM AND TERMINATION OF AGREEMENT

6.1   Term.  This Agreement shall commence on July 1, 2015.  The initial term of this Agreement shall end on June 30, 2016, and shall be automatically extended for additional one-year terms, subject to County funding availability, unless either party provides written notice to the other of its intent to terminate at the end of the period.

SHP000134

6.2 <u>Termination.</u>  This Agreement, or any extension thereof, may be terminated as otherwise provided in this Agreement or as follows:

      a.     Termination by agreement.  In the event that each party mutually agrees in writing, this Agreement may be terminated on the terms and date stipulated therein.

      b.     Termination by Cancellation.  This Agreement may be canceled without cause by either party upon sixty (60) days prior written notice in accordance with Section 9.3 of this Agreement.

      c.     Annual Appropriations and Funding.  This Agreement shall be subject to the annual appropriation of funds by the Kenton County Fiscal Court.  Notwithstanding any provision herein to the contrary, in the event funds are not appropriated for this Agreement, County shall be entitled to immediately terminate this Agreement, without penalty or liability, except the payment of all contract fees due under this Agreement through and including the last day of service.

6.3 <u>Responsibility for Inmate Health Care.</u>  Upon termination of this Agreement, all responsibility for providing health care services to all inmates, including inmates receiving health care services at sites outside the Jail, shall be transferred from SHP to County.

### ARTICLE VII.  COMPENSATION.

7.1 <u>Base Compensation.</u>  County will pay to SHP the total annualized price of $920,640.00 during the initial term of this Agreement, payable in monthly installments. Monthly installments will be billed separately for medical and mental health services respectively.  Monthly installments for all medical services during the initial term of this Agreement will be in the amount of $73,085.36 each.  Monthly installments for all mental health services during the initial term of this Agreement will be in the amount of $3,634.64 each.  SHP will bill County approximately thirty days prior to the month in which services are to be rendered.  County agrees to pay SHP prior to the tenth day of the month in which services are rendered.  In the event this Agreement should commence or terminate on a date other than the first or last day of any calendar month, compensation to SHP will be prorated accordingly for the shortened month.

7.2 <u>Increases in Inmate Population.</u>  County and SHP agree that the annual base price is calculated based upon an average daily inmate population of up to 750.  At any time while under this Agreement, County has the right to renegotiate terms based on a higher population limitation.

7.3 <u>Future Years' Compensation.</u> The amount of compensation (i.e., annual base price and per diem rate as defined in Sections 7.1 and 7.2, respectively) to SHP shall increase at the beginning of each contract year. The amount of compensation shall remain the same for the renewal period effective July 1, 2016. The amount of compensation shall increase by two percent (2%) for the renewal period effective July 1, 2017, and by two percent (2%) for the renewal period effective July 1, 2018, and by two percent (2%) for the renewal period effective July 1, 2019. SHP shall provide written notice to County of the amount of compensation increase requested for renewal periods effective on or after July 1, 2020, or shall otherwise negotiate mutually agreeable terms with County prior to the beginning of each annual renewal period.

7.4 <u>Inmates From Other Jurisdictions</u>. Medical care rendered within the Jail to inmates from jurisdictions outside Kenton County, and housed in the Jail pursuant to written contracts between County and such other jurisdictions will be the responsibility of SHP, but as limited by Section 1.7. Medical care that cannot be rendered within the Jail will be arranged by SHP, but SHP shall have no financial responsibility for such services to those inmates.

7.5 <u>Responsibility For Work Release Inmates.</u> SHP and County agree that SHP will be responsible for providing on-site medical services as reasonable and appropriate to County inmates assigned to work release and/or release for community service work for government or nonprofit agencies upon an inmate's presentation to SHP medical staff at the Jail. Notwithstanding any other provisions of this Agreement to the contrary, SHP and County agree that County inmates assigned to work release, including work for Kenton County agencies, are themselves personally responsible for the costs of any medical services performed by providers other than SHP, when the illness or injury is caused by and results directly or indirectly from the work being performed, or when such illness or injury is treated while the inmate is on work release. The costs of medical services associated with a particular illness or injury incurred by an inmate while on work-release may be covered by workers' compensation, medical insurance, accident insurance, or any other policy of insurance or source of payment for medical and hospital expenses, but such costs shall not otherwise be the financial responsibility of SHP. In all cases, SHP shall be responsible for providing medical care for any inmate who presents to medical staff on-site at the Jail, including any inmate injured or infirmed while on work release or release for community service, to the extent such care can be reasonably provided on-site, or shall assist with arrangements to obtain outside medical care as necessary.

## ARTICLE VIII: LIABILITY AND RISK MANAGEMENT.

8.1 <u>Insurance.</u> At all times during this Agreement, SHP shall maintain professional liability insurance covering SHP for its work at County, its employees and its officers in the minimum amount of at least one million dollars ($1,000,000.00) per occurrence and five million dollars ($5,000,000.00) in the aggregate. SHP shall provide

County with a Certificate of Insurance evidencing such coverage and shall have County named as an additional insured. In the event of any expiration, termination or modification of coverage, SHP will notify County in writing.

8.2 <u>Lawsuits Against County.</u> In the event that any lawsuit (whether frivolous or otherwise) is filed against County, its elected officials, employees and agents based on or containing any allegations concerning SHP's medical care of inmates and the performance of SHP's employees, agents, subcontractors or assignees, the parties agree that SHP, its employees, agents, subcontractors, assignees or independent contractors, as the case may be, may be joined as parties defendant in any such lawsuit and shall be responsible for their own defense and any judgments rendered against them in a court of law.

Nothing herein shall prohibit any of the parties to this Agreement from joining the remaining parties hereto as defendants in lawsuits filed by third parties.

8.3 <u>Hold Harmless.</u> SHP agrees to indemnify and hold harmless the Jailer, the County, its agents and employees from and against any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind arising solely out of the aforementioned program of health care services provided by SHP. This duty to indemnify shall include all attorneys' fees and litigation costs and expenses of any kind whatsoever. The Jailer shall promptly notify SHP of any incident, claim, or lawsuit of which the Jailer becomes aware and shall fully cooperate in the defense of such claim, but SHP shall retain sole control of the defense while the action is pending, to the extent allowed by law. In no event shall this agreement to indemnify be construed to require SHP to indemnify the Jailer, the County, its agents and/or employees from the Jailer's, the County's, its agents' and/or employees' own negligence and/or their own actions or inactions.

County does hereby agree to indemnify and hold harmless SHP, its agents and employees from and against any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind arising solely out of the operation of the facility and the negligence and/or action or inaction of the Jailer, the County or their employees or agents. This duty to indemnify shall include all attorneys' fees and litigation costs and expenses of any kind whatsoever. SHP shall promptly notify the County of any incident, claim, or lawsuit of which SHP becomes aware and shall fully cooperate in the defense of such claim, but the County shall retain sole control of the defense while the action is pending, to the extent allowed by law. In no event shall this agreement to indemnify be construed to require the County to indemnify SHP, its agents and/or employees from SHP's, its agents' and/or employees' own negligence and/or their own actions or inactions.

<u>**ARTICLE IX: MISCELLANEOUS.**</u>

9.1 <u>Independent Contractor Status.</u> The parties acknowledge that SHP is an independent contractor engaged to provide medical care to inmates at the Jail under the

direction of SHP management. Nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, or a joint venture relationship between the parties.

9.2    <u>Assignment and Subcontracting.</u>    SHP shall not assign this Agreement to any other corporation without the express written consent of County which consent shall not be unreasonably withheld. Any such assignment or subcontract shall include the obligations contained in this Agreement. Any assignment or subcontract shall not relieve SHP of its independent obligation to provide the services and be bound by the requirements of this Agreement.

9.3    <u>Notice.</u>    Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party(s) at the following address or to any other person at any other address as may be designated in writing by the parties:

a.    County:    Kenton County Fiscal Court
303 Court Street, Room 207
Covington, KY 41011

b.    SHP:    Southern Health Partners, Inc.
2030 Hamilton Place Boulevard, Suite 140
Chattanooga, Tennessee 37421
Attn: President

Notices shall be effective upon receipt regardless of the form used.

9.4    <u>Governing Law and Disputes.</u>    This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the Commonwealth of Kentucky, except as specifically noted. Disputes between the Parties shall, first, be formally mediated by a third party or entity agreeable to the Parties, in which case the Parties shall engage in good faith attempts to resolve any such dispute with the Mediator before any claim or suit arising out of this Agreement may be filed in a court of competent jurisdiction.

9.5    <u>Entire Agreement.</u>    This Agreement constitutes the entire agreement of the

SHP000138

parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. No modifications or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto. All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

9.6 <u>Amendment.</u> This Agreement may be amended or revised only in writing and signed by all parties.

9.7 <u>Waiver of Breach.</u> The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.8 <u>Other Contracts and Third-Party Beneficiaries.</u> The parties acknowledge that SHP is neither bound by nor aware of any other existing contracts to which County is a party and which relate to the providing of medical care to inmates at the Jail. The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of others who might otherwise be deemed to constitute third-party beneficiaries hereof.

9.9 <u>Severability.</u> In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

9.10 <u>Liaison.</u> The Kenton County Jailer or his designee shall serve as the liaison with SHP.

9.11 <u>Cooperation.</u> On and after the date of this Agreement, each party shall, at the request of the other, make, execute and deliver or obtain and deliver all instruments and documents and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and intentions of this Agreement.

9.12 <u>Time of Essence.</u> Time is and shall be of the essence of this Agreement.

9.13 <u>Authority.</u> The parties signing this Agreement hereby state that they have the authority to bind the entity on whose behalf they are signing.

9.14 <u>Binding Effect.</u> This Agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors and assigns.

**SHP000139**

9.15 <u>Cumulative Powers.</u>  Except as expressly limited by the terms of this Agreement, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

IN WITNESS WHEREOF, the parties have executed this Agreement in their official capacities with legal authority to do so.

KENTON COUNTY, KY
BY: _____

_____

Date: _____

ATTEST:

_____

Date: _____

SOUTHERN HEALTH PARTNERS, INC.
BY: _____
Jennifer Hairsine, President and Chief Executive Officer

# EXHIBIT 8

5

6

7  ESTATE OF BRADLEY GROTE          PLAINTIFF

8  vs.

9  KENTON COUNTY, KENTUCKY         DEFENDANT

10

11

12            * * * * * * * *

13  DEPONENT:        TIARA DOCKERY

14  DATE:           OCTOBER 1, 2021

15            * * * * * * * *

16

17

18  Tina M. Barlow, CCR

19  Certified Court Reporter

20

21

22             *B a r l o w*

Raising the Bar

23  Reporting & Video Services, LLC

24  620 Washington Street

      Covington, Kentucky 41011

25      (859) 261-8440

1  position.  Then there was a med staff position

2  that's different than the clerk position?

3       A.    Yes.  A med tech position.

4       Q.    Med tech.  I'm sorry.

5             Okay.  And what would be the duties and

6  responsibilities of the med tech?

7       A.    Preparing the medication for passing.

8       Q.    Okay.

9       A.    Passing the medication, ordering

10  medication for pharmacy, stocking the medication.

11  That's pretty much what that position entails.

12       Q.    You performed all those duties and

13  responsibilities while you were here at the Kenton

14  County Detention Center?

15       A.    Yes.

16       Q.    You're not sure if you were in the clerk

17  position or the med tech position or both on July

18  20 -- or July 19, 2019?

19       A.    Correct.

20       Q.    And you also, in the clerk position, kept

21  track of the number of detoxes that were at the

22  facility on a daily basis?

23       A.    Yes.  Detox checks.

24       Q.    Detox check.  What's a detox check?

25       A.    So if someone comes in and reports that

1                                              )

2  COMMONWEALTH OF KENTUCKY             )

3                                              )

4

5          I, Tina M. Barlow, Notary Public for the

6  Commonwealth of Kentucky, do hereby certify:

7       That the witness named in the deposition, prior

8  to being examined, was by me, first duly sworn;

9       That said deposition was taken before me at the

10  time and place therein set forth and was taken down

11  by me in shorthand and thereafter transcribed into

12  typewriting under my direction and supervision;

13      That said deposition is a true record of the

14  testimony given by the witness and of all objections

15  made at the time of the examination.

16      I further certify that I am neither counsel for

17  nor related to any party to said action, nor in any

18  way interested in the outcome thereof.

19      IN WITNESS WHEREOF I have subscribed my name

20  and affixed my seal this 11th day of October, 2021.

21

22                    _____

                      TINA M. BARLOW
23                    Notary Public
                      Notary ID 610796
24                    My Commission expires: 11/6/22

25

# EXHIBIT 9

| EECode | Lastname | Firstname | Home Department | HomeAllocation | Pay Class | InPunchTime | OutPunchTime | Allocation | Earn Code | Earn Hours | Dollars | Home Department Desc | Home Location Code | Home Location Desc | Home Job Code | Home Job Desc | Dist Department Desc | Dist Location Code | Dist Location Desc | Distributed Department Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A072 | BRAND | CAITLIN | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | | 5 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A072 | BRAND | CAITLIN | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | | 7.75 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A0JP | DOCKERY | TIARA | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | | 5 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A0JP | DOCKERY | TIARA | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | | 7 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A3W7 | RADOMILE | NIKOLAI | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | | 5 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A3W7 | RADOMILE | NIKOLAI | 7170 | Kenton County FTH | | 2019-07-20 | 2019-07-20 | Kenton Co | | 7 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |
| A095 | RAY | SHAWNEE | 7170 | Kenton County FTH | | 2019-07-15 | 2019-07-15 | Kenton Co | PTO | 8 | | 0 Kenton Count 03 | | KY | Default | Default | Kenton Count 03 | | KY | 7170 |

# EXHIBIT 10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

AT COVINGTON

CASE NUMBER: 2:20-CV-101


ESTATE OF BRADLEY GROTE,          PLAINTIFF,

vs.

KENTON COUNTY, KENTUCKY,        DEFENDANT.



* * * * * * * *

DEPONENT:      CAITLIN MARIE BRAND

DATE:         August 4, 2021

* * * * * * * *


LEE ANN GOFF

COURT REPORTER


B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1    Q.   Okay.  So it says, late entry for 7/19/19.

2    At approximately 1659 -- okay, where did you get the

3    1659?

4    A.   It would have been a time I wrote on the

5    glove.

6    Q.   Okay.  This LPN was called via radio to come

7    to booking, nonemergency.  Where did you get the

8    nonemergency information?

9    A.   On the radio.

10    Q.   Well, did you have that on your glove?

11    A.   No.  It was on the radio.

12    Q.   Are the radio -- is the radio transcribed

13    somewhere, all the communications?

14    A.   No, not that I'm aware of.

15    Q.   Okay.  So you, you put in nonemergency

16    because you recall now -- or then that it was a

17    nonemergency that you were called for?

18    A.   Yes.

19    Q.   Okay.  Did you make an assessment as to

20    whether or not it was an emergency situation when you

21    got there?

22    A.   Yes.

23    Q.   What did you do to assess whether or not it

24    was an emergency situation when you got there?

25    A.   I took his vitals, asked him what he had

1    exactly.

2         Q.    How do you spell it?

3         A.    It's like O-O-W-S or S-O-W-S.

4         Q.    Okay.  Tell me what the guideline --

5    guidelines are.

6         A.    I don't recall at this time.

7         Q.    Well, are those guidelines in the medical

8    staff office?

9         A.    They would have been.

10        Q.    Okay.  Now, I assume when you are working

11   for Crossroads, you assess patients for

12   methamphetamine use; correct?

13        A.    No.  We don't deal with methamphetamines.

14        Q.    Okay.  All right.  Well, tell me how you

15   assessed Mr. Grote for methamphetamine use on July

16   19th, 2019, when you first saw him in booking?

17        A.    I took his vitals.  Asked Mr. Grote what he

18   had taken and how much he had taken.  And his

19   response was a half gram.

20        Q.    Did you do anything else?

21        A.    And then eventually moved him to the

22   observation cells, provided oxygen.

23        Q.    Anything else?

24        A.    And then once I put him on -- got his oxygen

25   to a level that was okay to be at, left him on

1                                )

COMMONWEALTH OF KENTUCKY     )

2                                )

3

4         I, Lee Ann Goff, Notary Public in and for the

5  Commonwealth of Kentucky, do hereby certify:

6         That the witness named in the deposition,

7  prior to being examined, was by me duly sworn;

8         That said deposition was taken before me at

9  the time and place therein set forth and was taken down

10  by me in shorthand and thereafter transcribed into

11  typewriting under my direction and supervision;

12         That said deposition is a true record of the

13  testimony given by the witness and of all objections

14  made at the time of the examination.

15         I further certify that I am neither counsel

16  for nor related to any party to said action, nor in any

17  way interested in the outcome thereof.

18         IN WITNESS WHEREOF I have subscribed my name

19  and affixed my seal this 18th day of August, 2021.

20

21                    _____

22                    Lee Ann Goff

23                    Notary Public KYNP30963

24

25  My Commission Expires:  7/1/25

# EXHIBIT 11

December 16, 2021

Aimee Muller
Lewis Brisbois Bisgaard & Smith LLP
50 East Fifth Street
Suite 2000
Cincinnati, OH 45202

Chris Nordloh
Kenton County Attorney Offices
1840 Simon Kenton Way
Suite 4200
Covington, Kentucky 41011

RE: Grote v Kenton County, Kentucky, et al.

Dear Ms Muller and Mr Nordloh,

You have asked me to review the medical records and other case materials relating to the medical care provided to Bradley Grote while he was incarcerated at Kenton County Detention Center in Covington, Kentucky in July of 2019. My report includes four sections:
1. My background and qualifications;
2. Records reviewed;
3. Relevant background information;
4. A summary of my opinions, based on my education, experience, and research.

1. Background and Qualifications
I am a Medical Doctor licensed to practice medicine in Kentucky and Oregon. I am residency trained and Board Certified in Emergency Medicine. Additionally, I am fellowship trained and Board Certified in Medical Toxicology. I practiced Emergency Medicine from 2015 to the present. I have been elected to be a Fellow of the American College of Emergency Physicians (FACEP) and the American Academy of Emergency Medicine (FAAEM). I am currently employed by the University of Kentucky Hospital as an emergency physician and medical toxicologist. I am currently Co-Medical Director of the Emergency Department, as well as the Director of the Medical Toxicology service and the Undersea & Hyperbaric Medicine service. Additionally, I am employed by the Kentucky Poison Control Center where I am the Medical Director.

Pertinent to this case, I have extensive experience evaluating and treating patients in the emergency department, floor and intensive care unit for methamphetamine intoxication.

My current CV is attached as Appendix A, which lists my qualifications and publications in more detail.

## 2. Documents Reviewed

Before developing my final opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of Mr Grote's presentation and provided me with enough relevant data to develop my opinions to a reasonable degree of medical certainty.

## 3. Background

Methamphetamine (meth) is a common drug of abuse in the United States. Meth is also commonly smuggled into and abused in correctional facilities. Methamphetamine also may be mixed with other drugs such as fentanyl and PCP that can lead to mixed, polypharmacy overdoses.

There are various means of getting methamphetamine into the body. Methamphetamine may be insufflated, snorted, smoked and injected intravenously, subdermally or intramuscularly. It is not uncommon for arrestees to swallow packets of methamphetamine (or other drugs) at the time of arrest. This action is referred to as "body stuffing." This needs to be differentiated from "body packing" which is the deliberate ingestion of balloons and condoms filled with pure illicit substances to transport across a border. Body stuffing may lead to methamphetamine overdose.

Methamphetamine overdose causes a "sympathomimetic toxidrome." The classical presentation includes tachycardia, hypertension, hyperthermia, tachypnea, tremor, diaphoresis, paranoia, seizures, psychosis, and hallucinations. Most often only a few of these symptoms are present. The presence of these symptoms does not undoubtedly make the diagnosis of methamphetamine intoxication; cocaine, PCP, opioid withdrawal, and alcohol withdrawal may present with similar symptoms. Severe toxicity can eventually lead to multiorgan failure, seizure, stroke, cardiovascular collapse, and death.

Methamphetamine has a volume of distribution of 3.0-7.0 L, the average human being has 4.7 to 5.5 liters of water. The elimination half-life is approximately 6-15hrs an varies depending upon the pH of the urine. In oral ingestion time to peak concentrations have been 2.5-5hrs. Sustained release formulations have resulted in peaks at 7hrs post-ingestion. Methamphetamine serum concentration of 2.0 mg/L has been reported as fatal. Urine concentration of 28mg/L has also been reported as fatal. The oral bioavailability of methamphetamine is estimated to be approximately 70%.

The mainstay of treatment of methamphetamine intoxication is symptomatic and supportive care. IV fluids are administered to maintain hydration status from respiratory and evaporative losses. Sedative medications are used to control agitation and movement; these can be beneficial in decreasing muscle tone and helping to control temperature. Decontamination may be used with variable effect. Methods of decontamination include the administration of activated charcoal, gastric lavage and whole bowel irrigation. The effectiveness of these treatments is limited by the ingested dose, time to initiation of therapy and willingness of the participant to

participate. Activated charcoal is recommended to be administered in doses of 10:1 (for every 1 gram of substance ingested, 10 grams of activated charcoal are required). Gastric lavage requires the placement of large caliber medical tubes into the stomach and installation of water or normal saline into the stomach while at the same time siphoning gastric contents out. When performing gastric lavage up to 20% of gastric contents may be pushed past the pylorus preventing retrieval. Whole Bowel Irrigation requires the administration of large volumes of an osmotic laxative. This decreases the transit time through the gastrointestinal tract. The laxative is typically administered via oro- or nasogastric tube.


4. Summary of Opinions
I hold these opinions to a reasonable degree of medical certainty:

1. Based upon video available to me Mr Grote showed signs of agitation, akathisia and appeared to be generally. The signs are not specific to methamphetamine intoxication and could be the result of a variety of intoxicants (cocaine, diphenhydramine, PCP as examples), withdrawal syndromes (opiate, opioid and sedative-hypnotic as examples), and psychiatric illness.

2. Per LPN Brand's deposition Mr Grote informed her that he had ingested a half gram of methamphetamine. 0.5g of ingested methamphetamine with oral bioavailability of 70% results in an absorbed dose of 0.35g(350mg). 0.5g of methamphetamine does not represent an abnormal or excessive amount of methamphetamine.

The autopsy report shows a methamphetamine concentration in the blood of 7,570ng/ml. This converts to 7.57mg/L. Death has been reported with concentrations of 0.54mg/L and higher of methamphetamine in blood. Mr. Grote's level of 7.57mg/L is just over 14 times the lowest reported lethal dose. Death has been reported with oral ingestion of 200mg (0.2g) of orally ingested methamphetamine. Of note these were peripheral blood draws taken before time of death.

3. LPN Brand requested that the officers check on Mr Grote using the "Kenton County Detention Center Observation Form" every ten to fifteen minutes. If transport had been called sooner, he would have arrived at the emergency department sooner. However, given the symptomatology he displays and the inefficiency of decontamination techniques it is unlikely that the outcome would have changed.

4. The treatment Mr. Grote's condition in the emergency department and subsequently within the hospital is dependent upon the history that is provided the symptoms at presentation and the progression of his symptoms. There is no antidote for methamphetamine intoxication. Given this decontamination procedures (activated charcoal, gastric lavage, or whole bowel irrigation) would be considered.

Activated charcoal requires the patient to be able to protect their own airway or have an endotracheal tube in place. Rat models have shown a delay in toxicity when charcoal is administered 1 minute after oral ingestion of methamphetamine however this same model failed to show an overall mortality benefit. Activated charcoal is most beneficial when administered 1-2 hours following an ingestion. The American Academy of Clinical Toxicology has the following statement regarding single dose activated charcoal in their position statement: "Single-dose activated charcoal should not be administered routinely in the management of poisoned patients. Based on volunteer studies, the administration of activated charcoal may be considered if a patient has ingested a potentially toxic amount of a poison (which is known to be adsorbed to charcoal) up to one hour previously. Although volunteer studies demonstrate that the reduction of drug absorption decreases to values of questionable clinical importance when charcoal is administered at times greater than one hour, the potential for benefit after one hour cannot be excluded. There is no evidence that the administration of activated charcoal improves clinical outcome. Unless a patient has an intact or protected airway, the administration of charcoal is contraindicated."

Gastric lavage, "stomach pumping," requires the instillation and suctioning of normal saline or sterile water through a large orogastric tube. This procedure is not without risk including aspiration, gastric and esophageal perforation. The instilling of fluid runs the risk of placing any ingested material into solution making absorption easier. Furthermore, lavage may push 20% of gastric contents into the duodenum where further absorption may occur. The American Academy of Clinical Toxicology has the following statement regarding gastric lavage in their position statement: "In the rare situation where gastric lavage might seem appropriate, clinicians should consider treatment with activated charcoal or observation and supportive care in place of gastric lavage. New evidence since 2004 suggests the need to emphasize that gastric lavage should be performed only where the expertise exists (Appendix 3)."

Whole bowel irrigation is the instilling of an osmotic laxative to decrease transit time through the gastrointestinal tract thus shorting time for absorption. In a patient who has "stuffed" methamphetamine there is risk of placing the ingested material into solution for further absorption. The American Academy of Clinical Toxicology has the following statement regarding Whole Bowel Irrigation in their position statement: "Until methodologically sound clinical studies are published demonstrating or excluding that WBI hastens clinical recovery rates or improves patient outcomes, the conclusion remains the same as in 2004: WBI should not be performed routinely but can be considered for potentially toxic ingestions of sustained-release or enteric-coated drugs, drugs not adsorbed by activated charcoal (e.g., lithium, potassium, and iron) and for removal of illicit drugs in body " packers "or " stuffers.""

5. Based upon the information currently available to me I cannot say with more certainty than not that Mr. Grote's death would have been prevented by early transport to an emergency department.

I reserve the right to amend or supplement my report as further relevant information becomes available.

Please contact me if you have any further questions.

Peter Akpunonu, MD

# EXHIBIT 12

GROTE, BRADLEY JAMES
Unique ID# 993599

Kenton County Detention Center
3000 Decker Crane Lane
Covington, Kentucky 41017

Encounter: 07-19-2019 06:28 PM
Page 1 of 1

| Encounter | 07-19-2019 Fri 06:28 PM |
|---|---|
| **GROTE, BRADLEY JAMES**     **Unique ID# 993599**     **Gender: Male** | |

| | |
|---|---|
| Dictation: | NURSE - PROGRESS NOTE: <br><br> Name: BRADLEY JAMES GROTE <br> ID#: <br><br> Date: 07-19-2019 Fri <br><br> ALLERGIES: <br> NKDA <br><br> CURRENT MEDICATIONS: <br><br> At approx 1735 this LPN responded to a signal 6 to booking, on arrival pt was being held on his left side by a deputy, pt was foaming at the mouth, a deputy stated that he had been seizing, pt was postictal. pt was non responsive to sternum rubs or ammonia inhalants, pt 02 at this time was 61% 02 was applied at 5 liters, pupils were non reactive, pt had shallow labored breathing, at this time the Sgt was informed that a squad needed to be called, 02 was up 85% at approx 1747, once the squad arrived gave the EMTs report and the took over care, pt was taken to St Elizabeth, no further medical treatment given at this time. <br> VITAL SIGNS: <br> Blood Pressure: 113/70 <br> Pulse: 58 <br> Respiration: 12 <br> Pulse Oxygen: 85 <br><br> SIGNATURE: <br><br> Electronically signed by Caitlin Brand, LPN on 07-19-2019 06:40:09 PM (Type: Nurse) |
| Vitals: | Blood Pressure: 113/70 <br> Pulse: 58 <br> Pulse Oxygen: 85 <br> Respirations: 12 |
| Condition Related To: | |
| Dates: | Current Illness Date: <br> 1st Date Of Illness: <br> Unable To Work Dates: <br> Hospitalization Dates: |
| Diagnosis: | |
| Procedures: | |
| Providers: | Attending Provider: Brand, Caitlin, LPN, ID: |
| Facility: | Kenton County Detention Center |
| Encounter Type:> | Nurse Sick Call |
| Sign Off: | Signed Off By: CBRAND on: 2019-07-19 Fri 06:40 PM |

GROTE, BRADLEY JAMES
Unique ID# 993599

Kenton County Detention Center
3000 Decker Crane Lane
Covington, Kentucky 41017

Encounter: 07-24-2019 10:44 AM
Page 1 of 1

## Encounter — 07-24-2019 Wed 10:44 AM

**GROTE, BRADLEY JAMES**  Unique ID# 993599  **Gender: Male**

| | |
|---|---|
| Dictation: | NURSE - PROGRESS NOTE: |
| | Name: BRADLEY JAMES GROTE |
| | ID#: |
| | Date: 07-24-2019 Wed |
| | ALLERGIES: NKDA |
| | CURRENT MEDICATIONS: |
| | Late Entry for 7/19/19, At approx 1659 this LPN was called via radio to come to booking non emergency, on arrival pt was sitting in the booking chair and behaving erratic, pt was asked what he had taken and pt stated that he used a 1/2 gram a meth a day, when asked if that was all he had used pt would not answer the question, vital signs were attempted at this time, pt was unable to hold still long enough to obtain a proper BP, 02 level was decreased to 89%, pt was asked to focus on his breathing and asked to breath in through his nose and out of his mouth to increase 02, oxygen was applied, 02 raised to 96% pt was placed on observation checks at this time that will be followed by the deputies, pt laid down in cell, no further medical treatment needed at this time. |
| | SIGNATURE: |
| | Electronically signed by Caitlin Brand, LPN on 07-24-2019 10:56:24 AM (Type: Nurse) |
| Vitals: | |
| Condition Related To: | |
| Dates: | Current Illness Date: |
| | 1st Date Of Illness: |
| | Unable To Work Dates: |
| | Hospitalization Dates: |
| Diagnosis: | |
| Procedures: | |
| Providers: | Attending Provider: Brand, Caitlin, LPN, ID, |
| Facility: | Kenton County Detention Center |
| Encounter Type:> | Nurse Sick Call |
| Sign Off: | Signed Off By: CBRAND on: 2019-07-24 Wed 10:56 AM |

# EXHIBIT 13

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3                 AT COVINGTON

4          CIVIL ACTION NUMBER: 2:20-CV-101

5            JUDGE WILLIAM O. BERTELSMAN

6

7    ESTATE OF BRADLEY GROTE          PLAINTIFF

8         vs.

9    KENTON COUNTY, KENTUCKY, ET AL.    DEFENDANTS

10

11                  * * * * * * * *

12   DEPONENT:        JASON RUSSELL

13   DATE:            AUGUST 5, 2021

14                  * * * * * * * *

15

16   Lois A. Roell,

17   Registered Merit Reporter

18

19

20

21

22              *Barlow*
               *Raising the Bar*
23        Reporting & Video Services, LLC
24             620 Washington Street
               Covington, Kentucky  41011
25                (859) 261-8440

1    A    Yes.

2    Q    Where is the shift commander's office

3  from booking?

4    A    It's next to control.

5    Q    How far is that?

6    A    About halfway down the jail.

7    Q    How many yards is that?

8    A    I don't know, 200 yards.  I'm not trying

9  to be -- I couldn't tell you.  Further than medical.

10    Q    Do you know who called 911 for Mr. Grote?

11    A    It was our master control board operator

12  that day.

13    Q    How is it that the master control

14  operator was advised to call 911?

15    A    That would be a phone call from me.

16    Q    So you -- did you radio the master

17  control people?

18    A    No.

19    Q    Did you go to the master control people?

20    A    No.  I just went right to the phone in

21  booking.

22    Q    And did what?

23    A    Called control, said, hey, I need a life

24  squad.

25    Q    Okay.  So tell me what it is that made

```
1                                    )

2   COMMONWEALTH OF KENTUCKY    )

3                                    )
```

4            I, Lois A. Roell, RMR and Notary Public

5   in and for the Commonwealth of Kentucky, do hereby

6   certify:

7            That the witness named in the deposition,

8   prior to being examined, was by me duly sworn;

9            That said deposition was taken before me

10  at the time and place therein set forth and was

11  taken down by me in shorthand and thereafter

12  transcribed into typewriting under my direction and

13  supervision;

14           That said deposition is a true record of

15  the testimony given by the witness and of all

16  objections made at the time of the examination.

17           I further certify that I am neither

18  counsel for nor related to any party to said action,

19  nor in any way interested in the outcome thereof.

20           IN WITNESS WHEREOF I have subscribed my

21  name and affixed my seal this 7th day of October,

22  2021.

23                    _____

24                    LOIS A. ROELL, RMR
                       Notary Public  ID 629180
25                    My Commission expires: 09/07/23

# EXHIBIT 14

# COMMONWEALTH OF KENTUCKY

## REGISTRAR OF VITAL STATISTICS
### CERTIFIED COPY

6187348



KENTUCKY CERTIFICATE OF DEATH

116 201932997

Case #: E201907310097

| 1a. DECEDENTS LEGAL NAME (First, Middle, Last) (Include AKA's if any) | 1b. IF FEMALE, DECEDENTS LAST NAME PRIOR TO FIRST MARRIAGE | 2. SEX |
|---|---|---|
| **BRADLEY JAMES GROTE** | N/A | **MALE** |

| 3. ACTUAL OR PRESUMED DATE OF DEATH (Month/Day/Year) (Spell Month) | 4. SOCIAL SECURITY NUMBER | 5a. AGE-LAST BIRTHDAY (Years) | 5b. UNDER 1 YEAR | | 5c. UNDER 1 DAY | | | 6. DATE OF BIRTH (MM/DD/YYYY) | 7. COUNTY OF DEATH |
|---|---|---|---|---|---|---|---|---|---|
| | | | Months | Days | Hours | Minutes | | |
| **July 21, 2019** | **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** | **27** | | | | | **10/10/1991** | **KENTON** |

| 8. PLACE OF DEATH (Check only one) | | | | | | |
|---|---|---|---|---|---|---|
| HOSPITAL: ☒ Inpatient ☐ ER/Outpatient ☐ Dead on Arrival | OTHER: ☐ Hospice Facility ☐ Nursing Home/Long Term Care Facility ☐ Decedent's Residence ☐ Other (Specify) | | | | | |

| 9. FACILITY NAME (If not institution, give street and number) | 10. CITY OR TOWN, STATE AND ZIP CODE |
|---|---|
| **ST. ELIZABETH HEALTHCARE EDGEWOOD** | **EDGEWOOD, KY 41017** |

| 11. BIRTHPLACE (City and State or Foreign Country) | 12. MARITAL STATUS | 13. SURVIVING SPOUSE (If wife, give name prior to first marriage) |
|---|---|---|
| **EDGEWOOD, KENTUCKY** | ☐ Married ☐ Married but Separated ☐ Widowed ☐ Divorced ☒ Never Married ☐ Unknown | **N/A** |

| 14. DECEDENTS USUAL OCCUPATION (Kind of work done during most of working life.) (Do not use retired) | 15. KIND OF BUSINESS/INDUSTRY | 16. WAS DECEDENT EVER IN U.S. ARMED FORCES? |
|---|---|---|
| **SHIPPING AND RECEIVING** | **MANUFACTURING** | ☐ Yes ☒ No |

| 17a. RESIDENCE - State | 17b. COUNTY | 17c. CITY OR TOWN | 17d. STREET AND NUMBER | 17e. ZIP CODE | 17f. INSIDE CITY LIMITS? |
|---|---|---|---|---|---|
| **KENTUCKY** | **KENTON** | **ERLANGER** | **445 CENTER STREET** | **41018** | ☒ Yes ☐ No |

| 18. DECEDENTS EDUCATION (Check the box that best describes the highest degree or level of school completed at the time of death.) | 19. DECEDENT OF HISPANIC ORIGIN?(Check the box that best describes whether the decedent is Spanish/Hispanic/Latino. Check the "No" box if the decedent is not Spanish/Hispanic/Latino.) | 20. DECEDENTS RACE (Check one or more boxes to indicate what the decedent considered himself or herself to be) |
|---|---|---|
| ☐ 8th Grade or Less<br>☐ 9th - 12th Grade; No Diploma<br>☒ High School Graduate or GED Completed<br>☐ Some College Credit but No Degree<br>☐ Associates Degree (e.g., AA, AS)<br>☐ Bachelor's Degree (e.g., BA, AB, BS)<br>☐ Master's Degree (e.g., MA, MS, MEng, MEd, MSW, MBA)<br>☐ Doctorate (e.g., PhD, EdD) or Professional Degree (e.g., MD, DDS, DVM, LLB, JD) | ☒ No, not Spanish/Hispanic/Latino<br>☐ Yes, Mexican, Mexican American, Chicano<br>☐ Yes, Puerto Rican<br>☐ Yes, Cuban<br>☐ Yes, other Spanish/Hispanic/Latino<br>(Specify) _____ | ☒ White<br>☐ Black or African American<br>☐ Native Hawaiian<br>☐ Asian Indian<br>☐ Chinese<br>☐ Filipino<br>☐ Japanese<br>☐ Guamanian or Chamorro<br>☐ Korean<br>☐ Vietnamese<br>☐ Samoan<br>☐ Other Asian (Specify)<br>☐ Other Pacific Islander (Specify)<br>☐ American Indian or Alaska Native (Name of the enrolled or principal tribe)<br>☐ Other (Specify) |

| 21. FATHERS NAME (First, Middle, Last) | 22. MOTHERS NAME PRIOR TO FIRST MARRIAGE (First, Middle, Last) |
|---|---|
| **JAMES DEAN HOPPER** | **LUANNA RAE GROTE** |

| 23a. INFORMANTS NAME | 23b. RELATIONSHIP TO DECEDENT | 23c. MAILING ADDRESS (Street and Number, City, State, Zip Code) |
|---|---|---|
| **LUANNA RAE GROTE** | **MOTHER** | **2045 SCOTT STREET, 2, COVINGTON, KY 41011** |

| 24. METHOD OF DISPOSITION (Check only one) | 25. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place) | 26. LOCATION - City, Town, and State |
|---|---|---|
| ☐ Burial ☒ Cremation ☐ Donation ☐ Entombment<br>☐ Removal from State ☐ Other (Specify) | **LINNEMANN FUNERAL HOME CREMATORY** | **ERLANGER, KY** |

| 27. SIGNATURE OF FUNERAL SERVICE LICENSEE (Or person acting as such) | DATE SIGNED (MM/DD/YYYY) | 28. KY LICENSE NUMBER (of licensee) | 29. NAME AND COMPLETE ADDRESS OF FUNERAL FACILITY |
|---|---|---|---|
| **G. MICHAEL SPARKS**<br>(Must Use Blue/Black ink) Electronic signature is legally acceptable pursuant to KRS 369.107 & KRS 369.118 | **08/21/2019** | **6796** | **SERENITY FUNERAL CARE**<br>**40 W. 6TH STREET**<br>**COVINGTON, KY 41011** |

| 30. DATE PRONOUNCED DEAD (MM/DD/YYYY) | 31. ACTUAL OR PRESUMED TIME OF DEATH | 32. WAS MEDICAL EXAMINER OR CORONER CONTACTED? |
|---|---|---|
| **07/21/2019** | **0656** | ☒ Yes ☐ No |

**CAUSE OF DEATH**

| 33. PART I. Enter the chain of events - diseases, injuries, or complications - that caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on each line. | Approximate Interval Between Onset and Death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) -> a. **ACUTE METHAMPHETAMINE INTOXICATION** | **1 DAY 15 HOURS OTHER** |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| Sequentially list conditions, if any, leading to the cause listed on line a. b. | |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST c. | |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| d. | |

| PART II. Enter other significant conditions contributing to death, but not resulting in the underlying cause given in Part I | 34. MANNER OF DEATH |
|---|---|
| **METHAMPHETAMINE 7,570 NG/ML AMPHETAMINE 121 NG/ML** | ☐ Natural ☒ Accident<br>☐ Homicide ☐ Pending Investigation<br>☐ Suicide ☐ Could not be Determined |

| 35. WAS AN AUTOPSY PERFORMED? | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: |
|---|---|---|
| ☒ Yes ☐ No | ☐ Yes ☐ Probably | ☐ Not pregnant within past year ☐ Pregnant at time of death |
| 36. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? | ☒ No ☐ Unknown | ☐ Not pregnant, but pregnant within 42 days of death ☐ Unknown if pregnant within past year |
| ☒ Yes ☐ No | | ☐ Not pregnant, but pregnant 43 days to 1 year before death |

| 39. DATE OF INJURY (Month/Day/Year) (Spell Month) | 40. TIME OF INJURY | 41. INJURY AT WORK? | 42. PLACE OF INJURY (e.g., Decedent's home; construction site; restaurant; wooded area) | 43. IF TRANSPORTATION INJURY, SPECIFY: |
|---|---|---|---|---|
| **July 19, 2019** | **UNKNOWN** | ☐ Yes ☒ No | **FOUND DOWN INTAKE AREA DE** | ☐ Driver/Operator ☐ Pedestrian<br>☐ Passenger ☐ Other (Specify) N/A |

| 44. DESCRIBE HOW INJURY OCCURRED: | 45. LOCATION OF INJURY (Street and Number, City or Town, State, Zip Code) |
|---|---|
| **INGESTED LARGE AMOUNT OF METHAMPHETAMINE** | **3000 DECKER CRANE LANE, COVINGTON, KY 41017** |

| 46. TO BE COMPLETED BY CERTIFIER: | 47. DATE OF DEATH (MM/DD/YYYY) |
|---|---|
| To the best of my knowledge, death occurred at the time, date, and place, and due to cause(s) and manner stated. | **09/23/2019** |
| SIGNATURE **RONALD R. COOK**<br>(Must Use Blue/Black ink) Electronic signature is legally acceptable pursuant to KRS 369.107 and KRS 369.118 | 48. LICENSE NUMBER **737** | 49. TITLE OF CERTIFIER **DEPUTY CORONER** |

| 50. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH (ITEM 33) |
|---|
| **RONALD COOK**<br>**KENTON COUNTY CORONER, 2378 GRANDVIEW AVENUE, FT MITCHELL, KY 41017** |

| 51. REGISTRAR'S SIGNATURE | 52. DATE FILED (MM/DD/YYYY) |
|---|---|
| *Christina S. Stewart* | **09/23/2019** |

This is to certify that this is a true and correct copy of the certificate of birth, death, marriage or divorce of the person therein named, and that the original certificate is registered at the Kentucky Office of Vital Statistics under the file number shown.

DATE ISSUED   12/16/2020

*Christina S. Stewart*
State Registrar



FORM VS NO. 1-A
(REVISED 06/2015)

DOCUMENT CONTAINS A WATERMARK – HOLD UP TO LIGHT TO VIEW

# EXHIBIT 15

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

AT COVINGTON


ESTATE OF BRADLEY GROTE,       )   Civil Action No.:

              Plaintiff,     )   2:20-CV-101

                               )

vs.                           )      DEPOSITION OF

                               )  DR. JEFFREY ERNEST KELLER

KENTON COUNTY, KENTUCKY et al.,   )    AUGUST 17, 2022

              Defendants.    )

_____   )




REPORTED REMOTELY BY:

MARLENE "MOLLY" WARD, CSR No. 704, RPR



Notary Public



Magna Legal Services



866-624-6221


www.MagnaLS.com



1  methamphetamine causes different symptoms at different

2  levels in people.  So overdose is kind of an older term,

3  and the degree of intoxication doesn't relate,

4  necessarily, to the amount of drug ingested, and some

5  people have a bad reaction to very little drug, and some

6  people can tolerate a lot of drug.  So the better term

7  is intoxication.

8       Q.  Okay.  So then there is real no distinction

9  just in terms of the signs and symptoms of intoxication

10 and overdose; is that right?

11      A.  They refer to the same process.

12      Q.  And the more methamphetamine you take the

13 greater or the more exacerbated the symptoms might be,

14 but overall they're the same symptoms, restlessness,

15 sweatiness, anxiety, twitchiness, things like that?

16      A.  Right.

17      Q.  Now, is methamphetamine intoxication,

18 Dr. Keller, that in and of itself is not necessarily a

19 medical emergency; would you agree with that?

20      A.  It depends on the severity.  It's like saying

21 a heart attack is not a medical emergency, some people

22 have a mild heart attack it's not, some people are

23 dying.  Same thing with meth, some people have mild

24 symptoms and it's not a medical emergency, some people

25 are dying.



```
 1                    REPORTER'S CERTIFICATE

 2           I, MARLENE "MOLLY" WARD, CSR No. 704,

 3   Registered Professional Reporter, certify:

 4           That the foregoing proceedings were taken

 5   before me at the time and place therein set forth, at

 6   which time the witness was put under oath by me;

 7           That the testimony and all objections made

 8   were recorded stenographically by me and transcribed by

 9   me or under my direction;

10           That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability;

13           I further certify that I am not a relative or

14   employee of any attorney or party, nor am I financially

15   interested in the action.

16           IN WITNESS WHEREOF, I set my hand and seal

17   this 31st day of   August  , 2022.

18

19

20           _____
                      Marlene Ward
21           MARLENE "MOLLY" WARD, CSR, RPR

22           Notary Public

23           P.O. Box 2636

24           Boise, Idaho  83701-2636

25   My Commission expires July 11, 2026
```

