**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:20-00101 (WOB-CJS)**


**LUANNA GROTE,
Administrator of the
Estate of Bradley
Grote,**                                                    **PLAINTIFF,**

**VS.**                          <u>**MEMORANDUM OPINION AND ORDER**</u>

**KENTON COUNTY, ET AL.,**

                                                           **DEFENDANTS.**

Before the Court are the following motions:

- Southern Health Partners' and Caitlin Brand's Motion to Strike Opinions and Testimony of Jeffrey Keller, M.D., (Doc. 138);

- Kenton County Defendants'[1] Motion to Strike Report and Opinions of Victor Lofgreen, Ph.D., (Doc. 118);

- Southern Health Partners' and Caitlin Brand's Motion for Summary Judgment, (Doc. 137); and

- Kenton County Defendants' Motion for Summary Judgment, (Doc. 116).

The motions have been briefed and the Court now issues this Memorandum Opinion and Order.

### *Factual and Procedural Background*

### A. Arrest and Booking

---

[1] The Kenton County Defendants include: Kenton County, Kentucky; Kenton County Fiscal Court; Kenton County Detention Center; former Kenton County Jailer Terry Carl; booking clerk Sarah Bell; Deputy Brian Jennings; Deputy Alexander Brown; Deputy Aaron Branstutter; and Sergeant Jason Russell.

At 2:52 p.m.[2] on July 19, 2019, Covington police officer Sam Matthews stopped a car. (Video 8 at 0:0:11). When Officer Matthews approached the car, the front seat passenger, Bradley Grote, was standing next to the car. (*Id.* at 0:0:01). Officer Matthews saw Grote throwing something—later found to be syringes and a baggie of methamphetamine—over a nearby privacy fence. (Doc. 116-1 at 3). Grote was detained and arrested, and Officer Matthews took him to the Kenton County Detention Center. (Video 8 at 0:02:11).

Officer Matthews never saw Grote take any drugs before he was detained. (Doc. 116-1 at 3). Grote never seemed impaired during the traffic stop or en route to the jail. (Video 8). But Grote had secretly swallowed a baggie containing 14 times the lethal dose of meth. (Doc. 116 at 1). Grote never told Officer Matthews or anyone at the jail. (*Id.*).

At 3:57 p.m., Grote and Officer Matthews arrived at the jail and began the custody transfer. (Video 8 at 1:05:16). Grote still seemed normal. (*Id.*). He responded to the jail deputy's questions, followed instructions, and didn't seem impaired. (*Id.* at 1:05:30–1:06:50; Video 10 at 4:01:02–4:04:33). He was sweating, but the deputy assumed that was because it was a hot July day. (Doc. 116-

---

[2] Much of the evidence in this case comes from recorded video. There are two sources of video: (1) lapel cameras attached to the police officer and jail deputies, and (2) surveillance cameras inside the jail. The lapel camera video uses Coordinated Universal Time. The surveillance camera video uses Eastern Daylight Time. All time references in this opinion are to Eastern Daylight Time.

7 at 8). Officer Matthews also mentioned that it was a hot day. (Video 8 at 01:06:13).

The deputy asked Grote if he would be coming off any drugs, detoxing, or if he had any drugs on him. (*Id.* at 1:05:45–1:05:53). Grote said no. (*Id.*). Once inside the jail, a booking clerk performed a medical screening. (Doc. 116-6). One of the questions was "Have you recently ingested potentially dangerous levels of drugs or alcohol?" (*Id.*). Grote responded "No." (*Id.*). The jail's intake assessment shows that Grote was issued a contraband warning and was asked whether he had drugs hidden in his body. (Doc. 129-3). At 4:17 p.m., a jail deputy strip searched Grote, but found nothing. (Video 13 at 4:17:31–4:22:18).

At 4:22 p.m., Grote emerged from the strip search room and returned to the booking administration area. (Video 9 at 4:22:32). By this point he seemed agitated. He could not stand still. He was sweating and fanning himself with his shirt. He tried to complete some paperwork but struggled to sign his name and write his date of birth and social security number. (*Id.* at 4:22:45–4:24:45; Doc. 129-4; Doc. 129-5; Doc. 129-6; Doc. 129-7). At 4:24 p.m., he walked away from the booking desk and sat down. (Video 9 at 4:24:45). A jail deputy suspected that Grote might be experiencing alcohol withdrawal and asked the medical staff to come assess him. (Doc. 116-1 at 5).

At 4:31 p.m., medical staff employed by Southern Health Partners, the jail's statutorily-required and contracted medical provider, arrived to assess Grote. (Video 9 at 4:31:34). By this time Grote was shaking and his clothes were soaked through with sweat. (Video 1 at 0:00:20). Nurse Caitlin Brand struggled to obtain Grote's vitals because he was shaking so severely. (*Id.* at 0:00:55-0:01:25; Doc. 129 at 4). Nurse Brand asked Grote how much meth he had taken. (*Id.* at 0:01:55). Grote told her he had taken half a gram at noon that day, and that he was a daily user. (*Id.* at 0:01:58-0:02:27). Nurse Brand concluded that Grote was going through withdrawal. (Doc. 116-1 at 6). She told the deputies that he should be placed in a detox cell. (Video 1 at 0:04:52).

At 4:35 p.m., the deputies and medical staff took Grote to cell B4. (*Id.* at 0:04:58). Nurse Brand administered oxygen and told the deputies to check on Grote every 10-15 minutes. (*Id.* at 0:06:37-0:09:05). They left the cell at 4:40 p.m. (*Id.* at 0:09:10).

The deputies checked on Grote a few times over the next hour.[3] Checks were done at 4:50 p.m., 4:55 p.m., and 5:12 p.m. (Video 11). During the 5:12 p.m. check, the deputy opened the cell door and talked to Grote. (*Id.* at 05:12:59). Grote's condition was unchanged. (Doc. 116-1 at 8). The largest gap without a check was about 21 minutes, between 5:14:08 and 5:35:55. (Video 11).

---

[3] There is a roughly three-minute gap between the time stamps on the lapel camera videos and the time stamps on the jail surveillance camera videos. All times in this paragraph are taken from the jail surveillance camera.

4

At 5:32 p.m.,[4] a Class D inmate walking past Grote's cell saw Grote having a seizure and told a deputy in the booking area. (Video 4 at 0:00:18). The deputy entered Grote's cell, called a "signal six" medical emergency, and tried to revive him. (*Id.* at 0:00:30–0:00:34; Doc. 116-10 at 71). Grote was foaming at the mouth and immobile. (Video 4).

At 5:34 p.m., the medical staff arrived. (*Id.* at 0:01:30). Nurse Brand cleared the foam from Grote's mouth and tried to revive him with an ammonia inhalant. (*Id.* at 0:03:00). She administered oxygen. (*Id.* at 0:03:27). She asked Grote whether he could open his eyes, what was going on, and how much meth he had taken. (*Id.* at 0:05:53–0:06:33). For the next roughly 11 minutes, Nurse Brand continued to administer oxygen, measure Grote's vitals, and try to get a response. (*Id.* at 0:06:33–0:17:58). She and the shift commander, Sergeant Jason Russell, agreed that Grote needed a life squad, so Russell contacted the jail's control board and told them to call 911. (Doc 116-10 at 73–75).

At 5:50 p.m., EMS arrived. (Video 4 at 0:17:58). They suctioned Grote's airway and continued providing care. (*Id.*). At 5:57 p.m., they put Grote on a stretcher, moved him to the ambulance, and took him to the hospital. (*Id.* at 0:25:06).

---

[4] Now we're back to lapel camera time; 5:32 on the lapel camera was roughly 5:35 on the surveillance camera.

Two days later, Grote died from acute methamphetamine toxicity. (Doc. 129-11).

### B. Procedural History

Grote's estate sued in 2020. (Doc. 1). The Complaint included counts for constitutional violations under 42 U.S.C. § 1983 and state law claims for negligence and intentional infliction of emotional distress. (*Id.*).

The County Defendants moved for summary judgment, (Doc. 116), and to exclude Plaintiff's expert Victor Logfreen, Ph.D. (Doc. 118). Plaintiff responded to the motion to exclude, (Doc. 128), and to the summary judgment motion. (Doc. 129). The County Defendants replied to the summary judgment response. (Doc. 131).

Southern Health Partners moved for summary judgment, (Doc. 137), and to exclude Plaintiff's expert Jeffrey Keller, M.D. (Doc. 138). Plaintiff responded to the motion to exclude, (Doc. 142), and to the summary judgment motion. (Doc. 143). Southern Health Partners replied to the motion to exclude response, (Doc. 145), and to the summary judgment response. (Doc. 146).

### *Analysis*

### A. Motions to Exclude

Both sets of defendants moved to exclude a witness. The County Defendants want to strike the report and opinions of Victor Lofgreen, Ph.D., and Southern Health Partners wants to exclude

opinions and testimony of Jeffrey Keller, M.D. (Doc. 118; Doc. 138).

Motions to exclude are governed by Rule 702 of the Federal Rules of Evidence. Rule 702 says that an expert may offer an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Court acts as a gatekeeper, ensuring that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The focus is not on the expert's conclusions, but on the principles and methodologies that led them there. *Id.* at 595.

### 1. Southern Health Partners' Motion to Exclude Opinions and Testimony of Jeffrey Keller, M.D.

Jeffrey Keller, M.D. began providing medical care to inmates in 1996 and has been practicing correctional medicine full time since 2014. (Doc. 138-2 at 2). He is board certified in emergency medicine and is a fellow of both the American College of Emergency Physicians and the American College of Correctional Physicians. (Doc. 142-1 at 3). From 1997 to 2021 he served as Medical Director

7

and CEO of Badger Correctional Medicine, which provided medical care to inmates in Idaho. (*Id.* at 2). From 2013 to 2018 he also served as Chief Medical Officer for Centurion LLC, which provided medical care to inmates in eight states. (*Id.*).

His report focuses on the medical care Grote received at the jail. (Doc. 138-2). It concludes that Grote was showing obvious signs of meth intoxication during booking; that Nurse Brand's treatment violated the standard of care; that the jail deputies' failure to check on Grote when he was in the detox cell amounted to deliberate indifference; and that if Grote had been taken to the hospital earlier, he would have survived. (*Id.*).

Southern Health Partners argues that the Court should strike Dr. Keller's report for four reasons. First, it says that Dr. Keller doesn't have the specialized knowledge to opine as to what caused Grote's death. (Doc. 138 at 3). Dr. Keller may be a medical doctor but, unlike the defense experts, he is not a toxicologist and cannot opine on how the meth affected Grote. (*Id.* at 3-4).

But just because Dr. Keller doesn't specialize in toxicology doesn't mean his opinions are unreliable. Dr. Keller reviewed the same records as the defense experts, including Grote's medical records, certificate of death, and post-mortem examination. (Doc. 142-2). Southern Health Partners argues that Dr. Keller is "not qualified" when "[c]ompared to the defense experts." (Doc. 138 at 4). But that comparison is for the factfinder to make. They will

8

decide whether Dr. Keller's opinions deserve less weight because he specializes in emergency medicine instead of toxicology.

Southern Health Partners' second reason for striking Dr. Keller's report is that the opinions are unreliable and speculative. (*Id.*). The unreliability argument is that Dr. Keller relied on nothing more than his "personal opinion and experience" to conclude that Grote could have been saved if he had been taken to a hospital sooner. (*Id.* at 5). Facts and data to support that opinion are, in Southern Health Partners' view, "completely non-existent." (*Id.* at 6).

Again, Dr. Keller relied on the same facts and data that the defense experts did. That he came to a different conclusion does not mean that his report and opinions are inadmissible. If Southern Health Partners wants to attack those conclusions by pointing out missing information or inconsistencies—for example, that Dr. Keller does not know exactly when Grote ingested meth, or how, or what his tolerance was—they are free to do so. But those criticisms go to the weight of Dr. Keller's opinions, not admissibility. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

The argument that Dr. Keller's opinions are speculative stems from their "the earlier, the better" nature. (Doc. 138 at 7). Southern Health Partners argues that the opinions really boil down

to something simple: it's almost always better to catch a medical problem earlier rather than later because that gives you a better chance of saving the patient. And the only thing that Dr. Keller says in that regard is that, at "some point," it was too late to save Grote. (*Id.* at 8). Southern Health Partners says this is just too vague to help the trier of fact. (*Id.*).

But Dr. Keller's deposition testimony was more specific than "some point." He identified Grote's seizure as the point of no return: "As to resuscitable and not resuscitable, I suspect that that line was crossed at the time he had his seizure." (Doc. 138-6 at 37). That may be speculation, but all expert testimony is speculation. No one knows with absolute certainty what happened or why, that's why each side has competing experts to present their own theories of the case.

Southern Health Partners' third reason for striking Dr. Keller's report is that the opinions are inadmissible *ipse dixit*. In other words, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), *cert denied*, 506 U.S. 826 (1992)). Here, the "data" is the video footage of Grote at the jail, and the "opinion proffered" is that Grote's medical needs were obvious to the medical staff. Southern Health Partners argues that Dr. Keller

10

cannot assume, based on the video footage alone, that Grote's condition was obvious to the medical staff. (Doc. 138 at 9).

But Dr. Keller relied on more than just the video footage. He also reviewed the depositions of Nurse Brand and medical assistant Tiara Dockery. (Doc. 142-2 at 2). And his report itself says that "[t]he notes of LPN Brand"—not the video footage—"shows that [she] understood that Mr. Grote was showing methamphetamine toxicity." (Doc. 138-2 at 5). So while there may be a gap between the video and Dr. Keller's conclusions, he also relied on other documents to bridge that gap.

Southern Health Partners' fourth reason for striking Dr. Keller's report is that his opinions regarding "deliberate indifference" are inadmissible legal conclusions. (Doc. 138 at 9). Dr. Keller uses the legal phrase "deliberate indifference" several times throughout his opinion. (Doc. 138-2). He concludes that the failure to call an ambulance, the failure to do regular medical checks, and the failure to document medical assessments all amounted to deliberate indifference. (*Id.* at 6).

As discussed above, an expert may opine on an "ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. But an expert may not instruct the factfinder "as to applicable principles of law[.]" *Walker v. S. Health Partners*, 576 F. Supp. 3d 516, 533 (quoting *Shahid v. City of Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989)). So Dr. Keller may not opine on whether "defendants' actions

11

were or were not deliberately indifferent in a legal sense." (*Id.*).
The motion to strike will be granted for those legal conclusions.

In sum, Southern Health Partners' Motion to Strike will be
granted in part as to any legal conclusions and denied as to
everything else.

### 2. County Defendants' Motion to Strike Report and Opinions of Victor Lofgreen, Ph.D.

Victor Lofgreen, Ph.D. is a certified forensic litigation
consultant specializing in prison and jail management. (Doc. 128-
1). Throughout his career he held positions in corrections and
criminal justice. (*Id.*). His report focuses on the jail's policies
and procedures and concludes that they were inadequate because
they did not offer enough guidance on how to handle a situation
like Grote's. (Doc. 118-1).

The County Defendants argue that the Court should strike
Lofgreen's report and opinions for two reasons. First, they say
the opinions lack a proper foundation because they include legal
and medical conclusions that Lofgreen is unqualified for, and
because Lofgreen was not provided with all the records he needed
to form an opinion. (Doc. 118 at 5-9). Lofgreen's report does
include opinions on medical causation, including that Grote's
ingestion of meth and the jail deputies' alleged failure to take
him to the hospital contributed to his death. (Doc. 118-1 at 12-
13). It also includes legal opinions about what the jail deputies'

12

standard of care was, and whether their conduct rose to the legal standard at issue in this case, "deliberate indifference." The opinion uses the phrase "indifference" or "deliberate indifference" six times.

Lofgreen has no medical training and said in his deposition that he would not be offering any testimony or opinions about medical causation. (Doc. 118-2 at 15). He therefore lacks the specialized knowledge or training required by Rule 702 that would otherwise allow him to offer such opinions. The motion to strike will be granted as to any opinions involving medical causation.

As for the legal opinions, an expert may opine on an "ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. But an expert may not instruct the factfinder "as to applicable principles of law[.]" *Walker*, 576 F. Supp. 3d at 533. So Lofgreen may not opine regarding the legal rights of prisoners, the standard of care for jail deputies, or whether "defendants' actions were or were not deliberately indifferent in a legal sense." *See id.* The motion to strike will be granted for those legal conclusions.

For the records issue, the County Defendants argue that Lofgreen's opinions lack foundation because he never reviewed the applicable Kentucky regulations or the Health Services Agreement between the jail and Southern Health Partners. (Doc. 118 at 6). The regulations set the standards for jail operations, *see, e.g.*, 501 Ky. Admin. Reg. 3.010, and the Health Services Agreement, in

13

conjunction with the jail's policies and procedures, describe how those standards will be met.

Lofgreen's report might be "shaky" considering he never consulted the applicable standards before deciding whether those standards were met. But "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the proper means of attacking his opinions. *Daubert*, 509 U.S. at 596. The County Defendants are free to contradict Lofgreen's conclusions by identifying the Kentucky regulations and then showing how the jail's policies and procedures satisfy those regulations.

The County Defendants' second argument for striking Lofgreen's report and opinions is that the opinions are not reliable. (Doc. 118 at 9). Lofgreen relied on a security patrol log to determine when and how often the jail deputies checked on Grote in the detox cell. (Doc. 118-1 at 13). The County Defendants argue he should have relied on the overhead surveillance camera footage instead because it shows every interaction the deputies had with Grote, but the patrol log does not. (Doc. 118 at 9).

Plaintiff correctly points out that this goes to weight, not admissibility. (Doc. 128 at 3-4). If there is better evidence than that used by Lofgreen—evidence that might show he is wrong—the County Defendants are free to use that evidence to attack Lofgreen's conclusions. This comports with the "flexible" and

"liberal thrust" of Rule 702, which favors admissibility. *Daubert*, 509 U.S. 588, 594.

Accordingly, the County Defendants' Motion to Strike will be granted in part as to any medical or legal conclusions and denied as to everything else.

### B. Motions for Summary Judgment

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must resolve all ambiguities and draw all factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson*, 477 U.S. at 255).

### 1. 42 U.S.C. § 1983 deliberate indifference claims

To prevail on her § 1983 claims, Plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015)) (internal quotation marks omitted). Private companies performing traditional state functions, like providing medical

care to inmates, act under the color of state law. *Shadrick*, 805 F.3d at 736.

The constitutional deprivation alleged here is that defendants violated Grote's Fourteenth Amendment rights because they were deliberately indifferent to his medical needs.[5]

States are obligated to provide medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). That right to medical care comes from two different places in the Constitution, depending on an inmate's status. Convicted prisoners have a right to medical care under the Eighth Amendment. Pretrial detainees like Grote, on the other hand, have a right to medical care under the Fourteenth Amendment. *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Until recently, it didn't matter which category a plaintiff fell into, the test for a deliberate indifference to medical needs claim was the same.

That test had two parts: first, an objective prong requiring proof that the medical need was "sufficiently serious"; second, a subjective prong requiring proof that the defendant knew of and disregarded an excessive risk to the inmate's health or safety.

---

[5] Plaintiff's Complaint actually references the Fourth Amendment, (Doc. 1 at 24), but it's clear from context and from the Complaint itself that that was a mistake. The Complaint, for example, references Grote's right "to be free from cruel and unusual punishment," (*Id.* at 28), which stems from the Eighth Amendment and, for a pretrial detainee like Grote, the Fourteenth.

*Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Two cases changed that for pretrial detainees. First, in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court examined a pretrial detainee's excessive force claim. The Court concluded that because pretrial detainees, unlike convicted prisoners, cannot be punished at all, the correct standard for an excessive force claim is objective rather than subjective. *Id.* at 397–98. Second, in *Brawner v. Scott County, Tennessee*, 14 F.4th 585 (6th Cir. 2021), the Sixth Circuit expanded the holding in *Kingsley* beyond the excessive force context and applied it to deliberate indifference claims. 14 F.4th at 596.

The result is that the second prong of the deliberate indifference test—the subjective prong—has changed for pretrial detainees. Post-*Brawner*, a plaintiff "must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Hyman*, 27 F.4th at 1237 (quoting *Brawner*, 14 F.4th at 596) (cleaned up). The new test "asks whether the defendant acted 'recklessly in the face of an unjustifiably high risk' that is either 'known or so obvious that it should be known' to a reasonable official in the defendant's position." *Id.* (quoting *Britt ex rel. Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *2 (6th Cir. Feb. 10, 2022)).

The Sixth Circuit clarified things further in *Trozzi v. Lake County, Ohio*, 29 F.4th 745 (6th Cir. 2022). That case laid out the current three-part test for a Fourteenth Amendment deliberate indifference to medical needs claim: (1) the plaintiff had an objectively serious medical need; (2) a reasonable official knowing what the particular official knew at the time would understand that the detainee's medical needs subjected him to an excessive risk of harm; and (3) the official knew that failing to respond would pose a serious risk to the detainee, and the official ignored that risk. *Id.* at 757–58.

### a. Southern Health Partners Defendants

The Southern Health Partners defendants agree that Grote had an objectively serious medical need. (Doc. 137 at 9; Doc. 143 at 6). Therefore, the Court will focus on the second and third prongs of the test.

### i.  Nurse Brand

The first question is whether a reasonable official, knowing what Nurse Brand knew, would realize that Grote's medical needs subjected him to an excessive risk of harm. *See Trozzi*, 29 F.4th at 757. So, what did Nurse Brand know? And perhaps more importantly, what did she *not* know?

She did not know that Grote had swallowed 14 times the lethal dose of meth. (Doc. 116-13 at 121). But she did know that the deputies had requested the medical staff to check on Grote for

18

possible alcohol withdrawal. (Doc. 116-1 at 5). She knew that Grote admitted using half a gram of meth about four hours earlier, and that he was a daily user. (Video 1 at 0:01:58-0:02:27). And she knew, from her own observations, that Grote was sweating, shaking, and irritable, symptoms that are consistent with withdrawal. (Doc. 116-13 at 119-21).

A reasonable official who knew all of that would not necessarily understand that Grote's medical needs subjected him to an excessive risk of harm. Rather, they would likely conclude that Grote was merely going through routine withdrawal. And that's exactly what Nurse Brand concluded. (*Id.* at 121).

The second question is whether Nurse Brand knew that failing to respond would pose a serious risk to Grote and ignored that risk. *See Trozzi*, 29 F.4th at 757-58. This prong is meant to ensure that the defendant has a sufficiently culpable mental state before holding them responsible for a constitutional tort. *Id.* at 758. "In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction . . . cannot have violated the detainee's constitutional rights." *Id.*

That is the case here. Because Nurse Brand mistook Grote's symptoms as withdrawal instead of overdose, she was unaware of the risks of inaction. And she could not ignore a risk that she did not know was there. Therefore, Nurse Brand was not deliberately indifferent to Grote's medical needs.

19

###### ii.   Southern Health Partners

In addition to Nurse Brand, Plaintiff also brings a § 1983 claim against Southern Health Partners itself. Again, to prevail on her § 1983 claims, Plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler*, 893 F.3d at 890.

For the second prong, municipalities and private corporations are considered "persons" under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Street v. Corr. Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996) (extending liability to private corporations). And as explained above, the requirement that the defendant act under the color of state law is not in question here because private companies performing traditional state functions, like providing medical care to inmates, act under the color of state law. *Shadrick*, 805 F.3d at 736.

As for the first prong, when the defendant who did the depriving is a municipality or corporation, the case is analyzed under a *Monell* theory, meaning that the deprivation of rights must have come from the defendant's official policy or custom. *Simpkins v. Boyd Cnty. Fiscal Ct.*, 48 F.4th 440, 456 (6th Cir. 2022) (quoting *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)). *Monell* claims have three prongs. The plaintiff must (1) identify

20

the policy or custom, (2) connect that policy or custom to the defendant, and (3) show that the policy or custom caused his injury. *Id.* (citing *Alkire*, 330 F.3d at 815).

### A. *Monell* prong 1 — Identifying the policy or custom

For the first prong, there are four ways to identify a policy or custom: (1) an illegal official policy or legislation; (2) an official with final decision-making authority ratified illegal actions; (3) a policy of inadequate training or supervision; or (4) a custom of tolerating or acquiescing to federal violations. *Id.* (citing *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020)).

Here, Plaintiff focuses on three of the four methods, numbers (1), (2), and (3). In doing so, she leans heavily on the 2015 Sixth Circuit case *Shadrick v. Hopkins County*, arguing that that case is analogous to what happened here. (Doc. 143 at 32). The problem with that is that *Shadrick* only dealt with one of the four methods of proving a policy or custom: inadequate training or supervision. *See* 805 F.3d at 738 ("Our analysis focuses on the adequacy of SHP's *training program*[.]") (emphasis in original). So *Shadrick* is only relevant to Plaintiff's argument regarding that particular method, but not to Plaintiff's arguments as to the other two methods she focuses on.

### 1. Method 1 — Ratification by decision-maker

21

Plaintiff's first chosen method of identifying a policy or custom is ratification of illegal actions by an official with final decision-making authority. (Doc. 143 at 34). Such ratification can be proven by showing that the defendant failed "to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright*, 962 F.3d at 882 (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990)).

Plaintiff offers no proof of such allegations or of any failure to investigate them. All she says is, "Such is the circumstance here, with SHP in KCDC, and in other jails." (Doc. 143 at 34). To create a genuine dispute of fact in order to survive summary judgment, Plaintiff can cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). But Plaintiff doesn't cite to anything in the record at all. She points to other cases where the court found evidence of Southern Health Partners' deliberate indifference, but the evidence in those cases was in *those* cases—not this one.

### 2. Method 2 — Illegal policy or legislation

Plaintiff's second chosen method of identifying a policy or custom is showing an illegal official policy or legislation. (Doc. 143 at 35). To succeed with this method, a plaintiff can point to

either a written policy or something that is unwritten but "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Wright*, 962 F.3d at 880 (quoting *Monell*, 436 U.S. at 691).

The illegal official policy or legislation that Plaintiff points to here is "summarily denying medical care for patients with serious medical needs[.]" (Doc. 143 at 35). Plaintiff claims that Southern Health Partners does this by:

- Requiring LPNs to practice beyond the scope of their licensure by deciding whether patients will go to the hospital;

- Not providing patients with evaluations by a qualified advanced practitioner more than once every 14 days;

- Refusing to send patients with serious medical needs to the hospital if that patient refuses to allow an untrained deputy to take his vitals;

- Not instructing deputies on what to monitor and act on while performing medical observations; and

- Not charting several types of patient encounters and medical complaints.

*Id.* But Plaintiff has the same problem with this method that she had with her first: no evidence. Plaintiff does not point to a single thing in the record—no documents, no deposition testimony, nothing—to support any of this.

### 3. Method 3 — Inadequate training or supervision

23

Lastly, Plaintiff's third chosen method of identifying a policy or custom is to show a policy of inadequate training or supervision. (*Id.* at 36). This is the "most tenuous" of the four *Monell* liability theories. *Morgan ex rel. Morgan v. Wayne Cnty., Mich.*, 33 F.4th 320, 329 (6th Cir. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)) (internal quotation marks omitted). To show inadequate training or supervision, Plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy stemmed from the defendant's deliberate indifference; and (3) the inadequacy was closely related to or caused Grote's injury. *Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 286–87 (6th Cir. 2020).

### a. Southern Health Partners' training was not inadequate for the tasks its employees performed.

For the first prong, the tasks performed by Nurse Brand—21 of them—are listed in Southern Health Partners' staff nurse job description. (Doc. 143-1). Plaintiff only identifies one of those 21 tasks—documenting patient contacts—that Nurse Brand did not perform. (Doc. 143 at 24). But the question is not whether Brand performed the task, but whether she was adequately trained to perform the task. And Southern Health Partners' 30(b)(6) witness testified that nurses were trained to document patient encounters in the electronic medical record. (Doc. 141 at 27).

24

To the extent that Nurse Brand herself testified about her training, that testimony is insufficient to prove the training was inadequate. That a particular official may be inadequately trained "will not alone suffice to fasten liability on [the defendant], for the of[ficial]'s shortcomings may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989).

Brand's testimony is deficient for another reason too. The Sixth Circuit has said that, "[e]specially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of . . . training procedures." *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 580 (6th Cir. 2020) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992)). Plaintiff has offered no expert testimony on the adequacy of Southern Health Partners' training.

Plaintiff tries one last tack to prove that Southern Health Partners' training was inadequate, by piggybacking on the outcome in *Shadrick*. (Doc. 143 at 36–38). But that too is insufficient because a plaintiff may not ride on the evidentiary coattails of a prior case: "[Plaintiff] argues that this court has already held that SHP's training procedures were inadequate in *Shadrick v. Hopkins*[.] [Plaintiff's] argument is unconvincing because he has made no effort to develop any facts about the training that the SHP nurses in this case received." *Griffith*, 975 F.3d at 580. So

too here. Plaintiff doesn't point to anything in the record for this case. She just quotes an entire page of material from *Shadrick* and says that that case involved "similar circumstances as in this case." (Doc. 143 at 37).

But that's not accurate. The *Shadrick* court concluded that Southern Health Partners' training was inadequate because there was no "ongoing training program for its LPN nurses." *Shadrick*, 805 F.3d at 740. The court specifically took issue with the nurses' ignorance of the policies guiding their conduct, the lack of ongoing training, the lack of feedback and evaluations from superiors, and the fact that nurses only provided medical assistance when the inmates asked for it. *Id.*

None of those factors are present here. Nurse Brand testified that she received the Southern Health Partners policy and correctional nursing manuals and that she completed all courses, policies and procedures that were required in her orientation. (Doc. 116-13 at 27-34). She received ongoing training via continuing education units, which were documented with Southern Health Partners. (*Id.* at 34). Her job description also lists "Participates in all continuing education offered by SHP" as one of her tasks. (Doc. 143-1). She received evaluations and had the chance to review them. (Doc. 116-13 at 78). And she did not only provide care to inmates when requested. Rather, she performed regular medical observation checks. (*Id.* at 42).

26

Therefore, because the training and supervision offered by Southern Health Partners was not inadequate for the tasks its employees performed, Plaintiff cannot identify a policy or custom of inadequate training. Nevertheless, because the parties also dispute the second prong of the inadequate training or supervision test, it will be addressed here.

### b. Even if there was an inadequacy, it was not the result of deliberate indifference.

Assuming a plaintiff can prove that the defendant's training or supervision was inadequate for the tasks performed, the second element she must prove is that the inadequacy resulted from the defendant's deliberate indifference. *Ouza*, 969 F.3d at 287. There are two ways to do so. Plaintiff can prove (1) "a pattern of similar unconstitutional violations by untrained employees" or (2) a single violation, plus a showing that the defendant failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation. *Morgan*, 33 F.4th at 329 (quoting *Shadrick*, 805 F.3d at 738-39) (internal quotation marks omitted).

Here, Plaintiff relies on the second method. But she offers no evidence from the record to support her claim. She discusses *Shadrick* and says that "[t]here is ample evidence from which a jury could conclude" that there is an obvious risk of constitutional violations due to Southern Health Partners' lack of

27

training. (Doc. 143 at 37–38). She doesn't explain what that "ample evidence" is.

### c. Plaintiff offers no evidence that any inadequacy was related to or caused Grote's injury.

The third element a plaintiff must prove to show that a defendant had a policy of inadequate training or supervision is that the inadequacy was closely related to or caused the injury. *Ouza*, 969 F.3d at 287. Plaintiff makes no attempt to do that other than to say that Southern Health Partners' "failures to train and supervise its staff were a moving force behind" the injury. (Doc. 143 at 37). Simply reciting the standard proves nothing.

\* \* \* \*

In sum, Plaintiff has not identified any Southern Health Partners policy or custom that deprived Grote of his constitutional rights. Because Plaintiff cannot overcome that threshold, the Court need not address the other two prongs of the *Monell* claim. Accordingly, Southern Health Partners was not deliberately indifferent to Grote's medical needs.

### b. County Defendants

In addition to Southern Health Partners and Nurse Brand, Plaintiff also has § 1983 claims against various Kenton County defendants.[6] The structure of these claims is the same as it was

---

[6] The County Defendants were originally sued in both their individual and official capacities. (Doc. 1). Because Kenton County itself was named as a defendant, the parties agreed to dismiss the official capacity claims as

for the Southern Health Partners defendants: Plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler*, 893 F.3d at 890.

The County Defendants do not dispute the second prong, so the question is whether there was a deprivation of Grote's rights. The County Defendants argue that there was no constitutional deprivation, and thus no viable § 1983 claim. (Doc. 116-1 at 11). Alternatively, they argue that even if there was a constitutional deprivation, they are all entitled to qualified immunity. (*Id.* at 18).

The deprivation alleged here is also the same as it was for the Southern Health Partners defendants—deliberate indifference to Grote's medical needs. As a refresher, that claim has three elements: (1) the plaintiff had an objectively serious medical need; (2) a reasonable official knowing what the particular official knew at the time would understand that the detainee's medical needs subjected him to an excessive risk of harm; and (3) the official knew that failing to respond would pose a serious risk to the detainee, and the official ignored that risk. *Trozzi*, 29 F.4th at 757–58. Each defendant must be evaluated individually.

---

duplicative. (Doc. 30). They did so for Jailer Terry Carl, Deputies Alexander Brown and Brian Jennings, and Sergeant Jason Russell. But they did not do so for Deputy Aaron Branstutter or Clerk Sarah Bell. This is probably an oversight, and the Court assumes that the official capacity claims for those two defendants were likewise dismissed.

*Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

### i.   Booking clerk Sarah Bell

The first prong of the deliberate indifference test is whether Grote had an objectively serious medical need. *See Trozzi*, 29 F.4th at 757. A medical need is objectively serious if a doctor has diagnosed it as mandating treatment, or if it is so obvious that even a layperson would recognize the need for a doctor. *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)).

The County Defendants argue that Grote did not have an objectively serious medical need before his seizure in the detox cell, but that he did have such a need after the seizure. (Doc. 116-1 at 11–15). Plaintiff takes that concession to mean that the medical need prong was satisfied throughout the entire encounter, from the time Grote arrived at the jail to the time EMS removed him on a stretcher. (Doc. 129 at 14). But that's not the County Defendants' position. Their position is that there *was* a serious medical need from the time of the seizure onward, but there was *not* a serious medical need before that.

Why does it matter when the medical need arose? Whether it was always there, or only began halfway through? It matters because one of the jail staff defendants—booking clerk Sarah Bell—was only

30

involved in the first half of the story. Bell performed Grote's booking procedures—entering his citation information, getting personal data, asking medical intake questions, and so on—but was not involved beyond that. (Doc. 116-5 at 28–29). She was not responsible for taking inmates to their cells or for observing, checking on, or treating inmates. (*Id.* at 49–50, 67–68).

So if, as the County Defendants claim, Grote's objectively serious medical need only arose after he was in his cell, and thus after any encounter with Bell, then that prong of the deliberate indifference test cannot be satisfied for Bell. That leaves the real question: Did Grote have an objectively serious medical need before going to the detox cell?

No. To be objectively serious, the medical need would have to be so obvious that a layperson would recognize it. *Richmond*, 885 F.3d at 938. Here, Plaintiff suggests that Bell should have recognized Grote's serious medical need because he did not complete or sign the documents she gave him, which could indicate an inability to read or understand the information, which could indicate a serious medical condition. (Doc. 129 at 25). But that alone would not necessarily lead someone to believe that Grote had an objectively serious medical need.

During the booking process, no one recognized that what was happening was the beginning of a drug overdose. Grote never told anyone he had ingested the baggie of meth. (Doc. 116-1 at 12). And

31

while he did eventually admit to using meth, he lied about the amount he had taken and when, leading Nurse Brand and the deputies to assume he was going through routine withdrawal as opposed to something more serious. (*Id.*). He was sweating, but that alone would not indicate a serious medical need, especially since it was the middle of July. He was able to respond to questions, follow instructions, and walk to the detox cell. (*Id.* at 13–14). He sat in the booking area surrounded by five deputies and two medical staffers. The fact that seven people observed him and none of them concluded he had a serious medical need means that his condition was not so obvious that even a layperson would recognize it as an overdose.

Thus, because Grote did not have an objectively serious medical need during his encounter with Bell, the first prong of the deliberate indifference test is not met for her. The claim against her cannot survive summary judgment.

The remaining jail deputy defendants were all in the detox cell after Grote's seizure. The County Defendants acknowledge that from that point on, the objectively serious medical need prong of the deliberate indifference claim was met for those defendants. (*Id.* at 15). So the analysis for those defendants will focus on the time period in the cell after the seizure, and will analyze the second and third prongs of the test.

### ii. Deputy Alexander Brown

Deputy Brown responded to Grote's seizure as soon as another inmate told him about it. (Video 4 at 0:00:17). When he entered the detox cell he immediately called a signal six medical emergency and began massaging Grote's chest to try and revive him. (*Id.* at 0:00:35; Doc. 116-7 at 23). The medical staff arrived less than a minute later, and Nurse Brand began assessing Grote. (Video 4 at 0:01:31). From that point until EMS removed Grote from the jail, Deputy Brown assisted Nurse Brand by holding Grote on his side, and he deferred to Nurse Brand's medical judgment.

A reasonable official in Brown's position—seeing an inmate seizing and foaming at the mouth—would understand that Grote's medical needs subjected him to an excessive risk of harm. *See Trozzi*, 29 F.4th at 757.

Brown knew that failing to respond to the situation would pose a serious risk to Grote, but he did not ignore that risk. *See id.* at 757–58. He acted quickly by calling a medical emergency over the radio and then trying to revive Grote from the seizure. Then he helped Nurse Brand while she treated Grote until EMS arrived. Because Brown did not fail to respond to the situation, he was not deliberately indifferent to Grote's medical needs.

### iii.   Deputy Aaron Branstutter

Deputy Branstutter responded to the signal six medical emergency and assisted Nurse Brand while she assessed Grote. He deferred to her medical judgment in the assessment. (Video 2).

33

When EMS removed Grote from the jail, Deputy Branstutter accompanied them to the hospital. (Doc. 116-20 at 9).

A reasonable official in Branstutter's position would know that an inmate who just had a seizure would be at risk of excessive harm. *See Trozzi*, 29 F.4th at 757. Branstutter did not ignore that risk by failing to respond. He came to the cell after Brown called the medical emergency and he helped Nurse Brand as she treated Grote. Because Branstutter did not fail to respond to the situation, he was not deliberately indifferent to Grote's medical needs.

### iv.   Deputy Brian Jennings

Deputy Jennings was in the detox cell while Nurse Brand assessed Grote. He deferred to Nurse Brand's assessment and the medical team's decision to transport Grote to the hospital. (Doc. 116-17 at 46). A reasonable official in Jennings's shoes would know that a seizure would subject an inmate to excessive harm. *See Trozzi*, 29 F.4th at 757. Jennings did not ignore that risk because he knew that Nurse Brand was treating Grote. A "non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions." *Greene*, 22 F.4th at 608 (quoting *McGaw v. Sevier Cnty., Tenn.*, 715 F. App'x 495, 498 (6th Cir. 2017)) (cleaned up).

### v.   Sergeant Jason Russell

34

Sergeant Russell was the shift commander when Grote was at the jail. When he responded to the signal six medical emergency, Nurse Brand had already arrived and was assessing Grote. (Doc. 116-10 at 73). He and Nurse Brand both agreed that Grote needed a life squad, so he contacted the control board and told them to call 911. (*Id.* at 75).

A reasonable official in that position would know that Grote's condition subjected him to an excessive risk of harm. *See Trozzi*, 29 F.4th at 757. Russell did not ignore that risk or fail to act. He consulted with Nurse Brand, determined that Grote needed emergency medical services, and then arranged for EMS to come to the jail. Therefore, Russell was not deliberately indifferent to Grote's medical needs.

### vi.   Jailer Terry Carl

The claims against Jailer Carl, like those against the other jail staff defendants, are in his individual capacity. "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (citing *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) (unpublished opinion)).

Here, Carl had no unconstitutional behavior of his own. He wasn't at the jail when Grote was there and wasn't involved with Grote at all. (Doc. 116-17 at 22; Doc. 116-21 at 23). He didn't

find out what had happened until the shift commander called him at home. (Doc. 116-21 at 23–24).

Because Carl wasn't present when Grote was at the jail, Plaintiff focuses instead on his responsibility for the jail's training and policies. (Doc. 129 at 25–32). But this confuses a § 1983 individual liability claim with a municipal liability claim. *Heyerman*, 680 F.3d at 647 (citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)). If there is no evidence that an individual was personally involved in constitutional misconduct, then failure-to-train claims against that individual are treated as claims against the county. *Id.* (citing *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)).

### vii.   Kenton County

Plaintiff's last § 1983 claim is against the county itself. Because the county is a municipal entity, the first prong of the § 1983 claim—whether there was a constitutional deprivation—is analyzed under the *Monell* framework. *Simpkins*, 48 F.4th at 456. That means Plaintiff must (1) identify the challenged policy or custom, (2) connect that policy or custom to the defendant, and (3) show that the policy or custom caused the injury. *Id.*

#### A. *Monell* prong 1 — Identifying the policy or custom

To identify the policy or custom, Plaintiff claims that Kenton County had a policy of inadequate training or supervision. (Doc.

36

129 at 42-44). To show inadequate training or supervision, Plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy stemmed from the defendant's deliberate indifference; and (3) the inadequacy was closely related to or caused Grote's injury. *Ouza*, 969 F.3d at 286-87.

### 1. Kenton County's training was not inadequate for the tasks the jail staff performed.

Plaintiff doesn't identify the tasks the jail staff were expected to perform. After reciting the elements of an inadequate training or supervision theory, she says, "Because correctional officers were expected to perform these duties, the lack of training on these tasks made their training inadequate." (Doc. 129 at 41-42). But she doesn't say what "these duties" or "these tasks" were.

There are also no job descriptions for the jail staff positions anywhere in the record. What we do know is that jail personnel are required to perform medical screenings for incoming prisoners. 501 Ky. Admin. Regs. 3.090 Section 1(9). Medical screening inquiries for incoming prisoners include:

- Current health problems;
- Medications taken and special health requirements;
- Health problems designated by medical authorities;
- Behavioral observation, state of consciousness, and mental status;
- Body deformities;

- Skin and body condition;
- Dispositions and referrals of inmates to medical staff for emergencies.

*Id.* §§ (a)–(g). So the question is whether the jail staff's training was adequate to perform screening inquiries into those items.

The answer is yes. The jail's policies and procedures manual lists the items that the receiving jail deputy must cover during prisoner intake, and that list matches the items listed in the statute above. (Doc. 129-12 at 513). The last of those items—particularly relevant in this case—is referring inmates to medical staff when needed. The deputies were trained on that task because their training included recognizing signs and symptoms of health care emergencies, including substance abuse. (*Id.* at 525).

Other documents also confirm that the deputies were adequately trained to do medical screenings and prisoner intake. Deputy Brown's (the deputy who did Grote's intake) training manual included a section on initial triage and custody. (Doc. 116-26). That section instructs the deputy to ask the inmate questions listed in the triage questionnaire, including questions about medical care, substance use, and whether the inmate needs to be seen by medical staff. (*Id.*).

Finally, all the jail staff defendants confirmed that they received the training discussed above. They each signed a statement

saying they were given the jail's policy manual and were instructed to read and abide by it. (Doc. 116-28).

Therefore, the tasks the jail staff performed were prisoner intake and medical screenings, and they were adequately trained for those tasks.

### 2. Even if Kenton County's training was inadequate, that inadequacy did not result from deliberate indifference.

Assuming Plaintiff could prove that the county's training or supervision was inadequate for the tasks the jail staff performed, she must then prove that the inadequacy resulted from the county's deliberate indifference. *Ouza*, 969 F.3d at 287. She can do so by proving (1) "a pattern of similar unconstitutional violations by untrained employees" or (2) a single violation, plus a showing that the county failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation. *Morgan*, 33 F.4th at 329 (quoting *Shadrick*, 805 F.3d at 738–39) (internal quotation marks omitted).

Plaintiff has not identified any overdose deaths other than Grote's, so the first method is unavailable. Nor has she shown that any defendant violated Grote's constitutional rights, so the second is unavailable. *See id.* Thus, even if the county's training was inadequate, it did not stem from deliberate indifference.

### 3. Plaintiff offers no evidence that any inadequacy was closely related to or the cause of Grote's injury.

Plaintiff argues that the jail staff were not trained to know when to call 911 for medical emergencies. (Doc. 129 at 42). She says that this was the cause of Grote's injuries because, had they been properly trained, they would have called 911 sooner and Grote might have survived. (*Id.*). There are a couple of problems with that.

First, calling 911 for medical needs was not a task the jail staff were expected to perform. Under the jail's policies and procedures, that task belonged primarily to the medical staff. (Doc. 129-12 at 391). However, the policy also said that "nothing in this directive shall preclude any staff member from activating the 911 Emergency Medical System." (*Id.*). So, since jail staff could call 911 if necessary, there might be something to Plaintiff's argument about what the consequences might be if they weren't trained on that policy.

But then we run into the second problem: the jail staff *were* trained on that policy. Jailer Carl, Sergeant Russell, and Deputy Brown all gave consistent testimony about the 911 policy, and that testimony matched the instructions in the jail's policies and procedures. (Doc. 116-21 at 48–51; Doc. 116-10 at 71; Doc. 116-7 at 29). Plaintiff offers no evidence that the jail staff were inadequately trained on the 911 policy. And even if they were, that task did not belong to them anyway.

40

In sum, Plaintiff has not identified any Kenton County policy or custom that deprived Grote of his constitutional rights. Because Plaintiff cannot satisfy the first *Monell* prong, the Court need not address the other two prongs. Accordingly, Kenton County was not deliberately indifferent to Grote's medical needs.

### viii.   Qualified immunity

The County Defendants' last argument about Plaintiff's § 1983 claim is that, even if they did violate Grote's constitutional rights, they are protected by qualified immunity. (Doc. 116-1 at 18). That doctrine has two parts. First, do the facts show that the defendant violated a constitutional right? And second, if so, was that right clearly established? *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As explained above, the County Defendants did not violate Grote's constitutional rights. But seeing as how this argument is offered as an alternative, the Court will assume that there was a violation, and will analyze the second part.

A plaintiff who wants to show that a particular right was clearly established can do so one of two ways. One is to show that this is an "obvious case where general standards can clearly establish the answer," even without case law. *Colson v. City of Alcoa, Tenn.*, 37 F.4th 1182, 1189 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam)) (cleaned up). An obvious case is one where no reasonable official could conclude that the challenged action was constitutionally

41

permissible. *Id.* (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam)).

That method is not available here because this is not an obvious case where no reasonable official could conclude that the County Defendants' behavior was constitutionally sound.

The other method is to "identify a case that put [the official] on notice that his specific conduct was unlawful." *Id.* (quoting *Rivas-Villegas*, 142 S. Ct. at 8). This method requires the plaintiff to define the right with particularity, rather than as a general proposition. *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The plaintiff must identify a case with facts similar to his own. *Id.* (quoting *Rivas-Villegas*, 142 S. Ct. at 8).

For example, in *Colson v. City of Alcoa, Tennessee*, the plaintiff defined the right at issue as her "right to medical care for serious medical needs." 37 F.4th at 1189. The court held that that was not specific enough because it was "merely a restatement of the Fourteenth Amendment right itself[.]" *Id.* at 1190 (citing *Greene*, 22 F.4th at 605). It did not address the defendants' particular actions or the plaintiff's particular injury. *Id.*

This method is also unavailable here. Plaintiff's definition in this case is the right to "medical care and attention under the Fourteenth Amendment[.]" (Doc. 129 at 16). That sounds awfully similar to the "right to medical care for serious medical needs."

It is, perhaps even more so than the definition in *Colson*, "merely a restatement of the Fourteenth Amendment right itself." It does not address the County Defendants' particular actions or Grote's particular injuries. Thus, Plaintiff's definition is too broad and general to prove that the right is clearly established. Therefore, Plaintiff cannot overcome qualified immunity.

### 2. State law claims

In addition to her § 1983 claims, Plaintiff also brings state law claims for negligence and intentional infliction of emotional distress against both sets of defendants. The Court has supplemental jurisdiction over those claims. 28 U.S.C. § 1367. Because Defendants are entitled to summary judgment on the federal claims, the Court will exercise its discretion and dismiss those remaining state law claims. § 1367(c)(3).

### *Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) Southern Health Partners' and Caitlin Brand's Motion to Strike Opinions and Testimony of Jeffrey Keller, M.D., (Doc. 138), be, and is hereby, **GRANTED** as to any legal conclusions and **DENIED** as to the rest of the report and opinion;

(2) The County Defendants' Motion to Strike Report and Opinions of Victor Lofgreen, Ph.D., (Doc. 118), be, and is hereby, **GRANTED** as to any legal or medical conclusions and **DENIED** as to the rest of the report and opinions;

(3) Southern Health Partners' and Caitlin Brand's Motion for Summary Judgment, (Doc. 137), be, and is hereby, **GRANTED** as to Plaintiff's § 1983 claims, and

Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE;**

(4)    The County Defendants' Motion for Summary Judgment, (Doc. 116), be, and is hereby, **GRANTED** as to Plaintiff's § 1983 claims, and Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE.**

(5)    A separate judgment shall enter with this opinion.

This 23rd day of January 2023.



**Signed By:**

_**William O. Bertelsman**_

**United States District Judge**